JEFFREY F. KELLER (SBN 148005)
jfkeller@kellergrover.com
CAREY G. BEEN (SBN 240996)
cbeen@kellergrover.com
SARAH R. HOLLOWAY (SBN 254134)
sholloway@kellergrover.com
**KELLER GROVER, LLP**
1965 Market Street
San Francisco, California  94103
Tel:  (415) 543-1305 /Fax: (415) 543-7861

JOHN G. JACOBS (pending *PRO HAC VICE*)
jgjacobs@thejacobslawfirm.com
BRYAN G. KOLTON (pending *PRO HAC VICE*)
bgkolton@thejacobslawfirm.com
**JACOBS KOLTON, CHTD.**
55 West Monroe Street, Suite 2970
Chicago, Illinois 60603
Tel: (312) 427-4000 /Fax: (312) 268-2425

DAVID SCHACHMAN (pending *PRO HAC VICE*)
ds@schachmanlaw.com
**LAW OFFICES OF DAVID SCHACHMAN, P.C.**
55 West Monroe Street, Suite 2970
Chicago, Illinois 60603
Tel: (312) 427-9500 /Fax: (312) 268-2425

Attorneys for Plaintiff
BEVERLY NUNES
and the Putative Class

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

## IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEVERLY NUNES, individually and on behalf of a class of similarly situated individuals,<br><br>               Plaintiff,<br><br>    v.<br><br>TWITTER, INC.,<br><br>            Defendant. | Case No:<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

## CLASS ACTION COMPLAINT

1.      Plaintiff Beverly Nunes ("Nunes" or "Plaintiff") brings this class action complaint against Defendant Twitter, Inc. ("Twitter" or "Defendant") and alleges as follows upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## NATURE OF THE CASE

2.      Twitter is a global, public social networking and microblogging platform that allows it and its users to create, send and read (or follow) text messages (*i.e.,* "tweets") of up to 140 text characters.  Twitter's content is broadly accessible to its users and unregistered visitors, and use of its services to create, send, follow and read tweets is, subject to some exceptions, free.

3.      To generate revenue, Twitter relies almost exclusively on advertising services.  As part of its services, Twitter collects and stores user data, including user cellular telephone numbers, for the purpose of sending automated *en masse* text messages on its and Twitter users' behalf.  Twitter sends messages directly to users' Twitter accounts and/or mobile devices, often in the form of Short Message Service ("SMS") text messages, the text messaging service component of mobile telephones.  In 2013, over 70% of Twitter's advertising revenue was generated from mobile devices.

4.      The Telephone Consumer Protection Act ("TCPA), 47 U.S.C. § 227, *et seq.* and its implementing regulations, 47 C.F.R. §64.1200, *et seq.* prohibit companies, such as Twitter, from sending automated SMS text messages to mobile telephones without first obtaining consent.  Twitter has violated, and continues to violate, the TCPA and its regulations by sending automated SMS text messages to cellular telephone subscribers (a) who had recycled (or reassigned) cellular telephone numbers who have not expressly consented to receiving such messages and/or (b) who have expressly requested *not* to receive such messages.

5.      By sending such SMS text messages to consumers, Twitter has caused consumers actual harm, including the aggravation and privacy invasion that accompanies receiving unsolicited text messages.  Moreover, consumers are damaged by having to pay cellular telephone service providers for the receipt of Twitter's unsolicited text messages.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

6.    Plaintiff brings this suit under the TCPA on behalf of herself and a class of similarly situated persons.  Plaintiff and the classes seek injunctive relief and an award of statutory damages, together with costs and reasonable attorney's fees.

## PARTIES

7.    Nunes is a citizen of Taunton, Massachusetts.

8.    Twitter is a public, online social networking and microblogging platform that allows it and its users to create, send and receive text messages.  Twitter, one of the most sophisticated technology companies in the world, is a Delaware corporation with its principal place of business in San Francisco, California.  Twitter does business throughout the U.S. and California, including San Francisco County.  Twitter's website is www.twitter.com.  Twitter sends SMS text messages to consumers using its licensed SMS short code number: 40404.

## JURISDICTION

9.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is an action arising under the laws of the United States and also pursuant to 28 U.S.C. § 1332(d), because (a) at least one member of the putative class is a citizen of a state different from Defendant; (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) none of the exceptions under that subsection apply to this action.

## VENUE

10.    Venue is proper in this district under 28 U.S.C. § 1391(b) and (c).

## FACTS

11.    In recent years, marketers, who have often felt stymied by federal or state laws limiting solicitations, have looked to alternative technologies through which to send bulk solicitations cheaply.  One of the newest types of bulk marketing is through SMS.  SMS allows marketers to send (and receive) short text messages, usually limited to 160 characters, to (and from) cellular telephone subscriber's cellular telephone devices.

12.    A SMS message is directed to a wireless device through use of the device's assigned telephone number.  The message sender's telephone number is preserved as part of the recipient's message, so that the recipient knows, at least by number, who is sending the message.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

When a SMS message is successful, the recipient's cellular phone typically rings, alerting him or her that the phone is receiving a text message. As cellular telephones are inherently mobile and are frequently carried on their owner's person, calls to cellular telephones, including SMS messages, may be received by the called party virtually anywhere worldwide.

13. The use of SMS messaging (known colloquially as "text messaging") has become ever-present in the United States. According to CTIA-The Wireless Association® ("CTIA"), as of December 2012, there were 326.4 million U.S. cellular telephone subscriptions and approximately 2.19 trillion text messages sent annually (171.3 billion sent monthly).

14. Marketers have seized on this billion-dollar industry as a vast marketing and exposure opportunity. Using SMS technology, companies and individuals can now extend the promotional reach of their products, brands, services and ideas to potentially millions of consumers, almost instantaneously. And, with SMS technology, marketers know with near certainty that their message is received. According to Juniper Research, which specializes in high growth mobile market sectors, *97%* of SMS text messages are ultimately read by the cellular subscriber, and *90%* are read within the first four to six minutes of delivery.

15. Many companies, including Twitter, use automated computer equipment to send bulk SMS text messages to cellular telephone subscribers using a unique five or six digit number called "short code," as opposed to using an ordinary ten-digit telephone number. U.S. companies obtain short code numbers from an independent agency, Neustar, Inc. ("Neustar"), which manages and assigns U.S. short code numbers on behalf of cellular network operators. Companies typically lease short code numbers in order to run automated mobile text messaging applications. Twitter obtained its short code directly from Neustar for this purpose.

16. Unlike more conventional solicitations, SMS text messages actually cost its recipients money. Cellular telephone users must pay their respective wireless service providers to receive text messages, either individually or as part of a specified (and often limited) plan, regardless of whether or not the incoming message is authorized.

///

///

**A.    Twitter's SMS Text Messages**

17.    Twitter is an online public platform and micro-blogging service that allows users to create and read text messages – "tweets" – of up to 140 text characters.  Users can read and post tweets and follow the accounts and tweets of other users.  Users access Twitter through its website interface, SMS or a mobile device application.  Twitter does not charge to use its tweeting services (although advertisers can choose to purchase advertising services to reach a broader audience to promote their brands, products and services), and Twitter imposes no restrictions on the number of user tweets or the number of accounts a user can follow.  Twitter's systems are capable of delivering billions of short messages to hundreds of millions of people a day. According to its 2013 Form 10-K, filed with the U.S. Securities and Exchange Commission, Twitter has millions of users who create approximately 500 million tweets every day.

18.    Mobile devices, such as cellular phones, have become the primary driver of Twitter's business.  Twitter estimates that 76% of its users are on mobile devices.  In many countries, including the United States, Twitter users can register, follow accounts, receive notifications and send tweets entirely through SMS messaging.  In the United States, users communicate with Twitter through its short code number: 40404.

19.    Because Twitter does not generate revenue directly from its users, the substantial majority of its revenue comes from advertising services.  Twitter competes against other online and mobile businesses and traditional media outlets, such as television, radio and print, for spending on advertising.  Twitter's ability to compete effectively for advertiser spend depends upon many factors, including the size and composition of its user base, its ad targeting capabilities, the timing and market acceptance of its advertising services, its marketing and selling efforts, the return its advertisers receive from its advertising services, and its reputation and the strength of its brand.  As part of its services, Twitter collects and stores personal user information, including cellular telephone numbers, and, then, uses that information to send tweets, including automated text messages, on behalf of it and Twitter users at a low cost.  Twitter's ability to dial and send automated text messages (without human intervention), partnered with its ever-increasing user database, makes it a valuable resource for commercial and individual mobile

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

marketers. In 2013, Twitter estimated that nearly 90% of its total revenue came from advertising, over 70% of which was generated from mobile devices.

20.     The substantial majority of Twitter's advertising revenue is generated on a pay-for-performance basis, which means advertisers are only charged when a user engages with their ad.  In other words, Twitter is paid based on the volume of activity of people using its platform: when someone follows a Promoted Account (an advertisement that invites targeted Twitter users to follow a brand's account), clicks on a Promoted Trend (an ad that appears at the top of Twitters' list of "trending topics") or engages with someone else's Promoted Tweet (a Tweet purchased by advertisers who want to reach a wider group of users or to spark engagement from their existing followers) by clicking on the Promoted Tweet, retweeting (forwarding or reposting) it, replying to it, or marking it as a favorite, Twitter profits.

21.     Twitter's messages typically appear on a user's Twitter account, regardless of the device used.  Twitter users may also receive message notifications via e-mail, SMS text message or mobile push notifications (*i.e.*, alerts sent to the mobile device home screen).  In the case of SMS text messages, the messages are received by consumers' cellular telephones as a text message from Twitter's SMS short code, 40404.

22.     Often times, Twitter's SMS text messages do not identify Twitter by "name" as the message sender, even though the message is, in fact, sent by it using its short code number. Rather, they often identify the sender by the underlying advertiser's self-selected Twitter user name, such as "@swagpoilercode" or "@dayzdevteam."

23.     Twitter's SMS text messaging system connects to all U.S. mobile phone carriers' networks with virtual private network ("VPN") tunnels over what is called a Short Message Peer-to-Peer ("SMPP") bind.  SMPP is a standard communication protocol used by organizations, such as Twitter, needing to send vast amounts of SMS messages nearly simultaneously (i.e., high volume bulk text messaging), at very high speeds (i.e., hundreds or thousands of messages per second).  Indeed, in 2010, Twitter stated its desire to "become one of the highest volume SMS programs in the world—Twitter processes close to a billion SMS tweets per month and that number is growing around the world from Indonesia to Australia, the UK, the US, and beyond."

1  To this end, to help grow and scale its SMS service, Twitter "announce[d] the acquisition of

2  Cloudhopper, a messaging infrastructure company that enables Twitter to connect directly to

3  mobile carrier networks in countries all over the planet."

4       24.     Pursuant to the TCPA, a company must obtain consent before sending automated

5  SMS text messages to a cellular telephone.  *See* 47 U.S.C. § 227, *et seq*.  In many instances,

6  Twitter's SMS text messages sent to consumers' cellular telephones violate the TCPA because (1)

7  the telephone owner did not consent to receiving the SMS text messages (i.e., the consent, if it

8  was obtained at all, was obtained from the prior owner of that telephone number) and/or (2) the

9  current cellular telephone owner has expressly requested not to receive such text messages.

10      **B.     Twitter's Unauthorized Text Messages Sent to Recycled Numbers**

11      25.     While some Twitter users may elect to receive SMS text notifications, anyone in

12 the U.S. can receive unsolicited text messages from Twitter on their cellular phone ***even if they***

13 ***do not have a Twitter account***.  Thus, as with Plaintiff, Twitter sends automated SMS text

14 messages to owners of recycled cellular numbers (many of whom do not even have a Twitter

15 account) who have not consented to receiving such text messages.  For various reasons, cellular

16 telephone subscribers deactivate and relinquish their cellular telephone numbers.  Once

17 deactivated, the cellular telephone carrier reassigns the number to another subscriber – a practice

18 known as "recycling."  Recycling times (*i.e.*, the time between deactivation and reassignment)

19 vary across carriers, generally ranging from 30 days to six months depending on location and

20 demand.  During the recycling period, the cellular telephone number is considered disconnected.

21      26.     In some instances, the prior owner of a recycled telephone number may have

22 consented to receiving Twitter's SMS messages.  But, even if the prior owner consented, that

23 consent ***does not transfer*** to the new recycled cellular number's owner.  Ultimately, new owners

24 of recycled cellular numbers are given ***no choice*** in receiving (and paying for) Twitter's

25 unsolicited text messages.

26      27.     The mobile marketing industry is acutely aware of cellular number recycling and,

27 in particular, the risk associated with sending text messages to non-consenting recycled numbers.

28 To help mobile marketers navigate regulatory compliance, the Mobile Marketing Association

**KELLER GROVER LLP**
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

("MMA") publishes specific guidelines based on accepted industry practices for all mobile marketers. In its October 2012 U.S. Consumer Best Practices for Messaging, the MMA recommends that mobile marketers, such as Twitter, "have appropriate and effective systems and processes for *managing deactivation and recycled number information*. These systems and processes should be designed to ensure that mobile content programs subscribed to by previous holders of a specific phone number *do not continue to be delivered or billed to a subsequent holder* of that number when it is reassigned." The MMA further advises mobile marketers to "process deactivation information within three business days of receipt."[1]

28. In response to the liability risk associated with recycled numbers, numerous commercially available services exist to help mobile marketers, such as Twitter, identify recycled numbers and non-consenting cellular subscribers. For instance, companies such as Infutor, Nextmark List and Contact Center Compliance advertise their ability to instantly identify and flag disconnected telephone numbers from cellular telephone number data lists on a recurring basis (such as weekly or monthly). This type of service can identify disconnected numbers before they are recycled, thereby alerting mobile marketers that any consent associated with those telephone numbers has been terminated.

29. Similarly, Neustar (from which Twitter received its short code number) advertises its ability to identify non-consenting cellular numbers and subscribers in real time to help mitigate TCPA non-compliance risk. Specifically, Neustar can "clean" a company's telephone database by identifying telephone number ownership and porting history (e.g. numbers switched from one cellular carrier to another) in real time and, then, comparing those results to the company's list of consenting subscribers to identify mismatches. According to Becky Burr (Neustar Deputy General Counsel and Chief Privacy Officer and former FTC Attorney-Advisor), Neustar's TCPA compliance services "use continuously updated and highly accurate phone data that gets updated

---

[1] The MMA is a global authoritative trade organization that issues codes of conduct, best practices, guidelines, rules and instructions for all companies engaged in mobile marketing. Its U.S. Consumer Best Practices for Messaging are based on accepted industry practices, common wireless carrier policies and regulatory guidance. With over 800 members, the MMA is the preeminent source for mobile marketing information and expertise.

**KELLER GROVER LLP**
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

multiple times per minute to tell you instantly . . . whether the subscriber name that you have matches." Such services are important because, as Burr notes, "if they gave you consent to call a number that they instantly change, **you don't have consent to call the current subscriber to that number**."[2]

30.     Despite industry guidelines, commercially available resources and the obvious lack of consent associated with recycled numbers, Twitter fails to take the necessary steps to insure that its automated text messages are sent **only** to consenting recipients, nor does it have incentive to do so. Twitter is paid based on the volume of activity of people using its platform. The more SMS text messages Twitter sends (authorized or not), the more people who may participate in Twitter and engage in its advertisements, generating more money for Twitter. Twitter also benefits from network effects where more activity on Twitter results in the creation and distribution of more content (i.e., Twitter has been one of the most-visited websites on the internet), which attracts more users, platform partners and advertisers, resulting in a cycle of value creation. According to Twitter, Tweets have appeared on over eight million third-party websites, and in the fourth quarter of 2013 there were approximately 67 billion online impressions of Tweets off of Twitter's properties.

31.     To that end, Twitter simply treats the new recycled cellular telephone number owner as if he or she were the previous owner. If the previous owner gave consent to receive Twitter's text messages, Twitter continues to treat that consent as the consent of the new (unassociated) owner. New owners are then forced to incur the cost and bother of receiving Twitter's unauthorized text messages. Notably, new owners are provided no explicit means to contact Twitter to make the messages stop. Sometimes, the messages do not even identify

---

[2] As FTC Attorney-Advisor, Burr was responsible for competition and consumer protection policy in connection with information industry/electronic information infrastructure and participated in developing the FTC's approach to competition and consumer protection in the digital marketplace. Prior to the FTC, Burr held the positions of Senior Internet Policy Advisor and Associate Administrator and Director of International Affairs at the National Telecommunications and Information Administration ("NTIA"). There, Burr was responsible for domestic and international policy related to Internet and information technology.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

"Twitter" as the sender, and consumers, having no prior relationship with Twitter, may be completely unaware that the messages are coming from Twitter.  If the telephone number is associated with an online Twitter account, the new cellular subscriber has no way of accessing that account to opt out of receiving Twitter's text messages.  And, as evidenced below, Twitter often disregards consumers' reply message "stop" requests.

32.     Twitter knows, or is reckless in not knowing, that its SMS text messages are sent to non-consenting, recycled cellular number subscribers.  Indeed, Twitter has received numerous consumer complaints alerting it to this very fact and requesting that the messages stop.  Ultimately, Twitter is responsible for verifying cellular telephone number ownership and obtaining consent *before* sending automated text messages to cellular telephone subscribers.  Even with prior cellular subscriber consent, Twitter is liable under the TCPA for sending text messages to cellular numbers reassigned to new subscribers *without the new subscriber's consent*.  *See Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 641 (7th Cir. 2012) (under the TCPA, "[c]onsent to call a given number *must come from its current subscriber*," not its prior subscriber); *Breslow v. Wells Fargo*, 2014 WL 2565984 (11th Cir. 2014) (consent from "called party" means consent from the person subscribing to the called number at the time the call was made, not the former subscriber); *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, ¶ 123, 18 FCC Rcd.  14014, 2003 WL 21517853 (2003) ("we reject proposals to create a good faith exception for inadvertent autodialed or prerecorded calls to wireless numbers…").

33.     Given the multitude of readily available commercially feasible resources to identify such consumers, Twitter had ready means to identify those consumers or obtain their consent before sending automated SMS text messages.

**C.     Twitter's Unauthorized Text Messages Sent to Stop-Request Recipients**

34.     Twitter also sends unauthorized SMS text messages to cellular subscribers who have expressly "opted-out" or requested *not* to receive its text messages.  Notably, many of these cellular subscribers did not consent to receiving Twitter's SMS messages in the first place.  But, even with prior consent, Twitter is required to honor each stop-request as a termination of any

prior consent.  Accordingly, any SMS text message (other than a final one-time confirmation text message confirming the recipient's desire to not receive such messages) sent to a cellular subscriber *after* receiving an express stop request is done without prior express consent.

35.    Industry best practices for processing and honoring stop requests are well documented.  According to the MMA's 2012 U.S. Consumer Best Practices for Messaging, "[a] subscriber must be able to stop participating and receiving messages from any program by sending **STOP** to the short code used for that program. . . END, CANCEL, UNSUBSCRIBE or QUIT should also be opt-out key words for all programs; however content providers should feature the word STOP in their advertising and messaging. . .  When sent, *these words cancel the subscriber's previous opt-in for messaging*."  Further, "[t]he content provider must record and store all opt-out transactions."

36.    CTIA similarly advises that "[s]hortcode programs must respond to, at a minimum, the universal keywords STOP, END, CANCEL, UNSUBSCRIBE, and QUIT . . . and, if the user is subscribed, by opting the user out of the program."  Further, "[r]ecurring programs must promote opt-out instructions at regular intervals in content or service messages, at least once per month," and "[u]sers must be able to opt out at any time." *See* CTIA Compliance Assurance Solution Mobile Commerce Compliance Handbook, Version 1.2, effective August 1, 2013.[3]

37.    Again, Twitter simply ignores these accepted industry guidelines.  Instead, Twitter makes it notoriously difficult for consumers to opt-out or unsubscribe to its SMS text messages.  For instance, according to Twitter, the commands "STOP," "QUIT," "END," "CANCEL," "UNSUBSCRIBE" and "ARRET" (when replying to SMS messages) will deactivate your account *only if* you are an SMS-only user, that is, a user who does not have an online Twitter account but has previously communicated with Twitter via SMS text.  If the cellular number is linked to an online Twitter account, the command "OFF" must be used to stop

---

[3] The CTIA is an international non-profit organization that audits and enforces the rules surrounding carrier-based text messaging programs.  Together, the MMA and the CTIA establish and publish guidelines setting forth accepted industry best practices for mobile marketing.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

SMS spam.  Ultimately, consumers (many of whom are unaware that the messages are from Twitter) must be well-versed in Twitter's SMS commands to effectively communicate a stop-request and, even then, the outcome is uncertain.

38.     Despite receiving numerous express stop requests from cellular subscribers, Twitter continues to send automated text messages to these subscribers, sometimes for months afterwards. Even worse, according to consumer complaints, in many instances, Twitter's text messages actually *increase* after receiving a stop request.  And, often times, consumers receiving Twitter's SMS text messages are limited to a "reply" message stop request, which Twitter often ignores.

39.     Twitter knows, or is reckless in not knowing, that its SMS text messages to these cellular subscribers are unauthorized.  Reply message stop requests are, by design, sent to Twitter's short code, 40404, thereby directly informing Twitter (as intended) that any subsequent messages are unauthorized.  Again, however, Twitter has little incentive to honor stop requests. With nearly all of its revenue coming from advertising associated with the volume of activity on its system, each stop request is a loss of potential recurring revenue.  Ultimately, consumers are forced to bear the costs of receiving these unsolicited and unauthorized text messages.

40.     The following sample of consumer complaints regarding unauthorized texts from "40404" evidences Twitter's practice of disregarding recycled numbers and STOP requests and blatantly sending text messages to non-consenting (and often non-Twitter member) cellular telephone owners:

- "**I got new cellphone.** Yep the text messages are here again.  I tried **STOP**. Doesn't work. I've had to have this carrier cancel all text service." (Nanyjan, 8/7/13);

- "**I just got a new phone 2 weeks ago and began receiving unsolicited messages from 40404 – 2-3 times a day**. I have typed **STOP** and **UNSUBSCRIBE** everyday [sic], with no reply and an increase in messages from them." (Bocablues, 8/28/13);

- "I have tried several times by replying **stop**. I still am receiving messages. **I just got my phone** and have never done anything on it to subscribe to receiving messages." (Sarah, 6/5/13);

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP

1965 Market Street, San Francisco, CA 94103

Tel. 415.543.1305 | Fax 415.543.7861

- "[T]hese people kept sending my [sic] dirty and inappropriate text. **I don't even have a twitter [account]**." (Lily, 2/16/13);

- **Simply replying w/ "STOP" did not work** and only seemed to exacerbate the issue. I am now getting about 30 texts a day from 404-04." (Jay, 9/14/12);

- "Im [sic] tired of this **i dont [sic] even have a twiter [sic] [account]**" (Priscilla, 8/23/12);

- "**I tried to text the word stop several times and it did not work**….. still getting 20-30 messages since then…. dont [sic] know who this is sending these… wish it would stop….. what can i do now??????" (Sunshine, 6/12/12);

- "I keep receiving texts from 40404 and **have asked them repeatedly to stop** by replying to the texts as well as emails." (Cassidy, 3/11/12);

- "Have received several messages from this number. **I have never had a** facebook, myspace, or **twitter account**, so this is quite perplexing." (Txtree, 2/26/12);

- "I have a Family Talk account, through Walmart. Messages from 404-04 coming at all hours, and waking me up! **This number is not attached to a Twitter or FB account.** How do I make this stop? It says I cannot reply to this number, sending failed message appears.  Reply **STOP** will not work." (Tracie, 12/23/11);

- "**I reply many times to the company to stop this but they did not do this**. I don't know why. Plz [sic] stop this because this is very crazy. I recived [sic] 50 msgs daily, which disturb me while I am working in office." (Khalil, 12/22/11);

- "Receiving massive amounts of inappropriate texts from this number at all times of the day. [**H**]**ave texted back STOP and they still keep coming in**. THIS NEEDS TO STOP!" (Angela, 11/27/11);

- "Please make them stop texting me. I am receiving so many and it is very frustrating. **The more I say stop the more they text**" (iChattwo, 7/27/11);

- "Started getting msg about random junk 3 days ago, **do not have a twitter account** just getting bombed on text msg. Have these people nothing better to do??!!!!!" (Hdc, 7/15/11);

- "**I recently changed my phone number** and ever since then, I have been getting texts from 40404.  I have **replied several times**, saying they

have a wrong number and asking them to stop texting me, but it doesn't work…" (Gretch, 6/30/11);

- "I got 15 messages in 2 days **right after I opened my account with Veerozon [sic]**, As a matter of fact, I got eight 404-04, before I got my welcome message from Verizon!" (PlatosPond, 6/11/11);

- "**I sent message asking them to stop** and they just had a field day with that and sent more texts." (Holly, 1/25/11);

- "Stop texting me from this number. **I have contacted this company many times to stop** but they persist in using up my limited text service." (Egertone, 12/6/10);

- "I keep receiving 2-3 text a day about LED lights for sale **some how [sic] they are doing this through twitter and it is beginning to be harassment!!**" (Curt, 7/9/10).

**D.    Plaintiff's Experience**

41.    In or around November 2013, Plaintiff obtained a new cellular telephone number from MetroPCS. Almost immediately after obtaining her new cell phone number, Plaintiff began receiving impersonal, promotional text messages several times per day.  The messages were identified cryptically from "40404," which Plaintiff later learned was Twitter's SMS short code.

42.    An example of one message that Plaintiff received (repeatedly) is as follows:

There's a new Swagcode out!  It's worth 6 SBs and expires at [a certain time of day] PST. Please visit http://t.co/Tm07XLMK6U.

The "from" field of this particular message was identified as "@swagspoilercode."

43.    Plaintiff received a similar message from @swagspoilercode on March 13, 2014 at 10:00 p.m., as follows:

There's a new US/CA-only SwagCode out! It's worth 3 SBs and expires at 6:30 PM PDT. Please visit http://t.co/Tm07XLMK6U.

The nearly identical text messages that Plaintiff received, encouraging her to earn "swag bucks" (i.e., virtual currency that can be redeemed for valuable rewards, including gift cards to online and offline retailers), were sent for telemarketing purposes. Plaintiff also received similar

KELLER GROVER LLP

1965 Market Street, San Francisco, CA 94103

Tel. 415.543.1305 | Fax 415.543.7861

impersonal, promotional messages from "@dayzdevteam," that were sent for the purpose of encouraging the purchase of, and participation in, the "DayZ" survival horror video game.

44.     Like the complaints set forth above, the text messages Plaintiff received were generic, impersonal and commercial in nature, indicating that they were sent *en masse* to a group of consumers.  The SMS short code number for all of the unauthorized text messages that Plaintiff received was 40404 – Twitter's short code.  A sampling of the unauthorized text messages Plaintiff received from Twitter are depicted in Exhibit A, attached hereto.

45.     On at least two occasions in or around December 2013, Plaintiff, using the "reply" function for her SMS text messages, responded to 40404 alerting Twitter that its messages were unauthorized and requesting that the messages stop.  Plaintiff expressly used the word "STOP" in her text message responses to Twitter.  Despite her explicit stop requests, Plaintiff continues to receive unauthorized text messages from Twitter, as many as four to six messages per day, at all hours of the day and night, including many before the hour of 8 a.m. or after 9 p.m. local time.

46.     At no time did Plaintiff give prior express consent to Twitter to receive SMS text messages from it, let alone consent to receive autodialed telemarketing messages. Plaintiff has never had a Twitter account, has never used or followed Twitter and has no pre-existing relationship with either Twitter or the advertisers for the text messages she received.

## CLASS ALLEGATIONS

47.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(b) on behalf of herself and the following Class:

> All persons in the United States who: (a) within four years prior to the filing of this lawsuit, had a recycled cellular telephone number and were sent one or more text message to their recycled number from Twitter's short code (40404) without that person's prior express consent; and/or (b) after making an express request to Twitter not to receive text messages, were nonetheless sent one or more such messages from Twitter's short code (40404), other than a final one-time confirmation text message confirming the recipient's desire to not receive such messages, within four years prior to the filing of this lawsuit.

48.     Excluded from the Class are Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors, and any court to whom this case is assigned and its staff.  Plaintiff reserves the right to amend the

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

### A.    Numerosity

49.    The Class consists of hundreds, if not thousands, of individuals and other entities who are geographically dispersed making joinder impractical, in satisfaction of Rule 23(a)(1) of the Federal Rules of Civil Procedure.  The exact size of the Class, and the identities of the individual members of it are ascertainable through Defendant's and third parties' records, including but not limited to Twitter's SMS transaction records.

### B.    Typicality

50.    Plaintiff's claims are typical of the claims of the Class.  Plaintiff was sent unauthorized text messages from Twitter to her recycled telephone number; and was sent unauthorized text messages from Twitter after expressly requesting not to be sent such messages. Plaintiff's claims and the claims of the Class are based on the same legal theories and arise from the same unlawful and willful conduct, resulting in the same injury to Plaintiff and members of the Class.

51.    The Class has a well-defined community of interest.  Defendant has acted and failed to act on grounds generally applicable to Plaintiff and members of the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward respective Class members.

### C.    Commonality and Predominance

52.    Questions of law and fact common to Plaintiff's and respective Class members' claims predominate over any questions that may affect only individual members within the meaning of Rules 23(a)(2) and 23(b)(2) of the Federal Rules of Civil Procedure.

53.    Common questions of law and fact affecting the Class include, but are not limited to, the following:

a.    Whether Defendant sent text messages to the Class without obtaining their prior express consent;

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

b.  Whether Defendant made text calls to the Class using an automatic telephone dialing system and/or autodialer and/or an artificial or prerecorded voice;

c.  Whether Defendant's conduct violates 47 U.S.C. § 227(b)(1)(A);

d.  Whether Defendant's conduct violates 47 C.F.R. § 64.1200(a)(1).

e.  Whether Plaintiff and the Class members are entitled to damages, costs and/or attorney's fees from Defendant;

f.  Whether Plaintiff and Class members are entitled to increased damages (equal to not more than 3 times the amount of damages) based on the willfulness of Defendant's conduct; and

g.  Whether Plaintiff and Class members are entitled to a permanent injunction enjoining Defendant from continuing to engage in its unlawful conduct.

**D.  Adequacy**

54.  Plaintiff will fairly and adequately represent and protect the interests of the respective Class members.  Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions.  Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the respective Class members, and have the financial resources to do so.  Neither Plaintiff nor her counsel has any interest adverse to those of the respective Class or members.

**E.  Superiority**

55.  Plaintiff and Class members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class members' claims, it is likely that few members could afford to seek legal redress for Defendant's misconduct.  Thus, absent a class action, Class members will continue to incur damages, and Defendant's misconduct will continue without remedy.  Class treatment of common

1    questions of law and fact is also superior to multiple individual actions or piecemeal litigation in

2    that it conserves the court's and litigants' resources, and promotes consistency and efficiency of

3    adjudication.

### FIRST CAUSE OF ACTION
**(Violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)(A) and
Implementing Regulations, 47 C.F.R. § 64.1200(a)(1),
On Behalf of Plaintiff and the Class)**

7    56.    Plaintiff incorporates by reference the foregoing allegations as fully set forth

8    herein.

9    57.    The TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), makes it "unlawful for any person

10   within the United States... to make any call (other than a call made for emergency purposes or

11   made with the prior express consent of the called party) using any automatic telephone dialing

12   system or an artificial or prerecorded voice... to any telephone number assigned to a... cellular

13   telephone."

14   58.    The TCPA's implementing regulation, 47 C.F.R. § 64.1200(a)(1), further provides

15   that "[n]o person or entity may . . . initiate any telephone call (other than a call made for

16   emergency purposes or is made with the prior express consent of the called party) using an

17   automatic telephone dialing system or an artificial or prerecorded voice . . . [t]o any telephone

18   number assigned to a . . . cellular telephone."   A text message is a "call" within the meaning of

19   the TCPA. *See Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 952 (9th Cir.2009)

20   59.    Defendant violated both 47 U.S.C. § 227(b)(1)(A)(iii) and its implementing

21   regulation, 47 C.F.R. § 64.1200(a)(1).   Defendant made or initiated, or caused to be made or

22   initiated, unauthorized text calls to Plaintiff and members of the Class using an automatic

23   telephone dialing system ("ATDS") and/or autodialer, within the meaning of 47 U.S.C. § 227(a)

24   and 47 C.F.R. § 64.1200(f)(2).   An ATDS includes equipment that has "the capacity to store or

25   produce numbers and dial those numbers at random, in sequential order, or ***from a database of***

26   ***numbers***." *See In the Matter of Rules & Regulations Implementing the Telephone Consumer*

27   *Protection Act of 1991*, 2003 WL 21517853, 18 F.C.C.R. 14014 ¶ 131 (FCC July 3, 2003)

28   (emphasis added) (noting that the basic function of an ATDS is "the capacity to dial numbers

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

without human intervention" and that excluding from the definition of an ATDS various autodialing equipment "simply because it relies on a given set of numbers would lead to an unintended result," and that "the purpose of the requirement that equipment have 'the capacity to store or produce telephone numbers to be called' is to ensure that the prohibition on autodialed calls not be circumvented"); *In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 2008 WL 65485, 23 F.C.C.R. 559 ¶ 12 (FCC Jan 4, 2008) (rejecting argument that "[equipment] meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists"); *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 F.C.C. Rcd 15391, 15392 n.5 (FCC 2012) (ATDS includes any equipment "that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists").

60.     Defendant's equipment has the capacity to, and did in fact, store and dial Plaintiff's and the Class' telephone numbers from its database without human intervention. When someone signs up for a new Twitter account using SMS by texting the word START to short code 40404 from their cell phone, or when someone texts the word FOLLOW [username] to short code 40404 to "fast follow" another Twitter user without signing up for an account, Twitter's system automatically captures their cell phone number and stores it in its database. Similarly, when someone signs up for a new Twitter account using the internet and provides their cell phone number, or when a Twitter user logs into their account and adds their cell phone number to their account, Twitter's system automatically imports the number and stores it in its database. Moreover, Twitter's system has, on information and belief, an automated routing engine that receives and distributes Tweets, determines the Tweet endpoint (i.e., a mobile application, e-mail, SMS, the web, etc.), automatically applies rules to the message to determine the actual destination endpoint, translates the message as appropriate for each endpoint, and sends the message to the appropriate transmission engine for transmission to the appropriate recipients. In the case of tweets destined for SMS delivery, the messages are automatically placed in a message queue and subsequently routed through, and read by, a collection of servers and computers which

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

then communicate with the mobile phone carriers' computers and servers, resulting in the SMS text messages being delivered (all without human intervention) to the cellular telephone associated with the stored cell phone number identified by Twitter's system.

61.     In addition to autodialing phone numbers from its database, the equipment Defendant used also has the *capacity* to produce[4] telephone numbers to be called, using a random or sequential number generator, and to dial such numbers.  On information and belief, Twitter's systems are built atop open source software and technologies (including MySQL, Ruby on Rails, OpenJDK (JVM), Netty, Apache Lucene, Apache Thrift, Apache Hadoop and Redis, etc.) that utilize programming language (Java, C, C++, Scala, JavaScript, Ruby etc.) that are all capable of generating telephone numbers, using a random or sequential number generator.  For instance, Scala is one of the main application programming languages used at Twitter and much of its infrastructure is written in Scala.  Scala's programming command "Random()" provides the functionality of a "random number generator" capable of producing random phone numbers.  Similarly, MySQL, written in C and C++, is the persistent storage technology behind most Twitter data (timelines, user data and the Tweets themselves).  MySQL's "Rand()" function can be used to generate random telephone numbers.  Likewise, Netty is an open source Java non-blocking I/O ("NIO") framework that makes it easier to create high-performing protocol servers.  Twitter sends billions of SMS messages every month to hundreds of mobile carriers all around the world using Netty.  Netty's Java functionality similarly includes a "random number generator" that has the capacity to produce random telephone numbers to be called.

62.     By using such equipment, Defendant was able to make thousands upon thousands of text calls to consumers automatically without human intervention.  These calls were made *en masse* and without the prior consent of Plaintiff and members of the Class.

---

[4] "The statutory definition contemplates autodialing equipment that <u>either</u> stores <u>or</u> produces numbers" and the equipment need only have the "*capacity* to store or produce telephone numbers." *See In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 2003 WL 21517853, 18 F.C.C.R. 14115 (FCC July 3, 2003)  (Italics in original) (underlining added).  The statutory phrase "using a random or sequential number generator" modifies only the last antecedent "produce telephone numbers" and not the word "to store," as it makes no sense to say that one could "store" numbers using a number generator.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

63.     In addition, and alternatively, Defendant's unauthorized text calls to Plaintiff and members of the Class were made using "an artificial or prerecorded voice" within the meaning of 47 U.S.C. § 227(b)(1)(A) and 47 C.F.R. § 64.1200(a)(1).   The term "voice" is not limited to verbal communications, and includes written expressions.   *See, e.g., Dictionary.com*, http://dictionary.reference.com/browse/voice (last visited June 11, 2014) (defining "voice" as, among other things, "expression in spoken or written words, or by other means"); Collins English Dictionary,   http://www.collinsdictionary.com/ dictionary/ english/voice (defining "voice" to include "written or spoken expression") (last visited June 12, 2014). The adjective "artificial" includes communications "produced by man" that are "not occurring naturally."   Collins English Dictionary,   http://www.collinsdictionary.com/dictionary/ english/ artificial (last visited June 12, 2014). The adjective "prerecorded" includes communications "containing previously recorded information." *Dictionary.com*, http:// dictionary.reference.com/browse/voice (last visited June 12, 2014).   Text messages, such as the text messages here, that are not sent contemporaneously at the time they are drafted constitute an "artificial or prerecorded voice" since they are written expressions, not naturally occurring that contain previously recorded information.     On information and belief, all Twitter messages, after they are created, are first stored in a "message queue" before being delivered via SMS.

64.     As a result of Defendant's unlawful conduct, Plaintiff and members of the Class have suffered actual damages and, under section 227(b)(3)(B), are each entitled, *inter alia,* to receive a minimum of $500.00 in damages for each such violation of the TCPA and its implementing regulation.

65.     To the extent that Defendant's misconduct is determined to be willful and knowing, the Court should, pursuant to section 227(b)(3), increase the amount of damages recoverable by the Class members in accordance with the said statutory provisions.

///

///

///

///

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class, request the following relief:

1.     That the Court enter an order certifying the Class and appointing Plaintiff as the representative of the Class and appointing counsel for Plaintiff as lead counsel for the Class;

2.     That the Court enter an order declaring that Defendant's actions, as set forth above, violated the TCPA, 47 U.S.C. §§ 227(b) and its implementing regulations;

3.     That the Court enter judgment against Defendant for statutory damages and, if its conduct is proved willful, award Plaintiff and the Class increased damages equal to no more than three times their damages;

4.     That the Court award Plaintiff and the Class their costs and expenses, as well as reasonable attorneys' fees, in prosecuting this action;

5.     That the Court award Plaintiff and the Class post-judgment interest;

6.     That the Court issue an injunction prohibiting Defendant from continuing its conduct complained of herein; and

7.     That the Court award such other and further relief as may be necessary or appropriate.


Dated:  June 19, 2014                          **KELLER GROVER LLP**


                                               By:  /s/ *Jeffrey F. Keller*
                                                    _____
                                                    JEFFREY F. KELLER

                                                    *Counsel for Plaintiff*
                                                    BEVERLY NUNES
                                                    and the Putative Class

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**JURY DEMAND**

Plaintiff demands trial by jury on all counts for which a jury trial is permitted.

Dated:  June 19, 2014                              **KELLER GROVER LLP**


By:   /s/ *Jeffrey F. Keller*
       JEFFREY F. KELLER

*Counsel for Plaintiff*
BEVERLY NUNES
and the Putative Class