1  DAVID H. KRAMER, State Bar No. 168452
   DAVID J. STRANDNESS, State Bar No. 292416
2  JARRED O. TAYLOR III, State Bar No. 291620
   WILSON SONSINI GOODRICH & ROSATI
3  Professional Corporation
   650 Page Mill Road
4  Palo Alto, CA 94304-1050
   Telephone:   (650) 493-9300
5  Facsimile:   (650) 493-6811
   Email:       dkramer@wsgr.com
6  Email:       dstrandness@wsgr.com
7  Email:       jataylor@wsgr.com

8  *Attorneys for Defendant Twitter, Inc.*

9

10                    UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12                     SAN FRANCISCO DIVISION

13  BEVERLY NUNES, individually and on behalf of )   CASE NO.:  14-cv-02843-VC
    a class of similarly situated individuals,         )
14                                                     )   **TWITTER, INC.'S NOTICE OF**
                            Plaintiff,                 )   **MOTION AND MOTION TO DISMISS**
15                                                     )   **PLAINTIFF'S FIRST AMENDED**
                                                       )   **COMPLAINT**
16        v.                                           )
                                                       )   Hearing Date:   TBD per Court Order
17  TWITTER, INC.,                                     )   Time:           10:00 AM
                                                       )   Before:         Hon. Vince Chhabria
18                          Defendant.                 )
19  _____ )

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION................................................................................................................1

BACKGROUND...............................................................................................................2

ARGUMENT .....................................................................................................................3

I.    THE TEXTS AT ISSUE WERE NOT SENT USING AN ATDS OR AN
      "ARTIFICIAL OR PRERECORDED VOICE" ....................................................4

      A.    To Qualify As An ATDS, Equipment Must Have the Capacity To Generate
            And Dial Random Or Sequential Telephone Numbers...........................................4

      B.    A Text Message Is Not An "Artificial Or Prerecorded Voice"...............................7

II.   PLAINTIFF'S CLAIM ALSO FAILS BECAUSE IT IS PREDICATED ON
      TEXTS SENT TO A CELL PHONE NUMBER THAT TWITTER HAD
      CONSENT TO CALL .............................................................................................8

      A.    The "Called Party" For Purposes Of The TCPA's Consent Provision Is The
            Intended Recipient Of The Call ............................................................................9

      B.    Holding Callers Strictly Liable For Calls Inadvertently Made To Recycled
            Cell Phone Numbers Raises Significant Constitutional Problems.......................11

      C.    The Complaint Fails To State A Claim With Respect To SMS Texts
            Plaintiff Received Prior to Sending a Valid Opt-Out Request.............................14

CONCLUSION .................................................................................................................15

# TABLE OF AUTHORITIES

## CASES

*Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*,
    418 F.3d 600 (6th Cir. 2005)....................................................................12

*Andersen v. Harris & Harris, LTD.*,
    No. 13-cv-867, 2014 U.S. Dist. LEXIS 54953 (E.D. Wis. Apr. 21, 2014)....................10, 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..........................................................................4

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..........................................................................4

*Cellco P'ship v. Dealers Warranty, LLC*,
    No. 09-cv-1814, 2010 U.S. Dist. LEXIS 106719 (D.N.J. Oct. 5, 2010)........................9, 14

*Chicago v. Morales*,
    527 U.S. 41 (1999) ...........................................................................12

*Connick v. Myers*,
    461 U.S. 138 (1983) ..........................................................................13

*Cunningham v. Credit Mgmt., L.P.*,
    No. 09-cv-1497, 2010 U.S. Dist. LEXIS 102802 (N.D. Tex. Aug. 30, 2010) ....................15

*Dominguez v. Yahoo!, Inc.*,
    No. 13-1887, 2014 U.S. Dist. LEXIS 36542 (E.D. Pa. Mar. 20, 2014) ......................4, 5, 6

*Duncan v. Walker*,
    533 U.S. 167 (2001) ...........................................................................5

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988) ..........................................................................13

*FCC v. Fox TV Stations*, 132 S. Ct. 2307 (2012) ..............................................12

*Friedman v. Massage Envy Franchising, LLC*,
    No. 3:12-cv-02962-L-RBB, 2013 U.S. Dist. LEXIS 84250
    (S.D. Cal. June 13, 2013) ....................................................................15

*Gertz v. Robert Welch*,
    418 U.S. 323 (1974) ..........................................................................13

*Gragg v. Orange Cab Co.*,
    995 F. Supp. 2d 1189 (W.D. Wash. 2014) ....................................................4, 5

*Griffin v. Oceanic Contractors, Inc.*,
    458 U.S. 564 (1982) ...........................................................................7

*Hunt v. 21st Mortg. Corp.*,
    No. 2:12-cv-2697, 2013 U.S. Dist. LEXIS 132574
    (N.D. Ala. Sept. 17, 2013).................................................................4, 5, 7

*Huricks v. Shopkick, Inc.*,
  No. C-14-2464-MMC, 2014 U.S. Dist. LEXIS 101521
  (N.D. Cal. July 24, 2014) ..........................................................................................7

*Ibey v. Taco Bell Corp.*,
  No. 12-cv-0583-H, 2012 U.S. Dist. LEXIS 91030 (S.D. Cal. June 18, 2012)..................4, 7

*In re Grand Jury Matter, Gronowicz*,
  764 F.2d 983 (3d Cir. 1985) ......................................................................................12

*Knutson v. Reply!, Inc.*,
  No. 10-cv-1267, 2011 U.S. Dist. LEXIS 7887 (S.D. Cal. Jan. 26, 2011) ...........................7

*Leyse v. Bank of Am.*,
  No. 09-cv-7654, 2010 U.S. Dist. LEXIS 58461 (S.D.N.Y. June 14, 2010)..............9, 11, 14

*Leyse v. Bank of Am.*,
  No. 11-cv-7128, 2014 U.S. Dist. LEXIS 125527 (D.N.J. Sept. 8, 2014) ......................9, 14

*Manno v. Healthcare Revenue Recovery Group, LLC*,
  289 F.R.D. 674 (S.D. Fla. 2013) ..................................................................................9

*Manual Enters. v. Day*,
  370 U.S. 478 (1962) ..................................................................................................13

*Meyer v. Portfolio Recovery Assocs., LLC*,
  707 F.3d 1036 (9th Cir. 2012) .....................................................................................3

*McNeil v. Time Ins. Co.*,
  205 F.3d 179 (5th Cir. 2000)......................................................................................11

*Osorio v. State Farm Bank, F.S.B.*,
  746 F.3d 1242 (11th Cir. 2014) ....................................................................................9

*Padilla v. Whetstone Partners, LLC*,
  No. 14-21079-CIV-MORENO, 2014 U.S. Dist. LEXIS 95308
  (S.D. Fla. July 14, 2014) .............................................................................................7

*Satterfield v. Simon & Schuster, Inc.*,
  569 F.3d 946 (9th Cir. 2009).......................................................................................3

*Sepehry-Fard v. MB Fin. Servs.*,
  No. 13-cv-2784, 2014 U.S. Dist. LEXIS 71568 (N.D. Cal. May 23, 2014) .....................3, 4

*Soppet v. Enhanced Recovery Co.*,
  679 F.3d 637 (7th Cir. 2012)..............................................................................9, 10, 11

*United States v. Wilson*,
  503 U.S. 329 (1992) ....................................................................................................5

*Util. Air Regulatory Grp. v. EPA*,
  134 S. Ct. 2427 (2014) ..............................................................................................10

*Video Software Dealers Ass'n v. Webster*,
  968 F.2d 684 (8th Cir. 1992).................................................................................12, 13

1

**STATUTES**

2    47 U.S.C. § 227(a) ......................................................................................1, 4, 5

3    47 U.S.C. § 227(b)(1)(A) ................................................................. *passim*

4

**RULES**

5    47 C.F.R. § 64.1200(f)(2) ..........................................................................6

6

**MISCELLANEOUS**

7    137 Cong. Rec. 35302 (Nov. 26, 1991) ......................................................4

8    H.R. Rep. No. 101-633 (1990) .....................................................................4

9    H.R. Rep. No. 102-317 (1991) .................................................................4, 10

10   *In re Rules and Regulations Implementing the TCPA of 1991,*
           18 FCC Rcd. 14,014 (2003) ................................................................6

11

12   *In re Rules and Regulations Implementing the TCPA,*
           27 FCC Rcd. 15,391 (2012) ................................................................6

13   S. Rep. No. 102-178 (1991) .....................................................................4, 8

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION**

Please take notice that on a date to be set by Plaintiff as per the Court's Order of September 11, 2014, at 10:00am, before the Honorable Vince Chhabria, Defendant Twitter, Inc. ("Twitter") will and hereby does move to dismiss with prejudice Plaintiff's First Amended Complaint. Twitter's motion is based on this notice, the accompanying memorandum of points and authorities, the pleadings on file in this action, arguments of counsel, and any other matters that the Court deems appropriate.

**STATEMENT OF ISSUE TO BE DECIDED**

To state a claim under the provision of the Telephone Consumer Protection Act ("TCPA") invoked in this case, a plaintiff must plausibly allege that (1) the defendant made a non-emergency call to a cell phone; (2) without the "prior express consent of the called party"; (3) using an "automatic telephone dialing system" or "artificial or prerecorded voice." An "automatic telephone dialing system" ("ATDS") is defined by the TCPA as equipment that "has the capacity—(A) to store or produce telephone called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The issues to be decided are:

1. Whether Plaintiff has adequately alleged use of an ATDS even though she failed to plead any facts that plausibly support an inference that Twitter's equipment has the capacity to generate and dial random or sequential phone numbers;

2. Whether a text message is a call made using an "artificial or prerecorded voice"; and

3. Whether the TCPA proscribes calls made to a cell phone number for which the caller had prior consent to call but that, unbeknownst to the caller, had been reassigned to someone else.

## <u>MEMORANDUM OF POINTS & AUTHORITIES</u>

### INTRODUCTION

This case is another in a growing line of abusive, putative class action lawsuits brought under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. The statute, intended to curtail certain kinds of invasive telemarketing practices, has been co-opted by the plaintiffs' bar to seek windfalls for practices and from companies that Congress never intended to regulate.

Twitter is a free online service that allows users to post short messages ("Tweets") that can be read by other Twitter users. One way that users can view Tweets is as text messages, which they sign up to receive by giving Twitter their cell phone numbers. Sometimes, however, users change phone numbers and those numbers are reassigned to other people without Twitter's knowledge. That is what happened here. Plaintiff alleges that shortly after she activated her new cell phone, she began receiving text messages from Twitter. These messages were Tweets requested by the former user of Plaintiff's cell phone number. Sensing an opportunity, Plaintiff sued Twitter, demanding at least $500 in statutory damages for each text message Tweet she received. She also seeks to represent a class of all those who received Tweets via text messages to cell phone numbers recycled from Twitter users. Plaintiff's claim fails as a matter of law.

As an initial matter, Twitter's texts were not sent using an "automatic telephone dialing system or an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A). Congress expressly limited the definition of "automatic telephone dialing system" ("ATDS") to equipment that has the capacity to generate random or sequential phone numbers and dial those numbers. *Id*. § 227(a)(1). Plaintiff does not—and cannot—allege any facts making it plausible that Twitter uses such equipment. That is not surprising. Twitter sends Tweets by text only to users who give their phone numbers to Twitter for the purpose of receiving them. Plaintiff tries to avoid this problem with her claim by asserting that any equipment capable of automatically dialing numbers from a list is an ATDS. But that impermissibly reads the words "using a random or sequential number generator" out of the statute. It also would create profound practical problems, making an ATDS out of virtually any modern telephone. Congress could not have foreseen or desired such a dramatic expansion of the TCPA.

Next, Plaintiff tries to circumvent the ATDS requirement altogether by alleging that the text messages she received were calls sent using "an artificial or prerecorded voice." That defies common sense and finds no support in the statute's text or case law. It would also subject all text messages—no matter the equipment used or the purpose of the communication—to potential TCPA liability. The Court should reject Plaintiff's wordplay.

Finally, the text messages in question were sent with the "prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A). It is clear that Twitter intended the messages to go to the user who expressly consented to receiving them at the cell phone number he supplied. Sending texts to that number did not violate the TCPA. That is because the "called party" whose advance consent must be secured is the intended recipient of the call (based on the information the caller had when the call was made). Plaintiff claims otherwise. She suggests that, as the new holder of the phone number, only her consent matters. But that misreads the statute and creates serious constitutional problems. Requiring callers to obtain prior consent from *unintended* recipients of a call means strict liability for all calls made to friends, family, colleagues, or customers at phone numbers they happen no longer to control. That would turn dialing or texting into a game of Russian roulette, chilling a wide range of constitutionally protected communications and violating both the Due Process Clause and the First Amendment.

## BACKGROUND

Twitter is a social networking and microblogging service that allows users to post short "Tweets" that can be read by other Twitter users. Am. Compl. ¶¶ 2, 8, 17. Twitter has millions of users who create approximately 500 million Tweets every day on a wide range of matters of public and private concern, from protests in foreign capitals and American streets, to real-time discussions of culture, sports, and news. *Id*. ¶ 17; *see, e.g.*, Ellen Barry, Protests in Moldova Explode, With Help of Twitter, *N.Y. Times* (Apr. 7, 2009), http://www.nytimes.com/2009/04/08/world/europe/08moldova.html. Twitter users choose how they want to receive Tweets. They can access Tweets via Twitter's website or mobile application, request to receive them by email, or have them sent to their cell phones as SMS text messages. Am. Compl. ¶¶ 21, 60. To receive Tweets as text messages on their cell phones, users must provide Twitter with their cell phone

1   numbers and request to receive texts at that number. *Id.* Plaintiff does not allege that Twitter failed

2   to obtain prior express consent from the Twitter users who request Tweets via text.

3        Cellular subscribers, of course, relinquish their cell phone numbers from time to time, and

4   cellular carriers typically reassign those numbers to others. *Id.* ¶ 25. Those assigned a recycled cell

5   phone number will often receive calls or texts that were intended for and requested by the prior

6   holder of that number. *Id.* ¶¶ 25-26. That is the situation here. Plaintiff obtained a new cell phone

7   number in November 2013. *Id.* ¶ 41. Shortly thereafter, she began receiving text messages from

8   Twitter with the "from" field populated with Twitter account handles such as @swagspoilercode

9   and @dayzdevteam. *Id.* ¶¶ 42-43 & Ex. A. These were Tweets that the prior holder of Plaintiff's

10  new cell phone number had expressly requested to receive at that number. *Id.* ¶¶ 25-26, 45.

11  Plaintiff alleges that in December 2013, she replied to two of the messages in an effort to prevent

12  further messages. *Id.* ¶ 45. But Plaintiff admits that she did not use the simple "STOP" command

13  that would have caused Twitter to stop sending text-message Tweets to that number. *Id.* ¶¶ 37, 45.

14  Instead, one of Plaintiff's replies said simply "sto" and the other included the complete sentence

15  "STOP SENDING THESE MSGS." *Id.* ¶ 45. Because those were not valid "STOP" commands

16  that could be recognized by Twitter's system, Plaintiff's responses were instead posted online as

17  Tweets from the Twitter account associated with the cell phone number. *Id.* Plaintiff made no

18  further effort to communicate with Twitter, but instead filed this lawsuit under the TCPA.

19                                   **ARGUMENT**

20        To state a claim under the TCPA, Plaintiff must plausibly allege that Twitter made a

21  "call"[1] (1) to a cellular telephone number; (2) using an ATDS or "artificial or prerecorded voice";

22  and (3) without the "prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A)(iii); *see*

23  *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012). "Courts in this

24  district require more than a bare assertion of these elements, looking instead to the plaintiff's

25  factual allegations to determine whether a TCPA claim can be sustained." *Sepehry-Fard v. MB*

26

27        [1] The Ninth Circuit has held that text messages sent to cell phones constitute "calls" for TCPA
28  purposes. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009). For purpose of
    this motion, Twitter accepts that ruling, though it reserves the right to challenge it at a later stage.

1   *Fin. Servs.*, No. 13-cv-2784, 2014 U.S. Dist. LEXIS 71568, at *7 (N.D. Cal. May 23, 2014); *see*

2   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of

3   action, supported by mere conclusory statements, do not suffice."); *Bell Atl. Corp. v. Twombly*,

4   550 U.S. 544, 570 (2007) (plaintiffs must allege "enough facts to state a claim to relief that is

5   plausible on its face"). Plaintiff's claim here fails because there are no plausible allegations that

6   the texts at issue were sent (1) using an ATDS or an artificial voice, or (2) without the consent of

7   the called party.

8   **I.      THE TEXTS AT ISSUE WERE NOT SENT USING AN ATDS OR AN
           "ARTIFICIAL OR PRERECORDED VOICE"**

9
10            **A.      To Qualify As An ATDS, Equipment Must Have the Capacity To Generate
                      And Dial Random Or Sequential Telephone Numbers**

11           The TCPA expressly defines ATDS as equipment that has the capacity "(A) to store or

12   produce telephone numbers to be called, ***using a random or sequential number generator***; and

13   (B) to dial such numbers." 47 U.S.C. § 227(a)(1) (emphasis added). The emphasized language is

14   there for a reason. Congress did not want the TCPA to apply to all calls made to cellular

15   telephones, but instead only those using a particularly intrusive type of technology that

16   telemarketers were using to make unsolicited calls when the statute was passed. Congress was

17   concerned that by using dialing systems that could generate and dial random or sequential phone

18   numbers (such as 111-1111, 111-1112, 111-1113), telemarketing calls might reach unlisted

19   numbers, hospitals, or emergency organizations, or be able to tie up all the lines of a business and

20   thereby prevent outgoing calls. *See* S. Rep. No. 102-178, at 1-2 (1991); 137 Cong. Rec. 35,302

21   (Nov. 26, 1991); H.R. Rep. No. 101-633, at 3 (1990); H.R. Rep. No. 102-317, at 10 (1991).

22   Recognizing this limitation, numerous courts have dismissed TCPA claims where the equipment

23   used to make the calls lacked the requisite number-generation capacity. *See, e.g.*, *Dominguez v.*

24   *Yahoo!, Inc.*, No. 13-1887, 2014 U.S. Dist. LEXIS 36542, at *19 (E.D. Pa. Mar. 20, 2014)*; Gragg*

25   *v. Orange Cab Co.*, 995 F. Supp. 2d 1189, 1192-93 (W.D. Wash. 2014); *Ibey v. Taco Bell Corp.*,

26   No. 12-cv-0583-H, 2012 U.S. Dist. LEXIS 91030, at *9 (S.D. Cal. June 18, 2012); *see also Hunt*

27   *v. 21st Mortg. Corp.*, No. 2:12-cv-2697, 2013 U.S. Dist. LEXIS 132574, at *11 (N.D. Ala. Sept.

28   17, 2013) (defining ATDS as requiring number generation capacity).

Plaintiff's Amended Complaint reads like an opposition to a motion to dismiss, complete with citations to authority and argument. Am. Compl. ¶ 59. But glaringly absent are factual allegations making it plausible that the equipment through which Twitter sends Tweets as texts has the capacity to generate and dial random or sequential phone numbers. The closest Plaintiff comes is to allege that Twitter's equipment uses software that could somehow be rewritten to generate random phone numbers. *Id.* ¶ 61. But it is sophistry to suggest that the ability to reprogram equipment turns that equipment into an ATDS. That would make ATDSs out of modern "smart" cars, toasters, and virtually anything containing software. Though utterly lacking any actual capacity to generate random phone numbers, such devices could be reprogrammed to do so. That is plainly insufficient.[2] Rather, as courts have repeatedly held, an ATDS must have the *present* capacity to generate random or sequential phone numbers. *See, e.g.*, *Gragg*, 995 F. Supp. 2d at 1192-93 (ATDS must have a "present, not potential, capacity to store, produce, or call randomly or sequentially generated telephone numbers"); *Dominguez*, 2014 U.S. Dist. LEXIS 36542, at *12 n.4 (same); *Hunt*, 2013 U.S. Dist. LEXIS 132574, at *10-11 (same). Plaintiff alleges no facts to show that Twitter's equipment had such capacity.

Undaunted, Plaintiff devises an alternative definition, alleging that an ATDS is any system that can dial numbers from a list without human intervention. Am. Compl. ¶¶ 59, 60. In Plaintiff's view, automated dialing capacity is all that is required. But the TCPA's language cannot be disregarded so readily. Plaintiff's approach would simply read the words "*using a random or sequential number generator*" out of the statute. That violates the fundamental rule requiring courts "to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (citations omitted). The TCPA does not define the term ATDS as Plaintiff would like, but that is not license to ignore the actual text that Congress enacted. *See, e.g.*,

---

[2] The definition of ATDS extends only to equipment that "has the capacity" to store and produce numbers using a number generator. 47 U.S.C. § 227(a). The use of the present tense, (rather than the conditional) confirms that what matters here is whether the equipment actually has the requisite capacity at the time the call was made, not whether it might be modified to add that capacity later. *Cf. United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes.").

*Dominguez*, 2014 U.S. Dist. LEXIS 36542, at *17 n.6 (ATDS definition "require[s] more than simply that the system store telephone numbers and send messages to those numbers without human intervention").

Nor is Plaintiff's alternative definition supported by anything that the Federal Communications Commission ("FCC") has said or done. Charged with TCPA rulemaking authority, the FCC has published an ATDS definition appropriately mirroring the one in the statute: "The terms automatic telephone dialing system and autodialer mean equipment which has the capacity to store or produce telephone numbers to be called *using a random or sequential number generator* and to dial such numbers." 47 C.F.R. § 64.1200(f)(2) (emphasis added). And the FCC has recited the number generator requirement each time it has set forth the ATDS definition. *See, e.g.*, *In re Rules and Regulations Implementing the TCPA*, 27 FCC Rcd. 15,391, 15,392 n.5 (2012) (ATDS definition "covers any equipment that has the *specified capacity to generate numbers* and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists") (emphasis added).[3]

Plaintiff's proposed ATDS definition also defies common sense as it would threaten legitimate, everyday communications. Virtually all cell phones today have speed dial, group texting, and text auto-response capabilities—functions that give them the capacity to automatically dial numbers from pre-existing lists. If any device that can automatically dial numbers is an ATDS, as Plaintiff claims, then every call or text made from a modern phone subjects the caller to potential TCPA liability (regardless of whether the call or text is actually made using the phone's

---

[3] In a 2003 Order, the FCC addressed the issue of whether a "predictive dialer" qualifies as an ATDS. *In re Rules and Regulations Implementing the TCPA of 1991*, 18 FCC Rcd. 14,014, 14,090-93 (2003). A "predictive dialer" is a specific type of telemarketing dialing equipment that predicts when a live telemarketer will be available to be connected with the consumer who answers. *Id.* ¶ 94. In its Order, the FCC recognized that predictive dialers have the capacity to generate and dial random or sequential telephone numbers, but typically did not use that capacity and instead dialed numbers automatically from a list. Given that the equipment had the requisite capacity, the FCC found that predictive dialers fell within the ATDS definition. *Id.* ¶ 133 ("Therefore the [FCC] finds that a predictive dialer *falls within* the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." (emphasis added)). This Order does not help Plaintiff here: this case does not involve a predictive dialer, and the FCC did not purport to eliminate the requirement that the equipment have the capacity to generate and dial random or sequential phone numbers in order to be an ATDS.

1   automatic dialing capacity). Using a phone under that regime would be risky business. Calling or

2   texting anyone without their express consent, misdialing a phone number, or even accidentally

3   dialing one, would render the caller strictly liable for the TCPA's $500 statutory damages bounty.

4   Congress never imagined, much less intended, such absurd consequences. *See Hunt*, 2013 U.S.

5   Dist. LEXIS 132574, at *11 (explaining that Congress could not have meant for every iPhone to

6   be an ATDS); c*f. Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)

7   ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative

8   interpretations consistent with the legislative purpose are available.").

9       When the ATDS requirement is applied correctly, Plaintiff's claim fails. The Amended

10  Complaint does not allege facts making it plausible to find that Twitter's text-message Tweets

11  were sent using equipment that had the present capacity to generate random or sequential phone

12  numbers. Am. Compl. ¶¶ 60-61. Courts have repeatedly dismissed complaints that fail to allege

13  such facts.[4] This Court should the same.

14          **B.    A Text Message Is Not An "Artificial Or Prerecorded Voice"**

15      In an attempt to circumvent the ATDS requirement altogether, Plaintiff separately alleges

16  that the Tweets she received as text messages were sent using an "artificial or prerecorded voice."

17  Am. Compl. ¶ 63. That is nonsense. Quite plainly, a "text" message consists of text, not "voice."

18      Plaintiff tries to overcome the obvious by relying on the (seventh) alternative definition of

19  the word "voice" in an online dictionary. *Id*. (quoting DICTIONARY.COM, http://dictionary.

20  reference.com/browse/voice (defining "voice" as "expression in spoken or written words, or by

21  other means: 'to give voice to one's disapproval by a letter'"). But that is not how the word "voice"

22  

---

23      [4] *See, e.g., Huricks v. Shopkick, Inc.*, No. C-14-2464-MMC, 2014 U.S. Dist. LEXIS 101521, at
    *6 (N.D. Cal. July 24, 2014) (dismissing complaint where ATDS allegations "consist solely of

24  paraphrases of the definition of ATDS as set forth in the TCPA"); *Padilla v. Whetstone Partners,
    LLC*, No. 14-21079-CIV-MORENO, 2014 U.S. Dist. LEXIS 95308, at *6 (S.D. Fla. July 14,

25  2014) (dismissing complaint containing insufficient factual allegations to support conclusory
    allegation that calls were made using an ATDS); *Ibey*, 2012 U.S. Dist. LEXIS 91030, at *9 ("The

26  Court concludes that Plaintiff has not sufficiently pled the use of an ATDS"); *Knutson v. Reply!,
    Inc.*, No. 10-cv-1267, 2011 U.S. Dist. LEXIS 7887, at *5 (S.D. Cal. Jan. 26, 2011) (the "naked

27  assertion" that "messages were sent using equipment that … had the capacity to store or produce
    telephone numbers to be called, using a random or sequential number generator" "need not be

28  taken as true" (internal citation & quotation marks omitted)).

is used in the TCPA. Congress was not addressing a situation in which someone "gave voice" to some sentiment. It was instead referring to the medium through which the message was communicated. That uses the word "voice" in its most basic sense: "sound produced by vertebrates by means of lungs, larynx, or syrinx; especially: sound so produced by human beings." MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/voice (last visited Sept. 7, 2014). A typewritten letter may *give voice* to a particular idea but no one would say the letter was sent using an *artificial voice*. So too here, the statute distinguishes phone calls made using an artificial or prerecorded human voice from those made by a live person. *See* S. Rep. No. 102-178, at 4-5 (1991) ("[C]alls that deliver an artificial or prerecorded voice message are more of a nuisance and a greater invasion of privacy than calls placed by 'live' persons."). To come within this provision, therefore, the call must involve the transmission of an *audible* voice. Text messages simply do not fit the bill.

The practical consequences of Plaintiff's theory also argue powerfully against it. If texting involves the use of an artificial or prerecorded "voice," every text message would be covered by the TCPA—regardless of the equipment used or the purpose of the message. That would have profound implications for this burgeoning communications medium. If Bob moves to a new city and gets Sally's phone number from a friend, he violates the TCPA by sending a text message to her asking her to show him around town. The organizers of a political rally would similarly violate the statute by texting people who might want to participate unless they can show that they obtained the "prior express consent" of each participant. Likewise, anyone who accidentally sends a text to a wrong or mistyped phone number would be liable for statutory damages. Vast amounts of legitimate speech would be penalized or never occur in the first place. Congress did not contemplate such a result, and (unsurprisingly) no court has ever endorsed it. Plaintiff cannot state a TCPA claim by asserting that a text message is a call using an artificial voice.

## II.   PLAINTIFF'S CLAIM ALSO FAILS BECAUSE IT IS PREDICATED ON TEXTS SENT TO A CELL PHONE NUMBER THAT TWITTER HAD CONSENT TO CALL

The intended recipient of the text-message Tweets at issue was a Twitter user who signed up for such texts. Am. Compl. ¶¶ 25, 31, 45. Plaintiff does not contend that Twitter did not have prior express consent from that user. Instead, her claim is based on the fact that, unbeknownst to

Twitter, that user's cell phone number was later reassigned to Plaintiff. *Id*. ¶¶ 25-26. At the time the texts were sent, and until it received a valid opt-out request from the Plaintiff, Twitter had a reasonable belief that they were going to someone who had expressly consented to receive them. Holding Twitter liable for those texts is inconsistent with the text and purpose of the TCPA's consent provision and would create serious constitutional problems that can readily be avoided.

### A.   The "Called Party" For Purposes Of The TCPA's Consent Provision Is The Intended Recipient Of The Call

The TCPA exempts from liability any call "made with the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A). The statute does not define "called party," and courts (all outside the Ninth Circuit) have divided over how to interpret the term. Several courts have taken a commonsense approach and held that it refers to the "intended recipient" of the call. *Leyse v. Bank of Am.*, No. 11-cv-7128, 2014 U.S. Dist. LEXIS 125527, at *17 (D.N.J. Sept. 8, 2014); *Cellco P'ship v. Dealers Warranty, LLC*, No. 09-cv-1814, 2010 U.S. Dist. LEXIS 106719, at *34 (D.N.J. Oct. 5, 2010); *Leyse v. Bank of Am.*, No. 09-cv-7654, 2010 U.S. Dist. LEXIS 58461, at *9-11 (S.D.N.Y. June 14, 2010). In contrast, the Seventh and Eleventh Circuits have held that "called party" refers to "the person subscribing to the called number at the time the call is made." *Soppet v. Enhanced Recovery Co.*, 679 F.3d 637, 643 (7th Cir. 2012); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014).[5] This Court should adopt the first interpretation. It is most consistent with the statute, allows companies to reasonably comply with the TCPA, and avoids the serious constitutional problems that would result from imposing strict liability on anyone who inadvertently calls a reassigned cell phone number with the consent of the number's prior user.

As an initial matter, the most natural reading of the term "called party" is the party that a caller intended to call. When I dial the phone number that John gave me for the purpose of reaching him, I "called" John. That's true even if Jane happens to answer the phone, or if I

---

[5] Yet another court concluded that a "plaintiff's status as the 'called party' depends not on such technicalities as whether he or she is the account holder or the person in whose name the phone is registered, but on whether the plaintiff is the regular user of the phone and whether the defendant was trying to reach him or her by calling that phone." *Manno v. Healthcare Revenue Recovery Group, LLC*, 289 F.R.D. 674, 683 (S.D. Fla. 2013).

1   accidentally dial the wrong number, or if John's number has been assigned to someone else. That

2   is all the more true here, because the language of the consent provision puts the emphasis on the

3   perspective of the caller rather than the recipient. The statute makes it unlawful "to *make* any call"

4   other than one "*made* with prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A)

5   (emphases added). At the time a call is being made, the caller cannot be certain to have obtained

6   prior consent from the person who actually receives the call. Instead, from the caller's point of

7   view, the only person whose consent could be relevant is that of the party he intends to reach—the

8   person he reasonably believes he is calling based on the information he has. Under the consent

9   provision, that person is the "called party."[6]

10       That interpretation also makes practical sense. It means that when a person obtains consent

11   to make a call, that consent doesn't vanish simply because a phone number changes hands without

12   the caller's knowledge. Instead, the caller must know that it no longer has the consent of the party

13   it is calling. *See, e.g.*, *Andersen v. Harris & Harris, LTD.*, No. 13-cv-867, 2014 U.S. Dist. LEXIS

14   54953, at *32-33 (E.D. Wis. Apr. 21, 2014) (rejecting plaintiff's argument that his "outgoing

15   voicemail message revok[ed] consent regardless of whether the [caller] *actually* received the

16   message"; otherwise "the entire notion of consent under the TCPA …would be undermined"

17   (emphasis added)). Only in this way can the consent provision serve its purpose of protecting

18   "expected or desired communications"—such as those that "advise a customer (at the ***telephone***

19   ***number provided by the customer***) that an ordered product had arrived, a service was scheduled or

20   performed, or a bill had not been paid." H.R. Rep. No. 102-317, at 17 (1991) (emphasis added).

21

---

22       [6] In holding otherwise, the Seventh Circuit relied on the fact that the term "called party" is

23   used in other provisions of the TCPA where it seems to refer to the current subscriber. *Soppet*, 679
     F.3d at 639-40 ("The presumption that a statute uses a single phrase consistently, at least over so

24   short a span, implies that the consent must come from the current subscriber."). The Supreme
     Court recently made clear, however, that the assumption that identical words used in different

25   parts of a statute should be given the same meaning "readily yields" where context suggests
     otherwise. *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014). A statutory term "may

26   take on distinct characters from association with distinct statutory objects calling for different
     implementation strategies." *Id.* (internal quotation marks omitted). That is precisely the situation

27   here: whatever "called party" may mean elsewhere in the TCPA, given the emphasis of the
     consent provision on the caller's perspective, the term as used there refers to the party the caller

28   intended to reach based on the information the caller had when the call was made.

1 Especially given that the TCPA applies not just to telemarketers, but to "any person" who makes

2 "any call" using the requisite equipment (§ 227(b)(1)), it is imperative for callers to be able to

3 reasonably rely on the consent they obtain. If consent is lost through events about which the caller

4 is totally unaware and has no control, no call is safe and all carry a potential $500 price tag. "It is a

5 flawed and unreasonable construction of any statute to read it in a manner that demands the

6 impossible." *McNeil v. Time Ins. Co.*, 205 F.3d 179, 187 (5th Cir. 2000).

7
8    **B.    Holding Callers Strictly Liable For Calls Inadvertently Made To Recycled
         Cell Phone Numbers Raises Significant Constitutional Problems**

9        Plaintiff proceeds from the premise that prior express consent to call a phone number must

10 be obtained from the *current* holder of that number. Am. Compl. ¶¶ 32, 46. That is illogical,[7] and

11 in the context of recycled numbers, it puts the TCPA's constitutionality into serious doubt.

12       Given how often cell phone numbers change hands, ordinary callers, as well as services

13 that facilitate millions of texts every day, have no way to be sure that every number they dial still

14 belongs to the person from whom they received consent.[8] That means that some calls or texts will

15 _____

16 [7] If the called party is the "person subscribing to the called number at the time the call is
made" (*Soppet*, 679 F.3d at 643), callers would face liability even where they obtained consent
17 from the *actual recipient* of the call, if that person happens not to be the account holder. That leads
to bizarre results in what have become common scenarios, for example, where a company
18 purchases a cell phone plan for its employees to use. Requiring callers to get consent from the
actual subscriber would mean that "a business [would] have to inquire as to whether a person
19 giving the business express prior consent is in fact the person whose name is on the telephone bill"
(*Leyse*, 2010 U.S. Dist. LEXIS, at *15)—a burdensome requirement that serves no public good.
20
21 [8] We note that there are multiple petitions pending before the FCC on this issue with
petitioners and commenters alike explaining that there is no way for companies to learn in real
22 time and comprehensively if a wireless number has been reassigned. *See, e.g.,* Stage Stores, Inc.'s
Pet. for Expedited Declaratory Ruling at 3, CG Docket No. 02-278 (June 4, 2014) (there "are no
23 comprehensive public wireless number directories that can be accessed by callers to timely,
efficiently, or reliably verify whether or not a wireless number is one of the hundreds of thousands
24 of numbers that get reassigned on a weekly basis"); Rubio's Restaurant, Inc's Pet. For Expedited
Declaratory Ruling at 3-4 , CG Docket No. 02-278 (Aug. 11, 2014) ("Rubio's Restaurant Pet.")
25 ("[T]here is no available third-party service that reflects all reassigned number changes.").While
Plaintiff points to services that claim to assist in identifying reassigned phone numbers (Am.
26 Compl. ¶¶ 28-29), they do not offer complete lists of reassigned numbers. *See* Rubio's Restaurant
Pet. at 5 ("Neustar, one of the largest database of cellular numbers, only contains about 100
27 million self-reported wireless numbers, but there were an estimated 327 million cell phones in the
United States." (citing Neustar, Resources and Tools, *available at* http://www.neustar.biz/
28 resources/productliterature/enhancedwireless-file#.U-FK3_ldWao)). And even if there was a

(continued...)

1   inevitably, though unwittingly, go to unintended recipients. If the consent provision offers no

2   protection when that happens, even callers who carefully limit calls to numbers for which they

3   have obtained express consent will find themselves strictly liable for violating the statute. That

4   implicates the "fundamental principle in our legal system [] that laws which regulate persons or

5   entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations*,

6   132 S. Ct. 2307, 2317 (2012). The "purpose of the fair notice requirement is to enable the ordinary

7   citizen to conform his or her conduct to the law." *Chicago v. Morales*, 527 U.S. 41, 58 (1999)

8   (plurality op.). Plaintiff's approach makes that impossible. If consent evaporates the second a

9   phone number is reassigned, callers have no realistic way of knowing whether a given call is

10  permissible. The difference between a legal and an illegal call becomes a matter of chance, based

11  on circumstances out of the caller's control. Due process does not permit civil liability to be turned

12  into a roll of the dice.

13       These concerns are exacerbated here because the TCPA touches on "sensitive areas of

14  basic First Amendment freedoms." *Fox TV*, 132 S. Ct. at 2318 (emphasis and citation omitted). It

15  is settled law that "any statute that chills the exercise of First Amendment rights must contain a

16  knowledge element." *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992)

17  (emphasis omitted); *see, e.g., Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d

18  600, 611 (6th Cir. 2005) (strict liability laws "may have the collateral effect of inhibiting the

19  freedom of expression, by making the individual the more reluctant to exercise it" (citation

20  omitted)). "The scienter requirements forbid the enforcement of overbroad statutes that subject an

21  author to sanctions arising from innocent errors of fact, because such sanctions may have a

22  chilling effect on protected speech." *In re Grand Jury Matter, Gronowicz*, 764 F.2d 983, 988 (3d

23  Cir. 1985) (en banc).

24       That is what would be wrought by Plaintiff's misreading of the consent provision. Callers

25  who obtained express consent would be held strictly liable if it turns out—unbeknownst to them—

26

27

28  (...continued from previous page)
    database that was comprehensive and instantly updated, would individuals be required to check
    every time they place a call or send a text?

TWITTER'S MOT. TO DISMISS AM. COMPLAINT          -12-
CASE NO.: 14-CV-02843-VC

that the number was reassigned. Punishing innocent errors in this way "runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedom[] of speech" and "may lead to intolerable self-censorship." *Gertz v. Robert Welch*, 418 U.S. 323, 340 (1974). Indeed, faced with the prospect of significant liability even when they make good-faith efforts to do what the law requires, companies like Twitter may have no choice but to stop using text messaging to enable their users' communications. The result would be to deter a wide variety of legitimate communications, including matters of public concern, which occupy the "highest rung of the hierarchy of First Amendment values." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (citation omitted). These communications would be silenced even though nearly all of them are directed at people who requested them, and want them to continue. The First Amendment demands a different result. *Video Software Dealers*, 968 F.2d at 691 ("Because the statute's strict liability feature would make video dealers more reluctant to exercise their freedom of speech and ultimately restrict the public's access to constitutionally protected videos, the statute violates the First Amendment.") (emphasis omitted). By imposing liability on anyone who unwittingly calls a reassigned cell phone number, Plaintiff's approach makes the line between permissible and impermissible speech too precarious. This chokes off the "breathing space" that is "essential" to "fruitful exercise" of constitutional freedoms. *Gertz*, 418 U.S. at 342.

A "cardinal principle" of statutory construction is that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Here, construing the TCPA as Plaintiff suggests would seriously risk rendering the statute unconstitutional by turning liability into a game of chance and silencing protected communications. The Court must reject that reading. *Cf. Manual Enters. v. Day*, 370 U.S. 478, 492-93 (1962) (a "substantial constitutional question would arise" if a federal statute were to be read "as not requiring proof of scienter in civil proceedings," because that would lead to self-censorship and "deprive such materials, which might otherwise be entitled to constitutional protection, of a legitimate and recognized avenue of access to the public").

**C.     The Complaint Fails To State A Claim With Respect To SMS Texts Plaintiff Received Prior to Sending a Valid Opt-Out Request**

It is clear from the Amended Complaint that the intended recipient of the text-message Tweets here was the Twitter user who requested them. Under the correct application of the consent provision, therefore, Twitter cannot be held liable under the TCPA for sending those messages.

Plaintiff acknowledges that a Twitter user signed up for Twitter's SMS service, which allows users to receive Tweets via text messages sent to their cell phone. Am. Compl. ¶¶ 21, 25, 45. Twitter thus had "prior express consent" to send text messages to the phone number that the Twitter user provided. Subsequently, the Twitter user stopped using that number, and it was reassigned to Plaintiff. *Id*. ¶ 45. Plaintiff makes no allegation that the Twitter user ever tried to revoke his consent to receiving text messages. The Amended Complaint does not allege that he informed Twitter that he was no longer using the cell phone number or that Twitter was otherwise aware that the number had been reassigned. Nor does Plaintiff suggest that Twitter intended to send the text messages at issue to her, as opposed to the Twitter user. The only plausible reading of the Amended Complaint is that the intended recipient of the text messages was a Twitter user who expressly consented to receiving them. On these facts, Plaintiff's claim cannot proceed. *See, e.g.*, *Leyse*, 2014 U.S. Dist. LEXIS 125527, at *17; *Cellco P'ship*, 2010 U.S. Dist. LEXIS 106719, at *34; *Leyse*, 2010 U.S. Dist. LEXIS 58461, at *9-11.

Plaintiff tries to resist that conclusion by alleging that she tried to stop the text messages by sending replies to two of them. Am. Compl. ¶ 45. But it is clear from the allegations that Plaintiff did not do so in a valid and recognizable way. She asserts that the industry has developed "best practices for processing and honoring requests to stop receiving messages." *Id*. ¶ 35. A user need only text "STOP" (or another recognized command word) in response to an unwanted text message. *Id*. ¶¶ 35-36. And, indeed, that is exactly how Twitter's system operates: as described in the Amended Complaint (and on Twitter's website), by sending the command "STOP" in response to a text-message Tweet, a user will prevent any further Tweets from being sent to that phone number. *Id*. ¶ 37 ("the keyword commands "STOP," "QUIT," "END," "CANCEL," "UNSUBSCRIBE" and "ARRET" (when replying to SMS messages) will stop text messages").

1    Thus, had Plaintiff responded to any of the messages at issue with a simple "STOP," she would

2    have received no more messages and plainly would have had no basis to sue.

3          But Plaintiff did not do that. Instead, Plaintiff sent two responses, neither of which did

4    what Twitter's instructions require. In the first response, Plaintiff wrote "sto" (not "STOP"); in the

5    second, she wrote "STOP SENDING THESE MSGS." *Id*. ¶ 45. Twitter's systems are not

6    programmed to recognize a response that does not contain the word "STOP" (or one of the other

7    valid keywords) or that uses it as part of a longer sentence. Instead, Twitter interprets such phrases

8    as Tweets that the user wants posted on his Twitter account. *Id*. There is good reason for Twitter's

9    automated system to operate that way. Were it otherwise, a text message to Twitter saying "stop

10   the war" (or any other phrase using the word "stop") would unsubscribe the user from Twitter's

11   text message service, and silence users who wanted to make political statements or post other

12   Tweets using a word in common parlance. Requiring a single and unambiguous keyword

13   command makes perfect sense while still making it easy for users to opt-out. By failing to take

14   that simple step, Plaintiff failed to properly put Twitter on notice that she wished to stop receiving

15   text messages that Twitter had prior express consent to send. *Cf. Friedman v. Massage Envy*

16   *Franchising, LLC*, No. 3:12-cv-02962-L-RBB, 2013 U.S. Dist. LEXIS 84250, at *4 (S.D. Cal.

17   June 13, 2013) (no TCPA violation where defendant sent text in response to message asking that

18   texts cease where defendant's system did not understand the request); *Andersen*, 2014 U.S. Dist.

19   LEXIS 54953, at *32-33 (outgoing voicemail message insufficient to eliminate consent of called

20   party where calling party's system would not have understood request); *Cunningham v. Credit*

21   *Mgmt., L.P.*, No. 09-cv-1497, 2010 U.S. Dist. LEXIS 102802, at *13 (N.D. Tex. Aug. 30, 2010)

22   (notifying caller orally that cell phone calls are "inconvenient" insufficient to eliminate consent),

23   *report and recommendation adopted,* 2010 U.S. Dist. LEXIS 102329 (N.D. Tex. Sept. 27, 2010).

24                                    **CONCLUSION**

25          For the reasons above, Plaintiff's TCPA claim fails as a matter of law and Twitter's motion

26   to dismiss should be granted.

27

28

1    Dated:  September 16, 2014                  Respectfully submitted,

2                                                By:    /s/ *David H. Kramer*

3                                                David H. Kramer
                                                 David J. Strandness
4                                                Jarred O. Taylor III
                                                 WILSON SONSINI GOODRICH & ROSATI
5                                                Professional Corporation
                                                 650 Page Mill Road
6                                                Palo Alto, CA 94304-1050
                                                 Telephone:   (650) 493-9300
7                                                Facsimile:   (650) 493-6811
                                                 Email:       dkramer@wsgr.com
8                                                Email:       dstrandness@wsgr.com
9                                                Email:       jataylor@wsgr.com

10                                               *Attorneys for Defendant Twitter, Inc.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28