JEFFREY F. KELLER (SBN 148005)
jfkeller@kellergrover.com
CAREY G. BEEN (SBN 240996)
cbeen@kellergrover.com
SARAH R. HOLLOWAY (SBN 254134)
sholloway@kellergrover.com
**KELLER GROVER, LLP**
1965 Market Street
San Francisco, California 94103
Tel: (415) 543-1305 /Fax: (415) 543-7861

JOHN G. JACOBS (*PRO HAC VICE*)
jgjacobs@jacobskolton.com
BRYAN G. KOLTON (*PRO HAC VICE*)
bgkolton@jacobskolton.com
**JACOBS KOLTON, CHTD.**
55 West Monroe Street, Suite 2970
Chicago, Illinois 60603
Tel: (312) 427-4000 /Fax: (312) 268-2425

DAVID SCHACHMAN (*PRO HAC VICE*)
ds@schachmanlaw.com
**LAW OFFICES OF DAVID SCHACHMAN, P.C.**
55 West Monroe Street, Suite 2970
Chicago, Illinois 60603
Tel: (312) 427-9500 /Fax: (312) 268-2425

Attorneys for Plaintiff
BEVERLY NUNES
and the Putative Class

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

BEVERLY NUNES, individually and on behalf of a class of similarly situated individuals,

Plaintiff,

v.

TWITTER, INC.,

Defendant.

Case No: 3:14-cv-02843-VC

<u>CLASS ACTION</u>

**PLAINTIFF'S OPPOSITION TO TWITTER'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Location: Courtroom 4,17th Floor
450 Golden Gate Avenue
San Francisco, California 94102
Hearing Date: Nov. 20, 2014
Time: 10:00 A.M.

The Honorable Vince Chhabria

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ........................................................................................................ 1

II.    THE COMPLAINT MORE THAN ADEQUATELY ALLEGES  THE USE OF
       AN ATDS ................................................................................................................... 2

III.   TWITTER'S ARGUMENTS FOR DISMISSAL BASED ON OTHERS'
       SUPPOSED CONSENT ARE UNTENABLE ................................................................ 6

IV.    THE FAC SUFFICIENTLY ALLEGES THAT TWITTER CONTINUTED TO
       SEND MESSAGES AFTER PLAINTIFF ASKED IT TO STOP SENDING
       THEM ...................................................................................................................... 12

V.     THESE MESSAGES CONSTITUTED PROHIBITED ARTIFICIAL OR
       PRERECORDED VOICE MESSAGES ........................................................................ 13

VI.    CONCLUSION ......................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alea London Ltd. V. American Home Services*
    638 F.3d 768 (11th Cir. 2011)................................................................... 12, n.13

*Breslow v. Wells Fargo Bank, N.A.*
    755 F.3d 1265 (11th Cir. 2014)...................................................................... 11

*Connelly v. Hilton Grant Vacations Co., LLC,*
    2012 WL 2129364 (S.D. Cal. June 11, 2012) ................................................. 7

*Gager v. Dell Fin. Servs., LLC*
    727 F.3d 265 (3d Cir. 2013)........................................................................... 12

*Gomez v. Campbell-Ewald Co.*
    2014 WL 4654478 (9th Cir. Sept. 19, 2014) ................................................. 12

*Gutierrez v. Barclay's Group*
    No. 10cv1012 DMS (BGS), WL 579238 (S.D. Cal.  Feb. 9, 2011) ................. 11

*Heinrichs v. Wells Fargo Bank, N.A.,*
    2014 WL 985558 (N.D. Cal. Mar. 7, 2014)...................................................... 7

*Hernandez v. Collection Bureau of Am., Ltd.*
    2014 WL 4922379 (C.D. Cal. Apr. 16, 2014) .................................................. 1

*Kazemi v. Payless Shoesource, Inc.*
    2010 WL 963225 (N.D. Cal. 2010).................................................................. 5

*Kramer v. Autobytel, Inc.*
    759 F. Supp. 2d 1165 (N.D. Cal. 2010) ........................................................... 5

*Legg v. Voice Media Grp., Inc.*
    2014 WL 2004383 (S.D. Fla. May 16, 2014) ................................................... 4

*Mais v. Gulf Coast Collection Bureau, Inc.*
    2014 WL 4802457 (11th Cir. Sept. 29, 2014) ................................................. 4

*Meyer v. Portfolio Recover Associates, LLC*
    Case No. 11–56600 (9th Cir. filed Oct. 14, 2011) ........................................... 6

*Meyer v. Portfolio Recovery Associates, LLC*
    707 F.3d 1036 (9th Cir.2012),......................................................................... 6

*Moser v. FCC*
    46 F.3d 970 (9th Cir.1995).............................................................................. 12

*Olney v. Progressive Casualty Insurance Company*
    993 F.Supp.2d 1220 (S.D. Cal. 2014 .......................................................... 11, 12

*Osorio v. State Farm Bank,F.S.B.*
    746 F.3d 1242 (11th Cir. 2014)........................................................................ 11

*Pacleb v. Cops Monitoring*
    2014 WL 3101426 (S.D. Cal. July 7, 2014) ................................................... 11

*Robbins v The Coca-Cola Co.*
    2013 WL 2252646 (S.D. Cal. May 23, 2013).................................................. 5

*Satterfield v. Simon & Schuster, Inc.*
    569 F.3d 946 (9th Cir. 2009)....................................................................... 2, 6

*Sephry–Fard v. Dep't Stores Nat'l Bank*
    2013 WL 6574774 (N.D.Cal. Dec. 13, 2013) ................................................ 7

*Sherman v. Yahoo! Inc.*
    997 F. Supp. 2d 1129 (S.D. Cal. 2014) ......................................................... 6

*Soppet v. Enhanced Recovery Co. LLC*
    679 F.3d 637 (7th Cir. 2012)............................................................... 7, 11, 12

*Sterk v. Path, Inc.*
    2014 WL 2443785 (N.D. Ill. May 30, 2014) ................................................. 3

*Sterling v. Mercantile Adjustment Bureau, LLC.*
    2014 WL 1224604 (W.D.N.Y. Mar. 25, 2014)............................................ 11

**STATUTES**

Telephone Consumer Protection Act of 1991 ("TCPA"), 105 Stat. 2394
    (codified at 47 U.S.C. § 227)……………………………………………………..13

    47 U.S.C. § 227(b)(1)(A)……………………………………………………..13

    47 U.S.C. § 227 note……………………………………………….....10

Administrative Orders Review Act ("Hobbs Act"), 28 U.S.C. § 2342(1) …………………....1, n.1

Communications Act of 1934, as amended by the Telecommunications Act of 1996,
    47 U.S.C. § 402……………………………………………………..1, n.1

**REGULATIONS, ORDERS AND OTHER FCC AUTHORITIES**

47 C.F.R. § 64.1200(a)(1)…………………………………………………….…..13

*In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*
    18 F.C.C. Rcd. 14014 (2003) ...................................................................... 2, 9

*In Re The Matter Of Rules And Regulations Implementing The Telephone*
 *Consumer Protection Act of 1991*
  27 F.C.R. 15391 (2012) ................................................................. 3

*In The Matter of Cosumer Net v. ATT Corp.*
  15 F.C.C.R. 281 (1999) ............................................................... 12

*In the Matter of Dialing Servs, LLC*
  29 F.C.C. Rcd. 5537 (2014) ......................................................... 10

*In the Matter of Groupme, Inc./skype Commc'ns S.A.R.l*
 *Petition for Expedited Declaratory Ruling Rules & Regulations*
 *Implementing the Tel. Consumer Prot. Act of 1991*
  29 F.C.C. Rcd. 3442 (2014) ......................................................... 10

*In the Matter of Rules & Regulations Implementing the Tel.*
 *Consumer Prot. Act of 1991*
  19 F.C.C. Rcd. 19215 (2004) .......................................................... 9

*In the Matter of Rules & Regulations Implementing the Tel.*
 *Consumer Prot. Act of 1991*
  23 F.C.C. Rcd. 559 (2008) ............................................................. 3

*In the Matter of Rules & Regulations Implementing the Tel.*
 *Consumer Prot. Act of 1991*
  23 F.C.C. Rcd. 9779 (2008) ........................................................... 9

*In the Matter of Rules & Regulations Implementing the Tel.*
 *Consumer Prot. Act of 1991*
  27 F.C.C. Rcd. 15391 (2012) ......................................................... 9

*In the Matter of Rules & Regulations Implementing the Tel.*
 *Consumer Prot. Act of 1991*
  7 F.C.C. Rcd. 8752 (1992) ........................................................... 10

*Ms. Catherine O'hagan Wolfe*
  2014 WL 2959062 (F.C.C. June 30, 2014) ....................................... 10

*Notice of Proposed Rule Making in re Regulations Implementing the TCPA*
  2002 WL 31084939 (2002) ........................................................... 3

*Tel. Consumer Prot. Act Robocall Rules Political Campaigns & Promoters*
 *Are Reminded of Restrictions on Autodialed & Prerecorded Calls*
  27 F.C.C. Rcd. 11017 (2012) ......................................................... 4

**MISCELLANEOUS**

137 Cong. Rec. H11307-01 (Nov. 26, 1991) ....................................... 14

## I.   __INTRODUCTION__

Twitter's unfortunate rhetoric cannot mask the fact that its Motion to Dismiss is ill-founded and should be denied.  It asks the Court to ignore controlling FCC Orders that leave no question but that what was used here was an ATDS, attempting – in violation of the Hobbs Act[1] – to attack the validity of FCC orders in a district court.   But, even without regard to controlling FCC Orders, the First Amended Complaint ("FAC") explicitly alleges the use of autodialing equipment that has the capacity to store and produce telephone numbers to be called, using a random or sequential number generator and to dial such numbers – and does so in great detail.  There can be no question but that the FAC amply alleges the use of an ATDS.

In like fashion, Twitter asserts as a factual matter that it *did* have the consent of the called party.  While such a claim cannot form the basis of a motion to dismiss, in any event as it turns out, this is all a word game.  Twitter does not claim that it had the consent of Ms. Nunes, whom it called; instead, Twitter is arguing that some prior subscriber to that number at some point in the past supposedly consented to be sent Twitter texts and that this somehow excuses Twitter's burying Ms. Nunes in text messages she did not want.  Every court of appeal to consider the question – as well as the FCC – has ruled that the "called party" means the party who is the current subscriber to the number called who actually receives the call.  Not only does Twitter argue against this law, but further bases its argument on unsupported factual assertions outside the record that have no place in a motion to dismiss.  Thus, Twitter argues that it had the consent of the prior subscriber to the number (or perhaps the subscriber a few subscribers back), but there is no information in the record concerning the prior subscriber(s) of this telephone number.

---

[1] Under the Administrative Orders Review Act, known more informally as the Hobbs Act, the Court of Appeals is vested with "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47." 28 U.S.C. 2342(1). With some exceptions not relevant here, section 402 includes "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission under [the Communications Act of 1934, as amended by the Telecommunications Act of 1996]." *See Hernandez v. Collection Bureau of Am., Ltd.,* SACV 13-01626-CJC, 2014 WL 4922379 (C.D. Cal. Apr. 16, 2014) ("Taken together, these two statutes divest this Court of any authority to rule on the validity or invalidity of the FCC's 2003 Order... Rather, the Court is simply bound to apply the FCC's rulings.")

Similarly, Twitter asserts that it *intended* to call someone other than Ms. Nunes, but, again, Twitter's supposed intent, even if relevant, cannot form the basis of a motion to dismiss.

So, too, with Twitter's arguments concerning Ms. Nunes' attempts to get them to stop sending her the messages. Twitter acknowledges that she sent a message saying "STOP SENDING THESE MSGS," but claims that it somehow did not understand this to be a request to stop sending her messages. Again, this argument turns on what Twitter says it understood and what it would have done if it had understood things differently, but those are not matters in the record or upon which a motion to dismiss can be decided. We shall address these and Twitter's other arguments below. Suffice to say, under well-established law, the motion should be denied.

## II. THE COMPLAINT MORE THAN ADEQUATELY ALLEGES THE USE OF AN ATDS.

Twitter's motion is bottomed on the notion that in order to be an ATDS, the equipment used must *generate* the numbers to be called either randomly or sequentially. But that is not what the statute says.[2] The FCC, the agency charged with interpretation and enforcement of the TCPA statute, has repeatedly and definitively stated an opposite interpretation of the statute. As the FCC has stated repeatedly, "The statutory definition contemplates autodialing equipment that *either* stores *or* produces numbers." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C. Rec'd 14014, 14091-92 (2003) (the "2003 Report & Order") (emphasis added) ("It also provides that, in order to be considered an 'automatic telephone dialing system,' the equipment need only have the '*capacity* to store or produce telephone numbers (emphasis added)....'"); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) ("system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it."). The FCC explained that the ATDS requirement was to be interpreted broadly to apply to a wide spectrum of evolving technologies, including technology that is used to dial "lists" or "databases" of

---

[2] In footnote 2 of its brief Twitter wrongly states that in order to be an ATDS the statute requires that the equipment "store <u>and</u> produce" numbers to be called (emphasis added). It does not; it says "store <u>or</u> produce."

1   numbers, since such technology has the basic functional "capacity to dial numbers without human
2   intervention." *Id.*; *see also Sterk v. Path, Inc.*, 13 C 2330, 2014 WL 2443785 (N.D. Ill. May 30,
3   2014) (granting summary judgment for plaintiffs on ATDS and affording controlling weight to
4   the FCC "decisions stating that an ATDS may include equipment that automatically dials
5   numbers from a stored list without human intervention."). And the FCC has repeatedly
6   underscored this interpretation. Thus in 2008, in a Declaratory Ruling, the FCC again rejected
7   the argument that dialing equipment "meets the definition of autodialer only when it randomly or
8   sequentially generates telephone numbers, not when it dials numbers from customer telephone
9   lists." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
10  23 F.C.C. Rcd. 559, 566 (2008). The argument that the FCC expressly rejected in that
11  proceeding, of course, is precisely the argument that Twitter makes now.

12      Again, in 2012, the FCC emphasized the same point: "The Commission has, for example,
13  concluded that the scope of that definition [of an ATDS] encompasses 'hardware [that], when
14  paired with certain software, has the capacity to store or produce numbers and dial those numbers
15  at random, in sequential order, or from a database of numbers,' in light of, among other things, its
16  conclusion that 'the purpose of the requirement that equipment have the "capacity to store or
17  produce telephone numbers to be called" is to ensure that the prohibition on autodialed calls not
18  be circumvented.'" *In Re The Matter Of Rules And Regulations Implementing The Telephone
19  Consumer Protection Act of 1991*, 27 F.C.R. 15391, 1592 n.5 (2012). Yet, Twitter's motion
20  seeks *precisely* such "circumvention" of "the prohibition on autodialed calls."

21      In a footnote, Twitter argues that the 2003 Report & Order was limited to predictive
22  dialers. But that is not so. The 2003 Order was issued following an FCC notice[3] "explain[ing]

---

23

24  [3] See *Notice of Proposed Rule Making in re Regulations Implementing the TCPA*, 17 FCC Rcd.
    17459, 17473-74, ¶¶ 23-24, 2002 WL 31084939 (2002) ("2002 TCPA Notice") ("[m]ore
25  sophisticated dialing systems, *such as* predictive dialers *and other electronic hardware and
    software containing databases of telephone numbers*, are now widely used" and seeking comment
26  on "whether Congress intended the definition of "automatic telephone dialing system" *to be
    broad enough to include any equipment that dials numbers automatically*, either by producing 10-
27  digit telephone numbers arbitrarily or generating them from a database of existing telephone
    numbers.") (Italics added)
28

---

that more sophisticated dialing systems, *such as* predictive dialers and answering machine detection software, are now widely used by telemarketers . . . [and] invit[ing] comment on these and *other technologies* and … whether they fall within the restrictions on 'automatic telephone dialing systems.'" 2003 Order at 14090 (emphasis added).  Indeed, the 2003 Order itself expressly states that it applies not only to predictive dialers, but also to "modems." *Id.* at 14093 n.442.[4]  That the 2003 Order is not limited to predictive dialers is made explicitly clear in the 2012 Order, where the FCC describes the 2003 Order as covering *any equipment* -- not just predictive dialers -- that automatically dials numbers from a stored list:

> The Commission has emphasized that this definition [of ATDS] covers *any equipment* that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists....

2012 Order at 15392 n.5 (emphasis altered) ("The Commission has, *for example*, concluded that the scope of that definition encompasses 'hardware [that], when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers..'"); *see also Tel. Consumer Prot. Act Robocall Rules Political Campaigns & Promoters Are Reminded of Restrictions on Autodialed & Prerecorded Calls*, 27 F.C.C. Rcd. 11017, 11021 (2012) ("The Commission has emphasized that this definition covers *any equipment — including predictive dialers —* that has the specified capacity to dial numbers without human intervention whether or not the numbers called actually are randomly or sequentially generated or come from calling lists.") (emphasis added); *Legg v. Voice Media Grp., Inc.*, 13-62044-CIV, 2014 WL 2004383 (S.D. Fla. May 16, 2014) (finding the "2003 FCC Order as applying beyond the narrow circumstances of predictive dialers.").

But we wish there to be no mistake about it:  Twitter's motion to dismiss is ill-founded even without regard to the controlling interpretation of the statute given by the FCC.  Even

---

[4] See *Mais v. Gulf Coast Collection Bureau, Inc.*, 13-14008, 2014 WL 4802457 (11th Cir. Sept. 29, 2014) (applying Hobbs Act and holding that the 2008 FCC Order governed calls made in connection with medical debt while rejecting argument that Order was limited to consumer debt simply because the ruling listed an "example" of consumer debt since FCC did so illustratively, not exclusively, and finding "no evidence" that FCC intended a meaningful distinction).

accepting for sake of argument Twitter's proposition that the only calls that are prohibited are calls made by equipment that has the capacity to store <u>and</u> produce telephone numbers to be called using a random or sequential number generator and to dial such numbers, there is no question but that this is *precisely* what is alleged in ¶¶ 60 and 61 of the FAC.  And while Twitter does not directly criticize the level of detail provided concerning these allegations, we note that other cases, providing far less detail than here, have been held to adequately plead the use of an ATDS.  *E.g.,  Kazemi v. Payless Shoesource, Inc.,*  2010 WL 963225, at *2 (N.D. Cal. 2010); *Kramer v. Autobytel, Inc.,* 759 F. Supp. 2d 1165, 1171 (N.D. Cal. 2010); *Robbins v The Coca-Cola Co.*, 2013 WL 2252646 (S.D. Cal. May 23, 2013).

Plaintiff here provides unusually detailed and specific information not just about the messages sent and their content ("impersonal, promotional" messages that were "generic" and "commercial in nature"; *see* ¶¶ 41, 44), Twitter's licensed SMS short code number 40404 (¶¶ 8, 18, 21), how companies lease short code numbers in order to run automated mobile text messaging applications to send "bulk" SMS text messages (*see* ¶ 15), the volume and frequency of messages Twitter sent ("*en mass"* transmissions, including multiple texts per day, e.g., "30 texts a day" and "50 msgs daily" and "massive amounts"; *see* ¶¶ 3, 40, 41, 44, 62)[5] and how Twitter is capable of sending high volume bulk text at very high speeds ("SMPP is a standard communication protocol used by organizations, such as Twitter, needing to send vast amounts of SMS messages nearly simultaneously (i.e., high volume bulk text messaging), at very high speeds (i.e., hundreds or thousands of messages per second)...Twitter processes close to a billion SMS tweets per month and that number is growing…"; *see* ¶ 23), but Plaintiff also provides great detail about the specific software and equipment that was used to send the messages – much more than has repeatedly been held to amply plead the use of an ATDS.  *See, e.g.,*  ¶ 61 ("Twitter's systems are built atop open source software and technologies (including MySQL, Ruby on Rails, OpenJDK (JVM), Netty, Apache Lucene, Apache Thrift, Apache Hadoop and Redis, etc.) that *utilize* programming language (Java, C, C++, Scala, JavaScript, Ruby etc.) that are all capable of

---

[5] Indeed, numerous examples of the messages are attached as Exhibit A to the FAC.

1    generating telephone numbers, using a random or sequential number generator… Twitter sends

2    billions of SMS messages every month to hundreds of mobile carriers all around the world using

3    Netty. Netty's Java functionality similarly includes a "random number generator" that has the

4    capacity to produce random telephone numbers to be called.").

5           Twitter seeks to avoid all of this by asserting that its equipment does not have the *present*

6    ability to generate and call numbers and would have to be reprogrammed in order to do so.

7    (Twitter Mot. 5:1-15.) This argument fails twice over. First, it is premised on facts outside the

8    pleadings which have no place in a motion to dismiss, facts that are contrary to the allegations of

9    the FAC. Second, it is an argument that is foreclosed by controlling Ninth Circuit law on this

10    very question. As the Court in *Sherman v. Yahoo! Inc.*, 997 F. Supp. 2d 1129, 1142 (S.D. Cal.

11    2014), reconsideration denied (July 3, 2014), recently explained in addressing and rejecting this

12    precise argument and the district court authorities relied on by Twitter now to make it again:

> 13    Furthermore, in *Meyer v. Portfolio Recovery Associates, LLC,* 707 F.3d 1036,
> 14    1043 (9th Cir.2012), the Ninth Circuit specifically considered and rejected a
> defendant's argument that its dialers did not fall within the statutory definition of
> 15    ATDS because its dialers did not "have the present capacity to store or produce
> numbers using a random or sequential number generator." *See Meyer v.*
> 16    *Portfolio Recover Associates, LLC,* Case No. 11–56600, Dkt. No. 6–1
> (appellant's opening brief) at 25 (9th Cir. filed Oct. 14, 2011) (arguing that "[t]he
> 17    question at issue is the *present* capacity of [defendant's] dialers to store and
> produce numbers using a random and sequential number generator, not what
> 18    theoretical, future capacity could be possible if significant time and resources
> were spent by PRA to modify its dialers") (emphasis in original). In rejecting the
> 19    defendant's argument, the court reaffirmed its previous holding in *Satterfield* that
> the TCPA focuses on the equipment's capacity rather than present use. *Meyer,*
> 20    707 F.3d at 1043. [Footnote omitted.] (Emphasis in original.)

21    The FAC sufficiently alleges the ATDS element of the cause of action.

22    **III.  TWITTER'S ARGUMENTS FOR DISMISSAL BASED ON OTHERS' SUPPOSED**

23           **CONSENT ARE UNTENABLE**

24           Twitter asserts that it intended to call someone other than the person to whom the

25    telephone number was assigned, Plaintiff Nunes. Twitter claims that it had the consent from

26    someone else who once had that number, and it was intending to reach that person. Twitter states

27    that "unbeknownst to Twitter" that number was "later" reassigned to Plaintiff. (Twitter Mot. at

28    8:28 – 9:1.) There are multiple flaws with that attempted argument. A motion to dismiss cannot

1  be based on a party's claimed intent in a brief; it must be based on the allegations made in the

2  pleadings.  Nor as a matter of law, does the assertion that someone intended to call someone else

3  constitute a defense to a TCPA violation, as the FCC has explicitly ruled.

4          More fundamentally, an assertion that the defendant had consent to send the message is an

5  affirmative defense; lack of consent is not an element of any plaintiff's TCPA claim.   As Judge

6  Alsup explained in *Heinrichs v. Wells Fargo Bank, N.A.*, C 13-05434 WHA, 2014 WL 985558

7  (N.D. Cal. Mar. 7, 2014) in denying a motion to dismiss a TCPA claim based on consent grounds:

8          While the undersigned judge is inclined to agree with the analysis set forth in
           *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012)—the only
9          appellate decision so far to define "called party" for purposes of the consent
           exemption, as provided under Section 227(b)(1)(A)—the order need not determine
10         who "the called party" was to decide the present Rule 12(b)(6) motion. **This is
           because the consent exemption is not an element of Heinrichs' TCPA claims.**
11                                              ***
           District courts in this circuit have also recognized the consent exemption as an
12         affirmative defense—and not an element of a TCPA claim—at the pleading stage.
           *See, e.g., Sepehry–Fard v. Dep't Stores Nat'l Bank,* 13–CV–03131–WHO, 2013
13         WL 6574774 (N.D.Cal. Dec. 13, 2013) (Judge William H. Orrick); *Connelly v.
           Hilton Grant Vacations Co., LLC,* 12CV599 JLS KSC, 2012 WL 2129364, *3
14         (S.D. Cal. June 11, 2012) (Judge Janis L. Sammartino). Indeed, the defendants in
           *Sepehry–Fard* moved to dismiss a TCPA claim under Rule 12(b)(6) because the
15         plaintiff had not alleged that the phone calls there were made without consent.
           Nonetheless, *Sepehry–Fard* held that the plaintiff did not need to affirmatively
16         allege such a lack of consent, because "express consent is not an element of a
           TCPA plaintiff's prima facie case...." 2013 WL 6574774 at *3 (internal quotations
17         omitted). So too here.
                                                ***
18         As Wells Fargo challenges the amended complaint only on consent grounds, its
           motion to dismiss is accordingly **DENIED.**
19

20  2014 WL 985558 at *2-3; (first bolding emphasis added).

21          But even without regard to this determinative point of law, Twitter's position is untenable.

22  There is no small irony in Twitter's plea of unfairness in holding a party liable "even when they

23  make good faith efforts to do what the law requires." (Mot. 13:4-5.)  To say that Twitter made *no*

24  effort to do what the law requires appears to be an understatement.  Twitter cannot be unaware of

25  the phenomenon of frequent reassignment of cell phone telephone numbers and the fact that a

26  consent given with respect to a certain cell phone number (there is nothing in the record about

27  when Twitter claims that it obtained a consent with respect to this number or how many people it

28  was reassigned to since then before Ms. Nunes obtained the number) may well no longer relate to

the *current* owner of that number.[6]  Paragraph 27 of the FAC lays out in detail the mobile marketing industry's acute awareness of the problem of sending messages to a person at a recycled number based on an authorization received from the prior subscriber to that number and the practices that it recommends to avoid the problem.  Both the Mobile Marketing Association ("MMA")[7] and CTIA-The Wireless Association® ("CTIA")[8] recommend that companies such as Twitter put in place systems for managing deactivation and recycled number information so as to allow it to process that information within **three days** of deactivation.  (FAC ¶27.)

The FAC alleges that "numerous commercially available services exist to help mobile marketers, such as Twitter, identify recycled numbers and non-consenting cellular subscribers," (FAC ¶ 28) and goes on to list companies that advertise their ability to instantly identify and flag any number on a company's mailing list that has been deactivated.  The FAC lists the names of some of the companies that provide such services and (in ¶ 28) alleges, "Neustar (from which Twitter received its short code number) advertises its ability to identify non-consenting cellular numbers and subscribers **in real time** to help mitigate TCPA non-compliance risk.  Specifically, Neustar can 'clean' a company's telephone database by identifying telephone number ownership and porting history (e.g. numbers switched from one cellular carrier to another) in real time and, then, comparing those results to the company's list of consenting subscribers to identify mismatches." (Emphasis added.)

Quarreling with the FAC, Twitter asserts that it is impossible to find out which numbers it

---

[6]   Indeed, in its motion, Twitter says, "Given how often cell phone numbers change hands…" (Mot. at 11:12).   Twitter clearly is and has been aware of the problem.

[7] The MMA is a global authoritative trade organization that issues codes of conduct, best practices, guidelines, rules and instructions for all companies engaged in mobile marketing.  Its U.S. Consumer Best Practices for Messaging are based on accepted industry practices, common wireless carrier policies and regulatory guidance.  With over 800 members, the MMA is the preeminent source for mobile marketing information and expertise.

[8]   The CTIA is an international non-profit organization that audits and enforces the rules surrounding carrier-based text messaging programs.  Together, the MMA and the CTIA establish and publish guidelines setting forth accepted industry best practices for mobile marketing.

1   wishes to call are recycled. (Mot. at 12:8-12.) Indeed, not only does the FAC list numerous

2   commercially available sources, but we note, by statute, the Federal Trade Commission is

3   required to make *precisely* such a review to regularly compare numbers on the Do Not Call

4   Registry against a national database and remove recycled or cancelled numbers. *See In the*

5   *Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 23 F.C.C. Rcd.

6   9779, 9782 (2008); *see also, In Re Rules & Regulations Implementing the Tel. Consumer Prot.*

7   *Act of 1991,* 18 F.C.C. Rcd. 14014, 14036 (2003) (same).

8       Twitter does not claim that it was unaware of the high incidence of recycling of cell phone

9   numbers, nor does it claim that it availed itself of any of the several commercially available

10  services to try to avoid sending text messages to persons who had not consented to receive them.

11  Indeed, it does not assert that it took *any* steps to avoid doing so. It merely asserts that (at some

12  unstated point in the past) it received an authorization from someone who at that point had that

13  number, and that it simply continued to send messages to that number thereafter. Twitter does

14  not explain how this constitutes "good faith efforts to do what the law requires."

15      But, as we have noted, the FCC has made clear – more than once – that supposed "good

16  faith" is not a defense to a TCPA violation. *In the Matter of Rules & Regulations Implementing*

17  *the Tel. Consumer Prot. Act of 1991,* 19 F.C.C. Rcd. 19215, 19219 (2004) ("We also decline to

18  extend our safe harbor provision to any call made erroneously or inadvertently to a wireless

19  number regardless of whether that number has been recently ported from wireline service as

20  suggested by the DMA. We note that the Commission considered and declined to adopt a similar

21  proposal in the 2003 TCPA Order."), citing *In Re Rules & Regulations Implementing the Tel.*

22  *Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14117 (2003) ("we reject proposals to create

23  a good faith exception for inadvertent autodialed or prerecorded calls to wireless numbers").

24      The FCC has also made clear that callers must obtain the prior express consent of the

25  actual "recipient" or "receiving party" of the text messages; and not the person they intended to

26  call. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of*

27  *1991*, 27 F.C.C. Rcd. 15391, 15394 (2012) ("As noted above, the TCPA and Commission rules

28  require that the sender of autodialed text messages obtain the prior express consent of the

*receiving party* before sending such messages" and finding that the transmission of certain opt-out confirmation text messages is "permissible under the TCPA because *recipients of these texts have given prior express consent* within the meaning of section 227.") (emphasis added); *See also In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752 (1992) ("the market research calls to cellular carriers, as conducted by the West CelShare program, are clearly prohibited absent the prior express consent of the *cellular customer called*…the fact that its market research calls … are made without prior consent from the *subscribers* places its service under the prohibitions of the TCPA") (emphasis added); *In the Matter of Groupme, Inc./skype Commc'ns S.A.R.l Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 29 F.C.C. Rcd. 3442 (2014) (stating that "we are not convinced by commenters who assert that obtaining consent directly from the *recipient* of a voice call or text message to a wireless telephone number is not possible in all instances" and that "the protections of the TCPA are extended to the *recipients* of these [] messages.").[9]  If there were any doubt, Congress made this point absolutely clear by making a finding that "[b]anning such automated or prerecorded telephone calls ... except where the *receiving party* consents to receiving the call ... is the *only* effective means of protecting telephone consumers from this nuisance and privacy invasion."  TCPA, 105 Stat. 2394, note following 47 U.S.C. § 227 (Congressional Finding # 12) (emphasis added).

Two Courts of Appeals have ruled on the meaning of "called party" in the context of the TCPA's prior express consent exception, the Seventh and the Eleventh Circuits.  Both involved telephone numbers that were reassigned to the plaintiffs and both reached the identical conclusion: that the "called party" for purposes of the statute is "the person subscribing to the called number at the time the call is made" who answered[10] the call and not the party the caller

---

[9] *See also Ms. Catherine O'hagan Wolfe*, 13-1362, 2014 WL 2959062 (F.C.C. June 30, 2014); *In the Matter of Dialing Servs.*, LLC, 29 F.C.C. Rcd. 5537 (2014)

[10] "For cell service, the subscriber and the person who answers almost always are the same, given the norm that one person does not answer another's cell phone."  *Soppet,* 679 F.3d at 640

1   intended to reach. *Soppett v. Enhanced Recovery Co.*, 679 F.3d 637, 643 (7th Cir. 2012) (in a

2   certified class action brought by cell-phone subscribers who received autodialed calls directed at

3   prior subscribers to their phone numbers, court explained that "any consent previously given,

4   lapses when Cell Number is reassigned."), *Breslow v. Wells Fargo Bank, N.A.*, 755 F.3d 1265,

5   1267 (11th Cir. 2014) (affirming district court's holding that "called party" for the purposes of §

6   227(b)(1)(A)(iii)'s prior express consent provision was "not Former Customer, but the Plaintiffs"

7   who were the current subscribers to the cell phone service who received the calls); *see*

8   *also Osorio v. State Farm Bank,F.S.B.*, 746 F.3d 1242, 1250-52 (11th Cir. 2014).[11]

9           While the Ninth Circuit has not ruled on this question, there is no reason to think it would

10  rule differently from these courts and the FCC.  Not surprisingly, district courts within this circuit

11  have reached the same conclusion time after time that called party means the person who actually

12  received the calls. *E.g.  Gutierrez v. Barclay's Group,* No. 10cv1012 DMS (BGS), WL 579238 at

13  *4-5 (S.D. Cal.  Feb. 9, 2011) (same); *Pacleb v. Cops Monitoring,* No. 2:14–CV–01366–CAS,

14  2014 WL 3101426 at *2-3 (S.D. Cal. July 7, 2014) (same); *Olney v. Progressive Casualty*

15  *Insurance Company,* 993 F.Supp.2d 1220, 1223-24 (S.D. Cal. 2014 (same).  We are aware of no

16  contrary authority in this Circuit, nor has Twitter cited any.

17          Although Twitter says that "called party" naturally means "the party the caller intended to

18  call" (Mot. at 9:22-23), that is not at all true.  The called party is, perforce, the party that was

19  called – in this case, Ms. Nunes.  *See, e.g., Olney v. Progressive Cas. Ins. Co.*, 993 F. Supp. 2d

20  1220, 1223 (S.D. Cal. 2014) ("Suppose Smith, trying to reach Jones, dials the number with a typo

21  and reaches Perkins, who says 'you have the wrong number.' No colloquial user of English would

22  call Jones rather than Perkins the 'called party.' "), quoting *Soppet*, 679 F.3d at 640–41  Indeed,

23  as the FCC specifically ruled fifteen years ago with regard to calling a number where there was a

---

24  [11] *See also Sterling v. Mercantile Adjustment Bureau, LLC.*, 11-CV-639, 2014 WL 1224604 at *3
25  (W.D.N.Y. Mar. 25, 2014) ("MAB may not rely upon the consent of Jane Doe (the intended but
    not actual recipient of the calls) as a defense to plaintiff's TCPA claims."); *Paradise v.*
26  *Commonwealth Fin. Sys., Inc.*, 3:13-CV-00001, 2014 WL 4717966 at *3 (M.D. Pa. Sept. 22,
    2014) (same); *D.G. v. Diversified Adjustment Serv., Inc.*, 11 C 2062, 2011 WL 5506078 at *3
27  (N.D. Ill. Oct. 18, 2011) (same); *Tang v. Med. Recovery Specialists, LLC*, 11 C 2109, 2011 WL
28  6019221at *3 (N.D. Ill. July 7, 2011) (same).

---

1   do-not-call request, "Indeed, the distinction proffered by AT&T potentially would eviscerate the

2   policy goals of the statute in protecting telephone subscribers from unwanted telemarketing calls

3   by creating a virtually irrefutable defense that the telemarketer was trying to reach 'someone else'

4   at that number." *In The Matter of Cosumer Net v. ATT Corp.,* 15 F.C.C.R. 281, 298 ¶ 37 (1999).

5   What Twitter suggests is not a workable way to interpret a remedial statute.[12]

6       But this is a sterile discussion in any event.  When Twitter acknowledges, as it has, the

7   high turnover in cell phone numbers and it has not checked with any of the several commercially

8   available sources whose business it is to stay current (indeed, even in real time) on the assignment

9   and reassignment of numbers as to whether the number it wishes to call is still assigned to the

10  person who it claims gave it a consent, there cannot even be any good faith claim as to "intent" to

11  call a particular person.  Twitter has chosen to be willfully ignorant as to whom it is calling.[13]

12      Twitter's contentions cannot support a motion to dismiss and the contentions should be

13  rejected whenever they are considered.

14  **IV.    THE FAC SUFFICIENTLY ALLEGES THAT TWITTER CONTINUED TO**

15  **SEND MESSAGES AFTER PLAINTIFF ASKED IT TO STOP SENDING THEM**

16      In Section C of its Motion, Twitter, recognizing that Plaintiff's complaint (which alleges

17  that Twitter continued to send messages to her even after being asked to stop) would nonetheless

18  survive even if Twitter were correct that it cannot be liable for sending texts to consumers who

19  had recycled numbers, asserts that "the complaint fails to state a claim with respect to SMS texts

20  Plaintiff received prior to sending a valid opt-out request" (pp 14-15) and then posits that no

21  "valid opt-out request" was made since, according to Twitter, Plaintiff failed to do so in a "valid

22  _____

23  [12] *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013) ("Because the TCPA is a
    remedial statute, it should be construed to benefit consumers.")

24

25  [13] Twitter has a section in its motion suggesting Constitutional difficulties. (Motion, 11:7 –
    13:28.)  Although Twitter is correct that the TCPA is a strict liability statute (*Alea London Ltd. V.
    American Home Services,* 638 F.3d 768, 775 (11th Cir. 2011)), court after court has held that it is

26  constitutional, most recently in *Gomez v. Campbell-Ewald Co.*, 13-55486, 2014 WL 4654478 at
    *3 (9th Cir. Sept. 19, 2014), *citing Moser v. FCC*, 46 F.3d 970, 973–74 (9th Cir.1995).  In any

27  event, Twitter's constitutional arguments not only go far beyond the allegations of the complaint
    and require the Court to assume various facts, but also quarrel with the FAC's allegations.

28

1   and recognizable way."

2          While Twitter takes significant liberties in attributing supposed concessions to Plaintiff

3   and citing paragraphs of the FAC that do no such thing, it is clear that in December of 2013,

4   plaintiff texted Twitter a message saying "STOP SENDING THESE MSGS" (FAC ¶ 45) after

5   sending a message that Twitter says said "Sto" rather than "Stop." (*Id.*)  As the FAC notes, under

6   the industry Best Practices, even "Sto" should have resulted in a cessation of the messages. *See,*

7   FAC ¶ 36.  And there can be no question but that "STOP SENDING THESE MSGS" is about as

8   clear a request for Twitter to stop sending those messages as the English language allows.

9   Moreover, if Twitter is (without reference to any external authority or internal policy) contending

10  that only the word "STOP" was relevant, besides being nonsensical, it is in contravention of

11  industry best practices that required Twitter to ignore the words after "STOP" in honoring all

12  reasonably clear opt-out requests and to scan text message logs regularly to identify opt-out

13  attempts and take action to terminate those subscriptions, whether or not the subscribers utilized

14  the correct opt-out keywords or methods.  (FAC ¶¶ 35-37.)  But even worse, Twitter argues that

15  Plaintiff's stop requests failed to do "what Twitter's instructions require," ignoring Plaintiff's

16  allegations that Twitter's messages failed to provide "instructions on how to stop receiving the

17  messages" despite industry Best Practices requiring that they be provided on a regular basis.

18  (FAC ¶ 31, 36, 37, 44)

19         Plaintiff never should have had to make an "opt-out" request.  That stands the TCPA on

20  its head.  Unless she had given her express prior consent, she never should have received any

21  SMS text messages and never should have had to "opt out" of something to which she never

22  "opted in."  But she did, and the FAC alleges that the messages continued unabated for at least

23  seven months thereafter.  That is impermissible.

24  **V.     THESE MESSAGES CONSTITUTED PROHIBITED ARTIFICIAL OR**
25  **         PRERECORDED VOICE MESSAGES**

26         As an alternative basis for liability, Paragraph 63 of the FAC alleges that Twitter's texts

27  to Plaintiff and the class were made using "an artificial or prerecorded voice" within the meaning

28  of 47 U.S.C. § 227(b)(1)(A) and 47 C.F.R. § 64.1200(a)(1).  These provisions do not require the

1    use of an ATDS to impose liability.  Twitter argues that the claim is "nonsense."  (Motion at

2    7:17.)  Far from being "nonsense," as we shall demonstrate, this claim is consistent with the plain

3    language of the statute (and dictionary definitions) and is fully consistent with the purpose of that

4    phrase as supported by the legislative history: to limit the volume of unwanted calls made to

5    consumers by non-live callers (which Congress noted are more invasive of privacy than live

6    calls).  Reference to the legislative record and multiple sources make clear that the claim is

7    completely consistent with the legislative intent of the statute and its plain language.

8        Twitter posits that prerecorded calls "are more of a nuisance and a greater invasion of

9    privacy than calls placed by a live person."  (Motion at 8:9-10, quoting a Senate Report.)  But

10   Twitter does not explain why that was so.  In debating the bill that became the TCPA, the

11   Congressional Record reflects the following clear expression of concern (this from Rep. Cooper

12   of New Jersey):

13           I have said here before that some of these calls are much more annoying
         than others. For example, I regard and I hope the FCC will regard, robotic calls by
14       machines such as autodialers and computer-generated voices to be a much greater
         threat to the privacy of our homes than calls by live operators. At least you can
15       vent your anger to a real person if they have interrupted your dinner. You can ask
         them questions and hold them accountable to some extent. At least a live person
16       can only call one person at a time.

17   137 Cong. Rec. H11307-01, 1991 WL 250340.  Calls by non-live means were (rightly) viewed by

18   Congress as a particularly odious form of interruption and invasion of privacy, in that *inter alia,*

19   such non-live calls did not provide the victim the opportunity to rebuke the caller or instruct them

20   not to call again.  Every one of those concerns expressed by Congress applies *equally* to an SMS

21   message. (Indeed, as the FAC notes (¶ 37), Twitter's messages did not even contain instructions

22   on how to stop the messages, and often did not identify Twitter by "name" as the sender; (see ¶

23   22).  Paragraph 63 of the FAC is fully consistent with the legislative intent of the TCPA.

24       It is also fully consistent with its language.   The very first definition of "artificial" in the

25   Collins English Dictionary referred to in ¶ 63 of the FAC is "produced by man."   Even Twitter

26   does not dispute that the messages in question were produced my man.   The statute provides a

27   disjunctive "or" and provides that either an "artificial or prerecorded voice" is covered by the

28

statute's provisions. Neither does (or could) Twitter dispute that the messages are "prerecorded" by any reasonable understanding and the dictionary, as set out in ¶63.

The dispute then comes down to "voice." Twitter argues that, as used in the statute, "voice" can only mean the word "in its most basic sense: 'sound produced by vertebrates by means of lungs, larynx, or syrinx; especially sound so produced by human beings.'" Twitter never attempts to explain why the word should be construed "in its most basic sense" -- or why such construction serves the purposes of this remedial statute.

As it turns out, Vocabulary.com lists the second meaning of "voice" to be "**A means or agency by which something is expressed or communicated**," a definition that more than comfortably fits what happened here. (www.vocabulary.com/dictionary/voice.) Similarly, definition 1.1 found in Oxford Dictionaries.com is "An agency by which a particular point of view is expressed or represented" – again, a definition that very comfortably fits the events described in this complaint. (www.oxforddictionaries.com/us/definition/american_english/voice.)

The TCPA is a remedial statute that was meant to combat the problem of companies using emerging telecommunication technology to bombard unwitting and defenseless citizens with unwanted communications. The technology has evolved, but the problem has remained – indeed, grown. Instead of robocalls, companies use SMS, and do so because it is cheaper, and reaches its intended targets with almost 100% reliability and usually gets read within the first **4 to 6 minutes of being sent** a remarkable 90% of the time. (FAC ¶ 14.) The cost to advertisers is almost nothing (certainly on a per-message basis), but the cost to the unconsenting recipients – always in annoyance and invasion of privacy and often in terms of charges for the SMS messages – is enormous. Twitter has given no reason why this Court or any court should restrictively interpret this remedial statute.

## VI. CONCLUSION

The motion should be denied.

1

Respectfully submitted,

2

Dated:  October 14, 2014

3

By:   */s/ John G. Jacobs*
_____

4

John G. Jacobs
Bryan G. Kolton

5

David Schachman
Jeffrey F. Keller

6

Carey G. Been
Sarah R. Holloway

7

8

*Attorneys For Plaintiff*
BEVERLY NUNES

9

and the Putative Class

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, John G. Jacobs, an attorney in this matter, certify that on  October 14, 2014, I served the

foregoing *Plaintiff's Opposition To Twitter's Motion To Dismiss The First Amended Complaint*

by causing true and accurate copies of such paper to be filed and transmitted to the persons

registered to receive such notice via the Court's CM/ECF electronic filing system.

/s/  John G. Jacobs