JEFFREY F. KELLER (SBN 148005)
jfkeller@kellergrover.com
CAREY G. BEEN (SBN 240996)
cbeen@kellergrover.com
SARAH R. HOLLOWAY (SBN 254134)
sholloway@kellergrover.com
**KELLER GROVER, LLP**
1965 Market Street
San Francisco, California  94103
Telephone: (415) 543-1305
Facsimile: (415) 543-7861

JOHN G. JACOBS (*PRO HAC VICE*)
jgjacobs@jacobskolton.com
BRYAN G. KOLTON (*PRO HAC VICE*)
bgkolton@jacobskolon.com
**JACOBS KOLTON, CHTD.**
55 West Monroe Street, Suite 2970
Chicago, Illinois 60603
Telephone: (312) 427-4000
Facsimile: (312) 268-2425

Attorneys for Plaintiff Beverly
Nunes and the Putative Class

DAVID SCHACHMAN (*PRO HAC VICE*)
ds@schachmanlaw.com
**LAW OFFICES OF DAVID
SCHACHMAN, P.C.**
55 West Monroe Street, Suite 2970
Chicago, Illinois 60603
Telephone: (312) 427-9500
Facsimile: (312) 268-2425

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEVERLY NUNES, individually and on behalf of a class of similarly situated individuals,<br><br>                    Plaintiff,<br><br>          v.<br><br>TWITTER, INC.,<br><br>                    Defendant. | Case No. 3:14-cv-02843-VC<br><br>CLASS ACTION<br><br>**[CORRECTED] NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**<br><br>**[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]**<br><br>**Ctrm:**   4<br>**Judge**:   Hon. Vince Chhabria<br>**Date:**   June 2, 2016<br>**Time:**   10:00 a.m. |

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on June 2, 2016, at 10:00 a.m., or at such other time as the Court may set, the undersigned will appear before the Honorable Vince Chhabria in Courtroom 4-17[th] Floor of the United States Courthouse at 450 Golden Gate Avenue, San Francisco, California, and then and there present the attached Motion for Partial Summary Judgment.

This motion asks the Court to grant summary judgment on two issues: (a) to determine that Twitter is responsible under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*., for making the SMS text message calls that Plaintiff received; and (b) that Twitter is not entitled to immunity for such calls under the terms of § 230(c)(1) of the Communications Decency Act, 47 U.S.C. § 230(c)(1).

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in Support of Motion filed herewith, the Declaration Of Bryan Kolton In Support of Plaintiff's Motion For Summary Judgment and all exhibits attached thereto, Plaintiff's Request for Judicial Notice in Support of Motion for Partial Summary Judgment, the Declaration Of Beverly Nunes In Support Of Plaintiff's Motion For Partial Summary Judgment and the Supplemental Declaration Of Beverly Nunes In Support Of Plaintiff's Motion For Partial Summary Judgment and all exhibits attached thereto, the pleadings and papers filed herein and upon such other matters as may be presented to the Court at the time of the hearing.

Dated: March 17, 2016                    Respectfully submitted,

                                         BEVERLY NUNES, individually and on
                                         behalf of a class of similarly situated individuals,

                                          /s/ *John G. Jacobs*
                                         John G. Jacobs (*Pro Hac Vice*)
                                         Bryan G. Kolton (*Pro Hac Vice*)
                                         JACOBS KOLTON, CHTD.
                                         55 West Monroe Street, Suite 2970
                                         Chicago, Illinois 60603

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jeffrey F. Keller (SBN 148005)
Carey G. Been (SBN 240996)
Sarah R. Holloway (SBN 254134)
KELLER GROVER, LLP
1965 Market Street
San Francisco, California 94103

David Schachman (*Pro Hac Vice)*
LAW OFFICES OF DAVID SCHACHMAN, P.C.
55 West Monroe Street, Suite 2970
Chicago, Illinois 60603

1

**<u>TABLE OF CONTENTS</u>**

2  I.      Introduction    ...............................................................................................1

3  II.     Statement Of Facts ........................................................................................1

4          A.      Twitter Account Holders And Tweeting..................................................1

5          B.      Twitter's Processing And Displaying Of Tweets On Timelines...................3

6          C.      Twitter's Asymmetric Follow Model And Followers..................................5

7          D.      Twitter's Sending Of Notifications To Followers
                   And Follower Delivery Preferences .......................................................5
8
           E.      Twitter's Constructing And Sending Of SMS Notifications
9                  Using Short Code 4040 .......................................................................7

10         F.      Twitter's Knowledge About The Problem Of Sending
                   SMS To Recycled Numbers ...................................................................10
11
           G.      Twitter's Ability To Override SMS Delivery Preferences
12                 And Stop SMS Delivery ......................................................................10

13         H.      Twitter's Sending Of SMS Notifications To Plaintiff's Cell Phone ..........10

14  ARGUMENT ...................................................................................................14

15  III.    Twitter Is Responsible For The Calls In Question ............................................14

16         A.      Twitter Has Admitted That It Is The Maker Or Sender Of The Text Calls ..............14

17         B.      Twitter Took The Steps Necessary To Physically Place The Text Calls.................15

18                 i.      YouMail ....................................................................................16

19                 ii.     TextMe .....................................................................................18

20         C.      Twitter Is So Involved In Making Calls To Be Deemed
                   To Have Initiated Them .....................................................................19
21
    IV.    The Communications Decency Act Provides No Immunity For Twitter ..............................21
22
    CONCLUSION ...................................................................................................25
23

24

25

26

27

28

---

1

## <u>TABLE OF AUTHORITIES</u>

2

### <u>CASES</u>

3

*Barnes v. Yahoo!, Inc.,*
    570 F. 3d 1096 (9th Cir. 2009) ................................................................ 22 n.15

4

*Doe No. 14 v. Internet Brands, Inc.,*
    767 F. 3d 894 (9th Cir. 2014) ............................................................................ 22

5

6

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC,*
    521 F. 3d 1157 (9th Cir. 2008) ........................................................................ 22

7

*Fraley v. Facebook,*
    830 F. Supp. 2d 785 (N.D. Cal. 2011) ............................................................ 24

8

9

*Gomez v. Campbell-Ewald Co.,*
    768 F. 3d 871 (9th Cir. 2014) cert granted, 135 S. Ct. 2311, 191 L. Ed. D 977 (2015)
    and aff'd, 136 S. Ct. 663 (2016), as revised (Feb. 9, 2016) .................................... 23

10

11

*Huricks v. Shopkick, Inc.,*
    No. C-14-2464 MMC, 2015 WL 5013299 (N.D. Cal. Aug. 24, 2015) ................................ 18

12

*La v. San Mateo Cty. Transit Dist.,*
    No. 14-cv-01768-WHO, 2014 WL 6682476 (N.D. Cal. Nov. 25, 2014) .................... 14, n.10

13

14

*Payton v. Kale Realty LLC,*
    No. 13 C 8002, 2016 WL 703869 (N.D. Ill. Feb. 2, 2016) ................................... 20

15

*Perkins v. LinkedIn,*
    53 F. Supp. 3d 1222 (N.D. Cal. 2014) ............................................................ 22

16

17

*Satterfield v. Simon & Schuster, Inc.,*
    569 F.3d 946 (9th Cir. 2009) ................................................................ 1, n.2, 16

18

*Sethi v. Seagate U.S. LLC Grp. Disability Income Plan,*
    No. 11–cv–06188–WHA, 2012 WL 3834948 (N.D. Cal. Sept. 4, 2012) .................... 14, n.10

19

20

*Sherman v. Yahoo!, Inc.,*
    997 F. Supp. 2d 1129 (S.D. Cal. 2014) ........................................................ 22-23

21

*Wreyford v. Citizens for Transportation Mobility,Inc.,*
    957 F. Supp. 2d 1378 (N.D. Ga. 2013) ............................................................ 23

22

23

### <u>STATUTES</u>

24

*Telephone Consumer Protection Act,*
    47 U.S.C. § 227 ............................................................................ 1, 22-23

25

*Communications Decency Act,*
    47 U.S.C. § 230(c)(1) ........................................................................ 1, 21-23

26

27

28

---

1

**TABLE OF AUTHORITIES (*Continued*)**

2

*Telephone Consumer Protection Act,*
        47 U.S.C. § 227 (b)(1)(A)................................................................................ 22, 23

3

4

**RULES AND REGULATIONS AND OTHER AUTHORITIES**

5

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,*
        64 Communications Reg. (P&F) 19 (F.C.C. Jan. 11, 2016) .................................... 19

6

7

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,*
        30 F.C.C. Rcd. 7961 (F.C.C. July 10, 2015) ............................................................ 1

8

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,*
        18 F.C.C. Rcd. 14014 (F.C.C. July 3, 2003) ................................................... 1, n.2

9

10

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,*
        23 F.C.C. Rcd. 559, 565 (F.C.C. 2008) ................................................................ 23

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      Introduction:  Statement Of The Issues To Be Decided

Plaintiff brought this case under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*., after receiving hundreds of unconsented-to SMS text messages.[1]  It is long since decided that an SMS text message is a "call" under the TCPA.[2]  This motion addresses the question framed in the July 10, 2015 FCC Declaratory Ruling and Order:  "who makes a call under the TCPA and is thus liable for any TCPA violations."  *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 30 FCC Rcd 7961, 7978 ¶ 25 (F.C.C. July 10, 2015) (the "FCC Order").  An understanding of the process by which such text messages are sent leaves no room for doubt but that Twitter is the "maker" of the calls in question and thus responsible for the TCPA violations that resulted in Plaintiff's receipt of hundreds of unconsented-to calls, even without regard to Twitter's previous repeated admission that it was the "maker" of the calls (texts) in question.

Separately, Twitter asserts that, in any event, it is immune from liability for TCPA violations because of § 230(c) of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1).  As demonstrated in Section IV below, the CDA is irrelevant to these proceedings and provides no protection to Twitter for its TCPA violations.

### II.     Statement Of Facts

#### A.   Twitter Account Holders And Tweeting

Twitter is an online social networking platform. Twitter enables its users (individuals,

---

[1] An SMS ("Short Message Service") message, more commonly referred to as a "text message," is a written communication sent to or from a wireless or cellular telephone device using the telephone number assigned by a wireless carrier to the device.  Stipulation Of Undisputed Facts In Connection With Cross-Motions For Summary Judgment ¶ 9.  Hereafter, citations to various paragraphs of the Stipulation will be:  "SOUF ¶ __."

[2] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 at 14115, para. 165 (F.C.C. July 3, 2003) ("This encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls"); *see also Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946 (9th Cir. 2009) (holding that a text message is a call and noting that "Congress used the word 'call' to refer to an attempt to communicate by telephone").

MOTION FOR PARTIAL SUMMARY JUDGMENT

Case No.: 14-cv-02843-VC

1   businesses and other organizations, including Twitter itself) across the globe to communicate

2   through the exchange of 140-character-or-less messages called "Tweets."  SOUF ¶¶ 1, 2. Twitter

3   has millions of users who Tweet approximately hundreds of millions of times per day.  *Id.*

4          Twitter offers its platform via the twitter.com website, via Twitter's Application Software

5   for iPad, iPhone, Android and other smartphones, tablets and computers ("Twitter App") and

6   through the SMS text messaging capability of cellular devices.  SOUF ¶ 3.  Twitter users who want

7   to submit Tweets must sign-up for a Twitter account.  *Id.*  Twitter's use is governed by various

8   policies, terms and conditions, rules and guidelines available on the Twitter website.  SOUF ¶¶ 4, 5.

9          Twitter users who have created an account on Twitter ("Account Holder(s)") are identified

10  in Tweets by their username (also referred to as their "handle").  SOUF ¶ 6.  Usernames are

11  preceded immediately by the "@" symbol, i.e., @username.  *Id.*  An Account Holder's username is

12  also referred to as their Twitter account.  *Id.*  There are multiple ways for Twitter users to sign up

13  for a Twitter account.  SOUF ¶ 7.  To sign up for a Twitter account via the Twitter website or

14  Twitter App, users can go to the www.twitter.com website or open the Twitter App, click on a sign-

15  up button, and provide Twitter with a name, email address and/or phone number and password, and

16  if they wish, select their usernames.  *Id.*  To sign up for a Twitter account via SMS Message, users

17  can send a text message with the word START to Twitter's 40404 Short Code.[3] Ex. 1.[4]  Twitter

18  will send a reply text message asking the user to send another text to 40404 that contains their full

19  name.  *Id.*  To activate and use an SMS-created account on the web, the user must provide Twitter

20  with a name, email, phone number and password.  *Id.*

21         There are multiple ways for Twitter Account Holders to submit Tweets using the Twitter

22  platform (also known as "Tweeting").  SOUF ¶ 10.  For example, they can Tweet via the Internet,

23  via Twitter App, or by using the SMS messaging function on their cellular phones.  *Id.*  To Tweet

24  via the Internet, a Twitter Account Holder can log into their Twitter account on the Twitter website,

25  _____

26  [3] A Short Code is a unique telephone number, often of 5 or 6 digits, from and/or to which SMS
    messages can be sent and/or received. SOUF ¶ 9.

27  [4] All "Ex.__" references are to Exhibits attached to the Declaration of Bryan G. Kolton in Support of
28  Plaintiff's Motion For Partial Summary Judgment ("Kolton Decl.")."

navigate to their Twitter homepage, click on a "Tweet" button, manually type or otherwise insert (e.g. through a copy and paste, or another means determined by the user) 140 characters or less of text, and then click on another "Tweet" button.  *Id.*  To Tweet via the Twitter App, a Twitter Account Holder can open their Twitter App, tap the "Compose Tweet" icon, manually type or otherwise insert (*e.g.*, through a copy and paste, or another means determined by the user) 140 characters or less of text, and tap a "Tweet" button.  SOUF ¶ 11. To Tweet via SMS message, a Twitter Account Holder with an account already linked to a cellphone number can manually type or otherwise enter 140 characters or less of text into their cellphone's text messaging function, insert the Short Code 40404 as the number to which the message is to be sent, and press a button utilized on the particular phone to indicate "send."  *Id.*   In accordance with Twitter's Automation rules and best practices, Twitter Account Holders can also submit Tweets using automated means.  Ex. 33(a).

Twitter Account Holders also can re-Tweet other Account Holders' Tweets by using the "Retweet" functionality on Twitter.  SOUF ¶ 15.  For example, to Retweet another Account Holders' Tweet, a Twitter Account Holder may click on a Retweet icon near the Tweet and then click on the Retweet button that appears in a pop-up screen with the content of the Tweet to be Retweeted and a box in which the Twitter Account Holder may add their own comment to the original Tweet.  *Id.*  Twitter Account Holders also may Retweet via SMS message by typing the command RETWEET and the username of the Account Holder whose Tweet is being Retweeted into their cellphone's text messaging functionality and sending the text message to the Short Code 40404.  *Id.*

In addition to up to 140 characters of text,[5] Twitter Account Holders may include in their Tweets photos, videos, and hyperlinks to third-party websites, among other things.  SOUF ¶ 13.

**B.  <u>Twitter's Processing And Displaying Of Tweets On Timelines</u>**

Regardless of how a Tweet is submitted, Twitter receives the content of the Tweet,

---

[5] Tweets are limited to 140 characters of text to conform to the standard length of an SMS text message, which is limited to 160 characters per message.  Ex. 2.  Twitter reserves 20 characters so that it can insert the username of Account Holders who submit the Tweets and/or Retweets into SMS text messages that it sends to certain users, discussed *infra* at pp. 8 and 12.  *Id.*

MOTION FOR PARTIAL SUMMARY                                         Case No.: 14-cv-02843-VC
JUDGMENT

1 | automatically processes it as a Tweet and distributes it via the Twitter Platform. SOUF ¶ 12.

2 | Through Twitter's automated computer process, Twitter displays the Tweets in an aggregated

3 | stream of Tweets and Retweets on the Account Holder's webpage on Twitter's website with the

4 | newest Tweet or Retweet at the top, in what is referred to as their "Timeline."  SOUF ¶ 16.

5 |       Before Tweets are displayed on Twitter's website, Twitter's system automatically converts

6 | any hyperlinks that Account Holders include in their Tweets to "t.co" formatted links.  SOUF ¶ 17.

7 | Thus, for example, ██████████████████████████████

8 | ██████████████████████████████████████████

9 | ██████████████████████████████ PL000151[6]; Ex.

10 | 3 at 557-58.  Twitter's system also shortens the display URL (*i.e.,* the visible text displayed as the

11 | hyperlink) of any hyperlinks provided in Tweets or Retweets.  For example, a Tweet containing a

12 | hyperlink with a display URL "http://dayzdev.tumblr.com/post/81688020510/ a-very-busy-couple-

13 | of-weeks-for-the-whole-team-has …" would have its display URL shortened into

14 | "dayzdev.tumblr.com/post/816880205…"  Ex. 4 at 64.  Twitter employs this link conversion

15 | process for multiple reasons.  SOUF ¶ 17.  For example, the automated conversion allows Tweets to

16 | contain long URLs but stay within the maximum number of 140 characters for a Tweet, and also

17 | helps protect users from unintentionally visiting malicious websites.  *Id.*  As Twitter explains on its

18 | website, this process also allows Twitter to track user behavior, for example, by measuring

19 | information "such as how many times a link has been clicked, which is an important quality signal

20 | in determining how relevant and interesting each Tweet is when compared to similar Tweets." Ex.

21 | 33(b) at 1.

22 |       Tweets are public by default and visible to anyone accessing and/or searching Twitter's

23 | website at www.Twitter.com, regardless of whether the viewer is a Twitter Account Holder. SOUF

24 | ¶ 18.

---

[6] All "PL_" references are to documents attached to the Supplemental Declaration of Beverly Nunes in Support of Plaintiff's Motion For Partial Summary Judgment ("Supp. Nunes Decl.")."

MOTION FOR PARTIAL SUMMARY JUDGMENT

Case No.: 14-cv-02843-VC

- 4 -

**C.  Twitter's Asymmetric Follow Model And Followers**

A central feature of Twitter is the ability of users to "Follow" Twitter Account Holders and thereby more readily access their Tweets.  SOUF ¶ 19.  Twitter users subscribe to receive Account Holders' Tweets by "Following" them.  *Id.*  Unlike other social networking platforms, Twitter's system is an "asymmetric follow model" where Twitter Account Holders can be Followed by thousands or millions of other users without requiring a reciprocal relationship.  SOUF ¶ 21.  In other words, Twitter Account Holders need not know anything about who their Followers are, and need not approve their Followers, meaning anyone can Follow someone else's Tweets.  Ex. 2 at 5215.  Some Twitter Account Holders have tens of millions of Followers.  For example, @katyperry, @justinbieber, @taylorswift13, @BarackObama, @YouTube, @rihanna, @ladygaga, @TheEllenShow, @twitter and @jtimberlake have more than 50 million Followers each.  Ex. 33(c)-(l).

A Twitter user can Follow an Account Holder by clicking on that user's @username link or navigating to that user's profile page on www.Twitter.com or via the Twitter App, and then clicking the "Follow" button, or by sending an SMS message with the words "Follow [username]" to the 40404 Short Code.   SOUF ¶ 19.   If a Twitter Account Holder has any Followers, then the Account Holder's Tweets and Retweets are automatically displayed by Twitter in each Follower's Timeline in addition to the Account Holder's own Timeline. SOUF ¶ 20.

**D. Twitter's Sending Of Notifications To Followers And Follower Delivery Preferences**

Another feature of Twitter is the ability of users to receive notifications from Twitter alerting them about various activity on Twitter. Ex. 5 at 4697.  For example, in addition to displaying Tweets and Retweets on Timelines, Twitter sends notifications of Tweets and Retweets to Followers via various delivery methods, including (1) through web pop-up notifications that appear within a web browser of users who are logged into their account on twitter.com; (2) by email notifications; (3) via Twitter App push message notifications (alerts sent to the home screen of a

1  mobile device by a mobile application); and (4) by SMS text message notifications ("SMS

2  Notifications"[7]).  SOUF ¶ 28; Ex. 5 at 4697; Ex. 8.

3        Notifications of Tweets and Retweets are sent by Twitter to Followers based on the

4  Followers' delivery preferences.  SOUF ¶ 23.  Delivery preferences are set by Followers.  SOUF ¶

5  24.  Twitter Account Holders are not able to set or change their Followers' delivery preferences.  *Id.*

6  Account Holders need not have any knowledge about whether, how, where, to whom and/or when

7  notifications relating to their Tweets or Retweets will be sent to Followers.  *See, e.g.,* SOUF Ex. A

8  at 1087-88 (the source of information does not need to have any "knowledge of the receiver's

9  particular device and interface or the receiver's address for the particular device and interface of

10  choice").

11        Twitter users can set SMS text message as a delivery preference via the www.twitter.com

12  website's mobile notifications settings, or via SMS text message from their mobile device. SOUF ¶

13  24.  To enable SMS message as a delivery preference, the Follower can log into Twitter, navigate to

14  their Twitter Account Homepage, click on their account icon at the top of the page and select

15  "settings," then "mobile," and then check the box next to "Text notifications" for "Tweets from

16  people you've enabled for mobile notifications."  SOUF ¶ 25.  In addition, the Follower must

17  "enable for mobile" the Accounts whose Tweets the Follower wishes to receive notifications of via

18  SMS message.  SOUF ¶ 26.  To do this, the Follower can go to the Account home page on

19  www.twitter.com for any Account they are Following, click on the settings icon at the top of the

20  page to the left of the "Following" button, and select "Turn on Mobile Notifications."  *Id.*  The

21  Follower can also enable SMS message as a delivery preference by entering certain SMS text

22  commands into their cellphone's text messaging functionality (such as "Follow [username]" or "ON

23  [username]") and sending the text message to the 40404 Short Code.  Ex. 9 at 5070-5071; Ex. 10;

24  _____

25  [7]   The Parties dispute the correct terminology for the messages that are delivered as SMS messages
    as a result of users' enabling SMS message as a delivery preference for mobile notifications.
26  Plaintiff refers to them as "SMS Notifications" (*see, e.g.,* Ex. 5 at 4697, Ex. 6 at 5093, Ex. 7 at
    5230-33, Ex. 8 at 5082-84, Ex. 9 at 5070-71 and Ex. 10) and Twitter refers to them as "SMS
27  Tweets."  Without agreeing on the appropriate terminology and preserving their positions, the
    parties have referred to them in the SOUF as "Messages."
28

1   Ex. 8 at 5082-84.

2         After a Tweet is submitted, Twitter's computer system automatically identifies the

3   Followers of the Account Holder who Tweeted, looks up the Followers' delivery preferences

4   (including the delivery method, such as web pop-up, email, SMS message or mobile push, as well

5   as the delivery address, such as the Followers' email address or cell phone number), processes the

6   content received in the Tweets, reformats the content for delivery to Followers based on the

7   delivery preferences set by those Followers, applies various rules to further determine whether,

8   when and where the notifications should be sent, and then distributes notifications of the Tweets to

9   Followers.  SOUF ¶ 28, 43; SOUF Ex. A at 1066, 1073, 1077.

10        **E.   Twitter's Constructing And Sending Of SMS Notifications Using Short Code 40404**

11        As a result of Twitter users' setting SMS message as a delivery preference, Twitter's system

12  disseminates to cellular carriers billions of SMS Messages each month for delivery to cell phones.

13  SOUF ¶ 29.  ████████████████████████████████████████████████████

14  ██████   Ex. 11 at 483930.  Twitter has relationships with hundreds of wireless carriers enabling

15  users who are customers of those carriers to engage with Twitter through SMS and receive

16  notifications of Tweets from Twitter through SMS.  SOUF ¶ 30; Ex. 5 at 4697.  Twitter generally

17  enters into written agreements with participating wireless carriers for this purpose.  *Id.*

18        Twitter uses the Short Code 40404 to send SMS messages, which number it leased from

19  Neustar, Inc.  SOUF ¶ 31.  When Twitter sends SMS messages, they are received on the recipients'

20  cellphones as SMS messages from Short Code 40404.  *Id.*  Attached to the Kolton Declaration are

21  copies of the "Registrant Sublicense Agreement" (Ex. 29) and the "Common Short Code

22  Acceptable Use Policy" (Exs. 27-28) that lessees of Short Codes (such as Twitter's lease of Short

23  Code 40404) agree to be bound by, which documents reciprocally incorporate each other.  As a

24  result of these agreements, Short Code lessees *inter alia* agree that they (i), "will not use a CSC

25  [Short Code] for the purpose of facilitating the sending of spam or other unlawful unsolicited

26  messages to wireless subscribers," (ii) "will ensure that [their] CSC campaign complies with all

27  applicable requirements for consent, opt-in, opt-out by a wireless subscriber ….,"  and (iii)  are

28  "solely responsible for the knowledge and adherence to… any and all laws, statutes, rules and

regulations pertaining to [their] use of the Service and a CSC, including without limitation laws related to intellectual property, defamation, publicity and privacy."  Exs.27-30.

In order to send SMS messages to Followers, Twitter must first obtain the Follower's cellphone number and associate it with the Follower.  SOUF ¶ 38.  When Twitter obtains a cellphone number, Twitter's system creates a device record associated with the cellphone number, which record identifies the wireless carrier associated with the cellphone number.  SOUF ¶¶ 44-45.[8]

Twitter's SMS computer system constructs and encodes the SMS Notifications of Tweets that are sent to Followers.  SOUF ¶¶ 28-29, 43-48.  Specifically, Twitter's system:

- Retrieves a copy of the content of each Tweet or Retweet, as modified by Twitter with converted and/or shortened hyperlink t.co URLs (called the "Tweet Payload").  SOUF ¶ 44;

- Removes certain content supplied in the Tweet or Retweet.  For instance, Twitter automatically removes all photos and videos when constructing SMS messages.  SOUF ¶ 47;

- Adds certain content supplied by Twitter.  For instance, Twitter inserts hyperlinks that were not included in the Tweet or Retweet.  *Id.*  Twitter also reserves up to 20 characters of text so that it can insert the @username of the Account Holder who supplied the Tweet.  SOUF ¶ 44; *see also* Ex. 2, Ex. 12.  In the case of Retweets, Twitter inserts the acronym "RT" followed by the @username of the original Tweeter, in addition to the @username of the Account Holder who supplied the Retweet. SOUF ¶ 50;

- Modifies certain content supplied in the Tweet or Retweet.  For instance, Twitter converts the display URL of hyperlinks to "t.co" hyperlinks.  PL000151.

- Encodes and formats the SMS message into "Protocol Data Units" or "PDUs" -- the format required for delivery to the wireless carrier identified in the device record for the

---

[8]  The identifying information that Twitter obtains about its users, such as cell phone numbers, are subject to Twitter's privacy policy.  Exs. 13-16.  Twitter rules prohibit users from sharing another person's private and confidential information, including cell phone numbers, with others.  Ex. 17, Ex.33(m).

1    Follower. SOUF ¶ 45.  PDUs are the required data units for transmission to carriers

2    using the Short Message Peer-to-Peer ("SMPP") protocol – the industry standard

3    protocol for the transfer of SMS messages to and from carriers' Short Message Service

4    Centers ("SMSCs").  *Id.*  Twitter inserts various meta-information in the PDUs,

5    including *inter alia*, the cellphone number associated with the Follower to which the

6    SMS messages are to be sent that Twitter retrieves from the Follower's device record in

7    its databases.  SOUF ¶ 44.

8    After SMS messages are constructed, they are routed to Twitter's outbound SMS queue,

9    where they remain until routed to the wireless carrier.  SOUF ¶ 55.  If the SMS queue is

10   overloaded, some SMS messages that have been enqueued for too long may be dropped.  *Id.*

11   Twitter's SMS computer system then transmits the remaining PDUs to the wireless carrier

12   associated with the cellphone number in the Follower's device record.  SOUF ¶ 48.  ███████

13   ████████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████

15   ███████████████████    SOUF ¶ 49; Ex.11 at 483934.  There can be a delay between the

16   time a Tweet is submitted and the time that an SMS Notification of the Tweet is received on a

17   cellphone.  SOUF ¶ 55.

18   Communications between Twitter and wireless carriers is encrypted by virtual private

19   network ("VPN") tunnels, which allow data to be transmitted securely over a shared or public

20   network, such as the internet, to and from different endpoints.  SOUF ¶ 53.  Both Twitter and the

21   carriers set up and configure the VPN tunnels that are used to send and receive SMS messages.  *Id.*

22   In order to send SMS Messages, Twitter configures an SMPP bind to wireless carriers'

23   SMSCs.  SOUF ¶ 54.  Twitter then may initiate a bind request, which allows for the transmission

24   and receipt of SMS messages.  *Id.*  If the bind request is accepted by the carrier's SMSC, a session

25   opens over the network connection for the transmission of SMS between Twitter and the carrier. *Id.*

26   ██████████████████████████████████████████████████████

27   ██████████████████████████████    Ex. 18 at 19-20, 24; Ex. 19; Ex. 11 at 483928, 483945.

28

1  **F.   <u>Twitter's Knowledge About The Problem Of Sending SMS To Recycled Numbers</u>**

2  ███████████████████████████████████████████████████████

3  ███████████████  Ex. 18 at 19-20, Ex. 20.  ██████████████████████████

4  █████████████████████████████████████████  *Id.*  ███████████

5  ███████████████████████████████████████████████████████

6  ████████████████████████████████████████████████  *Id.*

7  ██████████████████████████████████  *Id.*  Since at least April of 2011,

8  Twitter has also known about the TCPA requirement of "prior express consent" before making

9  text calls to wireless numbers.  Ex. 21.

10  ███████████████████████████████████████████████████████

11  ████████████████████████████████████████████████

12  ████████████████████  Ex. 18 at 19-20, Ex. 20, Ex. 1 at 483948.  Despite these steps, Twitter

13  has continued to send SMS Notifications to cell phone numbers without consent.  *See* Nunes Supp.

14  Decl., ¶¶ 1-3.

15  **G.   <u>Twitter's Ability To Override SMS Delivery Preferences And Stop SMS Delivery</u>**

16  ███████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████

18  ███████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████

21  ███████████████████████████████████████████████████████

22  ███████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  SOUF ¶ 28; Ex. 22, Ex. 18, Ex.20; SOUF Ex. A at 1089.

25  **H.   <u>Twitter's Sending Of SMS Notifications To Plaintiff's Cell Phone</u>**

26  On or about November 14, 2012 a Twitter account was created using the name "Jose perez"

27  with the Twitter username @Agema222.  SOUF ¶ 37.  Shortly after creating the @Agema222

28  account, the user of that account added a cellphone number to the @Agema222 account

---

MOTION FOR PARTIAL SUMMARY                              Case No.: 14-cv-02843-VC
JUDGMENT

1  information.  SOUF ¶ 38.  The user's action in adding a cellphone number to their account

2  information caused Twitter's system to create a device record associated with the cellphone number

3  provided.  *Id.*

4          As part of the verification process, the user of the @Agema222 account sent an SMS

5  message containing the word "GO" from the cellphone number associated with the @Agema222

6  account to Twitter's Short Code 40404.  SOUF ¶ 39.  Twitter's receipt of the command GO from

7  the cellphone number the user of the @Agema222 account had associated with that Account caused

8  Twitter's system to update the status of the device record for the @Agema222 account to verified.

9  *Id.*  The user of the @Agema222 account was directed to the mobile notifications settings page for

10 the account, where the user selected to receive "Text notifications" of "Tweets from people you've

11 enabled for mobile notifications."  SOUF ¶ 40.   Twitter's system updated the device record for the

12 @Agema222 account to indicate "enabled_for |#T" meaning enabled for Tweets only.  *Id.*

13         The user of the @Agema222 account Followed Twitter accounts @swagcodespoiler

14 and @dayzdevteam.  SOUF ¶¶ 32, 37.   The "@swagcodespoiler" account was created on or about

15 April 25, 2010 and the user description indicates the account is associated with the website

16 www.sc-s.com, which includes information relating to "Swag Codes" that can be used to earn

17 "Swagbucks," a virtual currency that can be redeemed for rewards on the website

18 http://www.swagbucks.com/ rewards-store. Codes that can be used to earn Swagbucks are posted

19 on the www.sc-s.com website and Tweeted by the user of the @swagcodespoiler account on

20 Twitter.  According to the @swagcodespoiler Twitter webpage, as of January 23, 2015,

21 @swagcodespoiler had more than 12,000 Twitter Followers and had Tweeted (including Retweets)

22 2,376 times. SOUF ¶ 34.  The "@dayzdevteam" account was created on or about April 10, 2012

23 and the user description indicates the account is associated with the website www.dayzgame.com,

24 which includes information about a survival horror video game called "DayZ."  SOUF ¶ 33.  Self-

25 described "reports" and other information are posted on the site and Tweeted by the user of the

26 @dayzdevteam account on Twitter.  *Id.*  According to the @dayzdevteam Twitter webpage, as of

27 January 23, 2015, @dayzdevteam had more than 176,000 Followers, and had Tweeted (including

28 Retweets) 1,238 times.  *Id.*

MOTION FOR PARTIAL SUMMARY                              Case No.: 14-cv-02843-VC
JUDGMENT

On numerous occasions after October 5, 2013, users of the @dayszdevteam and @swagcodespoiler accounts submitted Tweets and/or Retweets.  SOUF ¶ 42; *see also* Ex. 4; Ex. 23. After Twitter received these Tweets and Retweets, its computer system automatically identified the Followers of those accounts, and looked up their delivery preferences. SOUF ¶ 43. The system determined that @Agema222 had set SMS message as a delivery preference for notifications of Tweets and Retweets, and had enabled the @dayszdevteam and @swagcodespoiler accounts for mobile notifications.  SOUF ¶¶ 42, 43.  Twitter's system usually honored @Agema222's delivery preferences, by sending SMS notifications of Tweets and Retweets to the phone number associated with the @Agema222 account.  SOUF  ¶¶ 28-29, 43-48.

In those cases where SMS notifications were delivered to Plaintiff, Twitter routed a copy of the contents of the Tweets/Retweets with all hyperlinks automatically converted to t.co hyperlinks —the "Tweet Payload" — together with the "to" and "from" information for delivery via SMS pulled from Twitter's user database (to associate the Tweet Payload with the username of the Account Holder who supplied the Tweet/Retweet) and @Agema222's device record (to address the message to the cellphone number associated with the @Agema222 account and route it to the wireless carrier identified in the record for that number) to Twitter's SMS computer system.  SOUF ¶ 44.  Twitter's SMS computer system then formatted the data to the format required for delivery to the wireless carrier identified in the device record for the @Agema222 account—"Protocol Data Units" or "PDUs."  SOUF ¶ 44.

Twitter's SMS computer system automatically removed any photos and videos that had been submitted by the users of the @dayszdevteam and @swagcodespoiler accounts in their Tweets/Retweets.  SOUF ¶ 47.  In some instances, Twitter's SMS computer system automatically added a hyperlink to the Tweet or Retweet on www.twitter.com in place of an image or video.  *Id.* In some instances, a hyperlink was added by Twitter even for Tweets that did not include images or photos.  *Id.*  Examples of such hyperlinks include "m.twitter.com/swagcodespoiler" or "m.twitter.com/ dayzdevteam."  PL000147, 165.  Twitter inserted the @username of the Account Holder who submitted the Tweet, such as "@dayzdevteam" and "@swagcodespoiler."  *Id.*

1 | PL000151; Ex. 3 at 557-58. ████████████████████████████████

2 | ████████████████████████████████████████████████████████████████

3 | ████████████████████        *Id.*  The same process took place with respect to @dayszdevteam's

4 | Retweets, except that in addition, Twitter's system automatically added to the Tweet Payload "RT"

5 | followed by the username of the original Tweeter. SOUF ¶ 50.  For example, Twitter inserted

6 | something like "@dayzdevteam: RT @Hicks_206." PL000165; Ex. 4 at 63.

7 |       Twitter's SMS computer system transmitted the PDUs to the wireless carrier associated with

8 | the cellphone number in the @Ageema222 device record (either MetroPCS or T-Mobile, depending

9 | upon the timeframe).  SOUF ¶ 48.  The carrier that received the PDUs (either MetroPCS or T-

10 | Mobile) then routed the SMS Message for delivery to the cellphone number that Twitter retrieved

11 | from the @Ageema222 device record and inserted into the PDUs.  SOUF ¶ 49.

12 |       Plaintiff purchased a cellphone on or about October 5, 2013, and MetroPCS assigned to her

13 | new cellphone the cellphone number that the user of the @Ageema222 Account had previously

14 | provided to Twitter.  SOUF ¶ 41.  According to records from MetroPCS, her subscriber activation

15 | date was October 7, 2013 and her account activation date was October 8, 2013.  *Id.*

16 |       After Plaintiff was assigned her cellphone number, she received numerous SMS text

17 | messages from Twitter's Short Code 40404.  Supp. Nunes Decl., ¶ 1.  Plaintiff never provided her

18 | cell phone number ██████████ to Twitter.  *Id.* at ¶ 2.  Plaintiff never gave Twitter permission to

19 | send her SMS text messages at her cell phone number.  *Id.* at ¶ 3.  Plaintiff never had a Twitter

20 | account. *See* Declaration of Beverly Nunes in Support of Plaintiff's Motion For Partial Summary

21 | Judgment ("Nunes Decl.") ¶ 1.  Plaintiff wasn't a Twitter user, and her only interaction with Twitter

22 | prior to filing this lawsuit was having received numerous SMS text messages from Twitter's

23 | telephone number 40404 that are the subject of this lawsuit and on at least two occasions, using the

24 | "reply" function on her phone, having responded to the SMS text messages she received from

25 | 40404 in an attempt to request that the sender stop sending the SMS messages to her.  *Id.* at ¶ 2.

26 | Plaintiff had no involvement in sending the SMS text messages that she received from Twitter's

27 | Short Code 40404 and does not know the user of the @Agema222 Twitter account. *Id.* at ¶¶ 1, 3.

28 |

On or about July 28, 2014, nearly a month after this lawsuit was filed, a Twitter employee manually disabled SMS message as a delivery preference for the @Agema222 account, and removed the association of Plaintiff's cellphone number with the @Agema222 account.  SOUF ¶ 52.  Plaintiff has not received any SMS Messages from 40404 since July 28, 2014 at 9:53 p.m. EST (*id.*), even though both "@dayzdevteam" and "@swagcodespoiler" continued thereafter to regularly submit Tweets (*e.g.*, Ex. 4 at 44-57; Ex. 23 at 164-190).

## ARGUMENT

### III.   Twitter Is Responsible For The Calls In Question

#### A.   Twitter Has Admitted That It Is The Maker Or Sender Of The Text Calls

Plaintiff received over 200 unconsented-to text message calls on her cell phone.  As a matter of fact and law, only Twitter can be adjudged to have been the "maker" of those calls.  And, prior to this lawsuit, there was no question in anyone's mind but that Twitter was the party sending these text messages.  Indeed, Twitter repeatedly admitted that it was the sender -- time after time after time, explicitly -- both in its internal documents produced in discovery in this case[9], in court filings made in this case[10], and in filings it made before the FCC[11], among other places.

Nor were Twitter's repeated admissions remarkable.  *No one else* had the ability to make these calls given how Twitter organizes its operation, and no one else in this fact scenario could have sought to effectuate compliance with the TCPA.  That is because only Twitter has the

---

[9]   *E.g.*, "If you request it, **we** send notifications via **SMS** or through the Twitter for iPhone or Twitter for Android apps."  Ex. 7 at 5233; emphasis added.  *See also* Ex. 22 at 5655 ("When we send a text message to your phone…"); Ex. 18 at 19.

[10]   *E.g.*, "*First*, the system **used by Twitter to send the text messages** at issue is not an "automatic telephone dialing system."  Twitter's Statement from the CMC Statement at 3 (Dkt. No. 45) (emphasis added).  *See La v. San Mateo Cty. Transit Dist.*, No. 14-CV-01768-WHO, 2014 WL 6682476, at *4 (N.D. Cal. Nov. 25, 2014) (statement in joint CMC statement constituted binding judicial admission), *citing Sethi v. Seagate U.S. LLC Grp. Disability Income Plan*, No. 11–cv–06188–WHA, 2012 WL 3834948, at *6 (N.D. Cal. Sept. 4, 2012) (same).

[11]   *E.g.*, "Twitter, Blackboard, and countless others risk significant liability **every time they send text messages to people.**"  Comments Of Twitter, Inc. In Support Of Blackboard, Inc.'s Petition For Expedited Declaratory Ruling (F.C.C. April 22, 2015), Ex. 31 at 2 (emphasis added). *See also Id.* at 12 (Twitter argued that "the only way that Twitter can realistically avoid making "calls" to recycled cell phone numbers is simply to stop sending texts altogether"); Ex. 32 (same).

1  cellphone numbers to which SMS text messages will be sent, making placement of the call possible,

2  and decides whether SMS Notifications will be sent, to whom they will be sent and when they will

3  be sent, in accordance, in part, with the delivery preferences of users.  Only Twitter is in a position

4  to determine whether there exists "prior express consent" to send SMS messages to consumers at

5  those cellphone numbers (or whether such consent does not exist such as in the case of cellphone

6  numbers associated with its users that have been recycled) and only Twitter had the ability to stop

7  the sending of SMS messages if there is no such prior express consent by overriding the users' SMS

8  delivery preference and removing the cellphone numbers from its databases.

9  　　　And it is Twitter that constructs the SMS Notifications and then sends them.  It is

10  undisputed that the SMS Notifications did not come from users of Twitter; rather, as Twitter

11  repeatedly admits: the SMS Notifications came "from Twitter."[12]  Thus Twitter repeatedly

12  describes the SMS notifications as being *its* own,[13] and those notifications originated from Twitter's

13  telephone number 40404, the unique Short Code leased to it.  SOUF ¶¶ 9, 31.  Indeed, the messages

14  appear on recipients' cellphones as having come from 40404. *Id.* ¶ 31; Supp. Nunes Decl., ¶ 1.

15  **B.  <u>Twitter Took The Steps Necessary To Physically Place The Text Calls</u>**

16  　　　The FCC's recent Order provided strong guidance that Twitter should be determined to

17  have taken the steps necessary to make or initiate the SMS calls at issue in this litigation.  The FCC

18  explained that while neither the TCPA nor FCC's rules defined what it meant to "make" or

19  "initiate" a call, the FCC had noted in a prior ruling that "initiate" suggests a "direct connection

20  between a person or entity and the making of a call."  FCC Order ¶ 29-30.  After noting that "[t]he

21  TCPA's consent requirement applies to short message service text messages ('SMS' or 'text

22  messages') in addition to voice calls," the FCC went on to quote from its prior ruling that "'a person

23  or entity "initiates" a telephone call when it takes the steps necessary to physically place a telephone

24  call, and generally does not include persons or entities, such as third-party retailers, that might

25

26  _____

27  [12] *See, e.g.,* Ex. 9 ("Text OFF if you do not want to receive any messages from Twitter via SMS.");
    Ex. 18 at 19 (SMS "from Twitter"); Ex. 3 at 353 (███████████████████).

28  [13] *See, e.g.,* Ex. 25 ("You can receive Twitter notifications in the form of text messages"); Ex. 18 at
    19 (████████████); Ex. 22 at 5655 ("our text messages").

1  merely have some role, however minor, in the causal chain that results in the making of a telephone

2  call."'  FCC Order ¶ 27.

3       The facts of this case make it clear that Twitter – and only Twitter – takes the steps

4  necessary to physically place the telephone calls (i.e., to send the SMS text messages) at question in

5  this case.  As noted, when submitting a Tweet, a Tweeter such as Justin Bieber or Donald Trump (or

6  anyone else) need have no idea of whether, how, when, or to whom a notification of that Tweet will

7  be disseminated by Twitter.  That is all done by Twitter, with no input from the creator of the

8  Tweet.  So, too with the users of the @swagcodespoiler and @dayzdevteam accounts at issue here:

9  they did not have any "direct connection" with the making of text calls to Plaintiff, nor did they take

10  steps necessary to physically place such calls.

11       Moreover, there is no evidence that anyone other than Twitter ever made any "call," *i.e.*, any

12  "attempt to communicate *by telephone*" with Plaintiff.  *Satterfield v. Simon & Schuster, Inc.,* 569

13  F.3d 946, 953-954 (9th Cir. 2009) (stating that when Congress used the language "to make any

14  call" under the TCPA it "intended to regulate the use of an ATDS to communicate or try to get into

15  communication with a person *by a telephone,*" noting that the "purpose and history of the TCPA

16  indicate that Congress was trying to prohibit the use of ATDSs to communicate with others *by*

17  *telephone*" and quoting Webster's definition of a "call" as "to communicate with or try to get into

18  communication with a person *by a telephone*.") (emphasis added).

19       The portion of the FCC Order where it granted the petitions by YouMail and by TextMe

20  confirms this analysis.  It noted, "[t]hus, we look to the totality of the circumstances surrounding the

21  placing of a particular call to determine 1) **who took the steps necessary to physically place the**

22  **call**…"  FCC Order ¶ 29 (emphasis added).  We would submit there can be no question but that

23  Twitter, and only Twitter, took the steps necessary to "physically place the call."

24       The two petitions granted in part by the FCC are discussed below.

25              i.   **YouMail**

26       YouMail provided an app that functioned, in the petition's words, as "a virtual

27  receptionist," including the ability to send an automated text message in response to a voicemail the

28  caller had left.  The description given in the FCC Order described YouMail's service thusly:

---

MOTION FOR PARTIAL SUMMARY                          Case No.: 14-cv-02843-VC
JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The YouMail app user determines whether to send the auto-reply text messages, which categories of callers should receive auto-replies, how the user's name should appear in the auto-reply, and whether to include a message with the auto-reply (such as when the called party will be available to return the call).   YouMail states that an auto-reply is sent only if four criteria are met: (1) the YouMail user has set the app's options to send an auto-reply to some group of callers; (2) the calling party falls into that group; (3) the calling party has not previously opted out of receiving auto-replies from YouMail; and (4) "sufficient 'caller id' information is available to send the text."   YouMail states that it has "no influence over the content of the message selected by the [app user]."   FCC Order ¶ 31.

The FCC noted that the YouMail app users "choose whether to send text messages and their involvement in the process of creating and sending the messages in response to received calls are key factors in determining whether the app provider or the app user is the initiator of the call for TCPA purposes, either by taking the steps physically necessary to place the call or by being so involved in placing the call as to be deemed to have initiated it.   Based on the record before us, YouMail appears to do neither… Thus, YouMail is not the maker or initiator of the text because it does not control the recipients, timing, or content, but instead "merely ha[s] some role, however minor, in the causal chain that results in the making of a telephone call."   This stands in stark contrast to what happens when a Twitter user submits a Tweet. The creator of a Tweet has no involvement or choice in whether, how or when notification of that Tweet will be sent to whomever it is sent to. Whereas "YouMail exercises no discernable involvement in deciding whether, when or to whom an auto-reply is sent…" (*Id.),* Twitter's role is very different.  As between the Tweeter and Twitter, Twitter and Twitter alone decides whether, when and to whom notifications of Tweets will be sent by SMS message.  Twitter controls the recipients, timing and content of the SMS messages that are sent.

There is another sharp distinction between YouMail and Twitter:  YouMail's "auto-reply text messages include a link to the YouMail website, where the recipient of the text can access identifying information and instructions for how to opt-out of receiving future auto-reply messages from YouMail users."  *Id.* at ¶33.  Twitter provides no such link in the texts it sends nor any means for an unwilling recipient to figure out how to stop the receipt of unwanted texts.

1           ii.   **TextMe**

2           TextMe likewise filed a Petition for Declaratory Judgment that the FCC ruled upon in the

3   Order.  TextMe provided an app that allowed users to send invitational text messages to friends

4   "'using a multi-step process in which the users have to make a number of affirmative choices

5   throughout the invite process.'"  FCC Order ¶ 36.  Specifically, "an app user must: (1) tap a button

6   that reads 'invite your friends'; (2) choose whether to 'invite all their friends or individually select

7   contacts'; (3) choose to send the invitational text message by selecting another button."  (*Id.*)  Based

8   on this understanding of the facts, the FCC concluded that "TextMe does not make or initiate a call

9   when an app user sent an invitational text message using the foregoing steps."

10          Neither the TextMe nor YouMail scenarios is remotely comparable to the facts surrounding

11  Twitter's business model.  The creator of a Tweet has no role in selecting whether notifications of

12  Tweets will be sent, when they will be sent, to whom notifications will be sent nor how they will be

13  sent, including by SMS text messages delivery.

14                              *        *        *

15          Shortly after the issuance of the FCC Order, Judge Chesney issued summary judgment in

16  favor of another app maker in *Huricks v. Shopkick, Inc.,* No. C-14-2464 MMC, 2015 WL 5013299

17  (N.D. Cal. Aug. 24, 2015). That opinion confirms the contention that Twitter must be considered

18  the maker or initiator of the calls (text messages) in question in this case.

19          Judge Chesney relied extensively on the FCC analysis of the TextMe Petition and noted that,

20  similar to the app in TextMe, the Shopkick app (which sent invitational text messages urging

21  consumers to purchase retail goods) had a multi-step procedure that a user must undergo in order to

22  cause the text messages to be sent.   Judge Chesney read the FCC Order to indicate that Shopkick

23  controlled the content of the text messages, but that, "[a]s further explained by the FCC, however,

24  an app user is nonetheless considered the sender where the app user is required to make 'affirmative

25  choices' in determining whether to send invitational text messages, to whom to send such text

26  messages, and when to send the messages."  *Id.* at *3.  Specifically:

27          <u>First</u>, the user must have affirmatively granted the Shopkick app "permission to
            access the user's contacts in the phone."  <u>Second</u>, when the app provided the user
28          with the option to "invite friends," the user must have responded by selecting

MOTION FOR PARTIAL SUMMARY                                    Case No.: 14-cv-02843-VC
JUDGMENT
                                   - 18 -

"Continue" rather than "No Thanks." <u>Third</u>, once the user selected "Continue," the user would have been shown a series of screens by which he or she was given the option of ***selecting the contacts to whom the invitations would be sent***. <u>Fourth</u>, once the user selected contacts, the user would have been shown a screen listing the chosen contacts and the "format" in which the invitations were to be sent, after which, *to cause the invitations to be sent*, the user would have <u>then</u> pressed a button stating "Invite Friends." *Id.* (emphasis added).

Again, this fact scenario demonstrates why Twitter can find no comfort in the FCC Order. Here, neither of the users of the @swagcodespoiler nor @dayzdevteam accounts made any "affirmative choices" in determining whether or when to send SMS Notifications to any of their thousands of Followers, including @Agema222 or Plaintiff, who was neither a Follower nor user of Twitter. *Shopkick* demonstrates why Twitter is the maker or initiator of the text message calls in question here.

### C. <u>Twitter Is So Involved In Making Calls To Be Deemed To Have Initiated Them</u>

Even if it is determined that Twitter did not make the calls at issue (and if it didn't, then who did?), Twitter was "so involved" in the placing of a specific telephone calls here as to be "deemed" to have made them. In its Order, the FCC recognized that even if an entity did not take steps the necessary to "physically place the call," if it was "so involved in the placing of a specific telephone call" it nonetheless will have a sufficiently "direct connection" to the making of a call to be "deemed to have initiated it, considering the goals and purposes of the TCPA." FCC Order ¶ 30; *see also In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 64 Communications Reg. (P&F) 19 (F.C.C. Jan. 11, 2016) ("determination as to who is liable as the person who "makes" or "initiates" a particular robocall (including an autodialed text message) requires a fact-based determination governed by factors such as… the extent and nature of involvement by others, including the provider of the calling platform used to make that call.").

In describing this "so involved" test, the FCC explained that "whether a person who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform

1    for unlawful purposes may also be a factor in determining whether the platform provider is so

2    involved in placing the calls as to be deemed to have initiated them." FCC Order ¶ 30.[14]

3          One of the critical aspects of the "so involved" or "high degree of involvement" test as it is

4    variously called is "control of recipient lists."   As the court recently summarized the law in *Payton*

5    *v. Kale Realty LLC,* No. 13 C 8002, 2016 WL 703869 (N.D. Ill. Feb. 2, 2016):

6          "A 'high degree of involvement' exists where the broadcaster (1) **controls the**
           **recipient lists**; and/or (2) controls the content of the transmissions." *Rinky Dink*,
7          2015 WL 778065, at *7 (citing *Rules and Regulations Implementing the TCPA of*
           *1991*, 68 F.R. 44144-01, 44169 at ¶ 138 (July 25, 2003)).
8

9    *Id.* at *4 (emphasis added).   Here, there can be no question but that Twitter "controls the recipient

10   list."   *Id.*   Twitter's business model calls for it, and only it, to have the list of phone numbers to

11   which SMS messages will be sent notifying recipients of Tweets.   And for that separate reason

12   alone, Twitter must be determined to have a high degree of involvement in making or sending the

13   messages, all other reasons leading to the same conclusion notwithstanding.

14         If it is determined that Twitter did not make the calls here but rather one or more of its users

15   did, Twitter certainly should be charged with knowingly allowing its users to use its platform to

16   make such unlawful calls.   Twitter knew that wireless carriers recycle telephone numbers.   Twitter

17   knew that the TCPA requires "prior express consent" before making text calls and knew that if a

18   wireless carrier recycles a number that Twitter had previously associated with one of its users, the

19   new subscriber assigned to that number may be sent Twitter SMS messages without "prior express

20   consent."   Like all Lessees of Short Codes, Twitter agreed to "ensure" that the use of its Short Code

21   40404 "complies with all applicable requirements for consent, opt-in, opt-out by a wireless

22

23   _____

24   [14] The FCC noted that "[f]or example, if the Commission staff notifies a platform provider that its

25   service is being used unlawfully by its clients and the platform provider then allows such usage to
     continue after this warning, we will consider the fact that the platform provider allowed such usage

26   to continue after having actual notice of the unlawful activity to be a possible indicator that the
     platform provider is actively participating in the making or initiating of the calls at issue.   Of course,

27   we will consider all facts and circumstances surrounding any possible violation(s) before
     determining how liability, if any, should be applied." *Id.* at ¶ 30, n.110.

28

subscriber …." and agreed not use its Short Code for the purpose of "facilitating the sending of spam or other unlawful unsolicited messages to wireless subscribers."  Ex. 27 at 1318.

And while obtaining "prior express consent" is critical to TCPA compliance, Twitter was the only one who could have meaningfully sought to effectuate compliance.  Only Twitter knew the phone number to which SMS text messages would be sent and therefore it was the only one who had the ability to determine whether a phone number had been recycled.  And, if a cellphone number associated with one of its users had been recycled, Twitter is the only one who could have done anything about it: only Twitter could have overridden the SMS message delivery preferences of @Agema222 and removed the cell phone number associated with the @Agema222 account from its databases such that SMS messages would not be sent to that number.  Sure enough, nearly a month after this lawsuit was filed, a *Twitter employee* removed the association of Plaintiff's cellphone number with the @Agema222 account and the unlawful SMS messages to Plaintiff ceased.

The intent of Congress, when it established the TCPA in 1991, was to protect consumers from the nuisance, invasion of privacy, cost, and inconvenience that autodialed calls generate. FCC Order ¶ 29.  Congress found that these kinds of calls, "regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy," and that banning such calls, except when made for an emergency purpose or when the called party consents to receiving the call, "is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.*

Twitter's SMS system, which allows the making of such SMS text calls to consumers with recycled numbers who never gave their prior express consent to be called at those numbers, is precisely the kind of "non-consensual calling campaigns over which the TCPA was designed to give consumers some degree of control."  FCC Order ¶ 29.  Deeming Twitter to be the maker of the calls is entirely appropriate here considering the facts surrounding the placing of the particular calls at issue and "the goals and purposes of the TCPA."

**IV.**    <u>**The Communications Decency Act Provides No Immunity For Twitter**</u>

Twitter's Fourth affirmative defense is that it is immune from liability under the TCPA because of the provisions of § 230(c)(1) of the Communications Decency Act, 47 U.S.C. §

MOTION FOR PARTIAL SUMMARY
JUDGMENT

Case No.: 14-cv-02843-VC

230(c)(1). Twitter can find no respite in the CDA, however; the cited provisions are irrelevant to the

claims being asserted by Plaintiff here.

This particular provision of the CDA was enacted by Congress to respond to an unpublished

New York state court decision that held that an internet service provider could be liable for

defamation.  The court in *Perkins v. LinkedIn*, 53 F. Supp. 3d 1222, 1246 (N.D. Cal. 2014),

summarized the Ninth Circuit's explanation of the limited role and availability of a CDA (emphases

added):

> Section 230 of the CDA immunizes providers of interactive computer services
> against liability arising from **content** created by third parties. *Fair Hous. Council of
> San Fernando Valley v. Roommates.Com,, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2009)
> (en banc).  Section 230 was enacted to "protect websites from liability for **material
> posted on the website** by someone else."  *Doe No. 14 v. Internet Brands, Inc.,* 767
> F.3d 894, 897 (9th Cir. 2014).

The CDA is irrelevant to this action and does not even purport to grant immunity to TCPA

offenses.  Plaintiff is aware of only one court in the country that has analyzed potential immunity

under the CDA in the context of an alleged TCPA violation, and that case confirms that the focus of

CDA 230 is whether the defendant is the "publisher or speaker" of the *content* that is the subject of

the suit (be it allegedly defamatory[15] or pornographic or whatever), whereas the TCPA provision at

issue here (47 U.S.C. § 227(b)(1)(A)),[16] cares not about such things; its concern is with imposing

liability on the person who "makes" a call to an unconsenting recipient's cellphone, using certain

automated calling methods and equipment (*i.e*,."using an automatic telephone dialing system

("autodialer")," regardless of the *content* of the message.

The lone case of which Plaintiff is aware that deals with a proposed CDA defense put

forward against an alleged TCPA violation is *Sherman v. Yahoo! Inc.,* 997 F. Supp.2d 1129

---

[15]   As the court in *Barnes v. Yahoo!, Inc.,* 570 F3d 1096, 1101 (9th Cir. 2009), noted, "The cause of
action most frequently associated with the cases on section 230 is defamation," but made clear that
regardless of the name of the cause of action, "defamation versus negligence versus intentional
infliction of emotional distress – what matters is whether the cause of action inherently requires the
court to treat the defendant as the 'publisher or speaker' of content provided by another."  Of
course, the TCPA makes no such inquiry.
[16] Section 227(b) is entitled "Restrictions On Use of Automated Telephone Equipment."

---

1   (S.D.Cal. 2014).  In *Sherman,* Yahoo sent a text message to someone who had never provided his

2   phone number to Yahoo nor consented to such messages, informing him that a Yahoo user (the

3   plaintiff was not a Yahoo user) had sent him a message using Yahoo's Instant Messenger program

4   and informing him to Reply to the text message in order to respond.  *Id.* at 1130-31.  Mr. Sherman

5   sued for a violation of the TCPA and Yahoo defended, *inter alia,* on grounds that it had immunity

6   under the CDA.[17]  The Court noted that "[a] plain reading of the statute indicates protection is

7   intended <u>only</u> for the 'blocking and screening of offensive material.'"  *Id.* at 1137 (emphasis added).

8   The court rejected the CDA defense, finding it inapplicable to the facts of the case, finding that

9   Yahoo did not block or filter messages, but instead automatically sent the text message in question

10  to any addressee of an intended Yahoo Instant Message that it determined by an automatic check

11  had not previously been sent an IM by Yahoo member.  *Id.*  "Accordingly, the Court conclude[d]

12  that the 'good samaritan' immunity [wa]s inapplicable where Yahoo did not engage in any form of

13  content analysis of the subject text to identify material that was offensive or harmful prior to the

14  automatic sending of a notification message."  *Id.* at 1138.

15        So it is here.  There is no claimed "blocking or screening of offensive material" by Twitter.

16  There is no question of attempting to hold Twitter liable for the content of the text messages it

17  rained down on Plaintiff.  Section 227(b)(1)(A) of the TCPA is content neutral.  *Gomez v.*

18  *Campbell-Ewald Co*., 768 F.3d 871, 876 (9th Cir. 2014) *cert. granted,* 135 S. Ct. 2311, 191 L. Ed.

19  2d 977 (2015) *and aff'd,* 136 S. Ct. 663 (2016), *as revised* (Feb. 9, 2016).  The TCPA prohibition on

20  the use of autodialers in § 227(b)(1)(A) applies "regardless of the content of the call*." In the Matter*

21  *of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 23 F.C.C. Rcd. 559, 565

22  (2008); *Wreyford v. Citizens for Transp. Mobility, Inc.*, 957 F. Supp. 2d 1378, 1380 (N.D. Ga. 2013)

23  (TCPA "regulates 'any call,' regardless of its message.").  Twitter is not being held accountable for

24  ─────────────────────

25  [17]   To be precise, Yahoo pleaded section (c)(**2**) of the CDA (47 U.S.C. §230(c)(2)) as the basis of
    its supposed immunity, whereas Twitter relies on section (c)(**1**), but, as will be seen, the Court's
26  analysis in *Sherman* is equally dispositive of <u>any</u> attempted reliance on the CDA in this context.  It
    is to be further noted that both sub-(1) and sub-(2) are part of Section (c) of 47 U.S.C. § 230 , which
27  is entitled "Protection for 'good samaritan' blocking and screening of offensive material."  There is
    no issue of "blocking or screening of offensive material" in this case, suggesting on its face that the
28  statute has nothing to do with this case.

1 │ the **<u>content</u>** of the messages it improperly sent to Plaintiff, but for sending those messages

2 │ (whatever their content) to her cell phone without her consent using an autodialer.  Twitter seeks to

3 │ rely on an irrelevant statute that has nothing to do with the suit that brings it before this Court.

4 │      While the foregoing seems dispositive of Twitter's attempted assertion of immunity,

5 │ Plaintiff further notes that even if Twitter were to establish that it is an interactive computer service

6 │ provider, that would not be the end of the matter.  *See, e.g., Fraley v. Facebook,* 830 F.Supp.2d 785,

7 │ 801-02 (N.D. Cal. 2011), where the court denied Facebook's assertion of CDA immunity:

8 │      Although Facebook meets the definition of an interactive computer service under the
   │      CDA… in the context of Plaintiffs' claims, it also meets the statutory definition of an
9 │      information content provider, *see id.* § 230(f)(3) (defining an information content
   │      provider as "any person or entity that is responsible, in whole *or in part,* for the
10 │      creation or development of information provided through the Internet or any other
   │      interactive computer service" (emphasis added)). "A website operator can be both a
11 │      service provider and a content provider.... [A]s to content that it creates itself, or is
   │      'responsible, in whole or in part' for creating or developing, the website is also a
12 │      content provider."  (emphasis in original).

13 │      Here, it seems apparent that Twitter is responsible "in whole or in part" for creating and

14 │ developing the SMS messages sent to Plaintiff.  Twitter creates and develops the messages by

15 │ taking certain content of the Tweets submitted by the Tweeter, as modified by Twitter with

16 │ converted and shortened Twitter controlled "t.co" hyperlinks, removing certain content (such as

17 │ photos and videos), adding certain content (such as hyperlinks of Twitter's own choosing, the

18 │ @usernames of the account holders who Tweeted and/or Retweeted, the word "RT" in the case of

19 │ Retweets), modifying certain content (such as converting display URLs of hyperlinks to "t.co"

20 │ hyperlinks and converting character encodings), and encoding and formatting the content of the

21 │ messages into PDUs (including by inserting various meta-information such as its Short Code and

22 │ the telephone number to be called) and then sends them to wireless carriers with instructions to

23 │ deliver the SMS Notifications to the cell phone associated with Plaintiff's cell phone number.

24 │      Additionally, as noted previously, in order to obtain a short code from the agency that leases

25 │ short codes, Neustar a/k/a the Common Short Code Administration (the CSCA), licensed users of

26 │ short codes, such as Twitter, agree that they are "responsible for all content" associated with any

27 │ campaign conducted through its short code "regardless of whether or not you own or have the right

28 │ … to control the content associated with the [short code]."  Indeed, a document produced by Twitter

MOTION FOR PARTIAL SUMMARY                          Case No.: 14-cv-02843-VC
JUDGMENT

1 | in the litigation (Ex. 26) ███████████████████████████████████

2 | ████████████████████████████████████████████████████████

3 | ███████████████████████     Having agreed to be responsible for the content of the SMS messages it

4 | sent using its leased Short Code, a lessee can hardly claim via the CDA *not* to be responsible for

5 | such content.

6 |     Twitter's proposed reliance on so-called immunity under the CDA should be rejected.

7 | <u>**CONCLUSION**</u>

8 |     There is no legitimate question but that Twitter sent Ms. Nunes hundreds of text messages

9 | without her consent.  Indeed, until this lawsuit (and even during much of it), Twitter readily and

10 | repeatedly acknowledged the fact that it sent the messages.  Plaintiff is entitled to summary

11 | judgment on the issue of who sent or is responsible under the TCPA for sending these messages.

12 |     In like fashion, there is no legitimate question but that Twitter is not entitled to any

13 | immunity for its TCPA violations by virtue of the limited provisions of the CDA, which have no

14 | applicability to this situation.   Plaintiff is entitled to summary judgment on this issue.

15 |

16 | Dated:  March 17, 2016                                    Respectfully submitted,

17 |                                                            JACOBS KOLTON, CHTD.

18 |
                                                            By:    /s/ *John G. Jacobs*
19 |                                                                  John G. Jacobs
                                                                    David Schachman
20 |                                                                  Jeffrey F. Keller
                                                                    Bryan G. Kolton
21 |                                                                  *Attorneys for Plaintiff*

22 |
   | JEFFREY F. KELLER (SBN 148005)
23 | **KELLER GROVER, LLP**
   | 1965 Market Street
24 | San Francisco, California  94103
   | Telephone:  (415) 543-1305
25 | Facsimile: (415) 543-7861
   | jfkeller@kellergrover.com
26 |

27 |

28 |

JOHN G. JACOBS (*PRO HAC VICE*)
BRYAN G. KOLTON (*PRO HAC VICE*)
**JACOBS KOLTON, CHTD.**
55 West Monroe Street, Suite 2950
Chicago, Illinois 60603
Telephone: (312) 427-4000
Facsimile: (312) 268-2425
jgjacobs@jacobskolton.com
bgkolton@jacobskolton.com

DAVID SCHACHMAN (*PRO HAC VICE*)
**LAW OFFICES OF DAVID SCHACHMAN, PC**
55 West Monroe Street, Suite 2970
Chicago, Illinois 60603
Telephone: (312) 878-6136
Facsimile: (312) 268-2425
ds@schachmanlaw.com