DAVID H. KRAMER, State Bar No. 168452
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:    (650) 493-9300
Fax:    (650) 493-6811
Email: dkramer@wsgr.com

TONIA OUELLETTE KLAUSNER, *pro hac vice*
BRIAN M. WILLEN, *pro hac vice*
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone:   (212) 999-5800
Facsimile:    (212) 999-5899
Email:    tklausner@wsgr.com
Email:    bwillen@wsgr.com

*Attorneys for Defendant Twitter, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BEVERLY NUNES, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>TWITTER, INC.,<br><br>Defendant. | CASE NO.:  3:14-cv-02843-VC<br><br>**TWITTER'S NOTICE OF CROSS-MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT; OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**DATE:    JUNE 2, 2016**<br>**TIME:     10:00 AM**<br>**DEPT:     Courtroom 4 - 17th Floor**<br>**JUDGE:   Honorable Vince Chhabria** |

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 2

I.      FACTUAL AND PROCEDURAL BACKGROUND ........................................... 3

        A.      Twitter's Online Platform for User Communication ............................ 3

                1.      Processes for Twitter Users to Receive Tweets via SMS Messages .......... 4

                2.      The User-Initiated SMS Tweets At Issue In This Case ............................. 5

                3.      Reassignment of Perez's Phone Number to Plaintiff ............................... 6

        B.      Legal Proceedings to Date .......................................................... 6

ARGUMENT ....................................................................................................... 6

I.      TWITTER IS AN INTERMEDIARY, NOT THE INITIATOR OF THE
        MESSAGES AT ISSUE ........................................................................ 7

        A.      The FCC's 2015 Order Confirms That Intermediaries Like Twitter Are Not
                Liable Under the TCPA ............................................................... 7

        B.      Twitter is Protected Under the FCC's 2015 Order And The Case Law
                Applying That Order To Intermediary Services ................................ 10

        C.      Plaintiff's Efforts To Evade The FCC's 2015 Order Are Meritless ..................... 13

                1.      Twitter Has Not Admitted Liability ................................................. 13

                2.      Plaintiff Focuses on the Wrong User .............................................. 14

                3.      Twitter Did Not Knowingly Allow Its Platform to be Used Illegally ......... 15

II.     PLAINTIFF'S TCPA CLAIM IS BARRED BY SECTION 230 OF THE CDA ............ 16

        A,      Section 230 Protects Online Services From Liability For Distributing User-
                Supplied Information ................................................................... 17

        B.      The CDA Bars Plaintiff's Claim ..................................................... 18

                1.      Twitter is the Provider of An "Interactive Computer Service ................ 19

                2.      The Information At Issue Was Provided By Third Parties .................... 19

                3.      Plaintiff's Claim Seeks to Hold Twitter Liable as a "Publisher or
                        Speaker" ....................................................................... 21

        C.      Plaintiff's Efforts To Escape Twitter's CDA Immunity Fail .......................... 22

CONCLUSION .................................................................................................... 25

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................................7

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) ......................................................... *passim*

*Barrett v. Rosenthal*,
    40 Cal. 4th 33 (Cal. 2006) ..................................................................22, 23

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ......................................................... *passim*

*Carafano v. Metrosplash.com. Inc.*,
    339 F.3d 1119 (9th Cir. 2003) ...........................................................17, 19

*Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
    519 F.3d 666 (7th Cir. 2008) .............................................................22, 23

*Doe II v. MySpace Inc.*,
    175 Cal. App. 4th 561 (2009) ..................................................................24

*Doe v. Backpage.com, LLC*,
    No. 15-1724, 2016 U.S. App. LEXIS 4671 (1st Cir. Mar. 14, 2016) ...........18, 22

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008)...............................................18, 25

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) (en banc) ........................................ 17-18, 19, 20

*FTC v. Accusearch, Inc.*,
    570 F.3d 1187 (10th Cir. 2009) ...............................................................19

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ....................................................20

*Green v. Am. Online (AOL)*,
    318 F.3d 465 (3d Cir. 2003) ...................................................................24

*Huricks v. Shopkick, Inc.*,
    No. C-14-2464, MMC, 2015 U.S. Dist. LEXIS 112596 (N.D.Cal. Aug. 24,
    2015)................................................................................................. *passim*

*Jones v. Dirty World Entm't Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014) .......................................................... *passim*

*Kauffman v. Callfire, Inc.*,
    No. 3-14-cv-1333-H-DHB, 2015 U.S. Dist. LEXIS 149089 (S.D. Cal. Oct.
    8, 2015)............................................................................................. *passim*

*McKenna v. WhisperText*,
    No. 5:14-cv-00424-PSG, 2015 U.S. Dist. LEXIS 120090 (N.D. Cal. Sept. 9,
    2015)................................................................................................7, 10

*Norian Corp. v. Stryker Corp.*,
433 F. Supp. 2d 1051 (N.D. Cal. 2004) ...........................................................7

*Payton v. Kale Realty, LLC*,
No. 13 C 8002, 2016 U.S. Dist. LEXIS 21655 (N.D. Ill. Feb. 22, 2016) ................... *passim*

*Rinky Dink, Inc. v. Elec. Merch. Sys.*,
No. C13-1347-JCC, 2015 U.S. Dist. LEXIS 22108 (W.D. Wash. Feb. 24,
2015)..............................................................................................................13

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (9th Cir. 2009)............................................................................7

*Selou v. Integrity Sol. Servs. Inc.*,
No. 15-10927, 2016 U.S. Dist. LEXIS 18189 (E.D. Mich. Feb. 16, 2016) ...................7, 10

*Sherman v. Yahoo!, Inc.*
997 F. Supp. 2d, 1129 (S.D. Cal. 2014) ...........................................................23

*Zango, Inc. v. Kaspersky Lab, Inc.*,
568 F.3d 1169 (9th Cir. 2009)...........................................................................23

*Zeran v. Am. Online, Inc.*,
129 F.3d 327 (4th Cir. 1997)....................................................................... *passim*

**STATUTES & LEGISLATIVE HISTORY**

47 U.S.C. § 227(b) .................................................................................................7

47 U.S.C. § 227(b)(1)(A) .....................................................................................24

47 U.S.C. § 230(b)(2) ...........................................................................................17

47 U.S.C. § 230(c)(1) .................................................................................. *passim*

47 U.S.C. § 230(c)(2) ...........................................................................................17

47 U.S.C. § 230(f)(2) ............................................................................................19

47 U.S.C. § 230(f)(3) ............................................................................................19

H.R. Rep. No. 107-449 (2002) ............................................................................18

S. Rep. No. 102-178 (1991) ...................................................................................7

**ADMINISTRATIVE MATERIALS**

47 C.F.R. § 64.1200(a)(1) .......................................................................................7

47 C.F.R. § 64.1200(a)(1)(iii) ..............................................................................24

47 C.F.R. § 64.1200(a)(2) .....................................................................................24

*In the Matter of Rules and Regulations Implementing the TCPA of 1991*, 30 FCC
Rcd. 7961 (June 18, 2015) ........................................................................ *passim*

*Rules and Regulations Implementing the TCPA of 1991*,
    68 F.R. 44144, 44169 (July 25, 2003)................................................................13

**MISCELLANEOUS**

*Prosser and Keeton on the Law of Torts* § 113 (5th ed.1984) .........................................21

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on June 2, 2016 at 10:00 a.m., or as soon thereafter as the matter may be heard, Defendant Twitter, Inc. ("Twitter") will appear before the Honorable Vince Chhabria in Courtroom 4, 17th Floor of the United States District Courthouse at 450 Golden Gate Avenue, San Francisco, California, 94102, and move the Court for an Order granting summary judgment in its favor pursuant to Federal Rule of Civil Procedure 56. Twitter is entitled to judgment in its favor because:

1. The undisputed evidence establishes that Twitter acted at the direction of its users in transmitting the text messages about which Plaintiff complains. The law is clear that intermediary services like Twitter do not "initiate" such messages and therefore are not liable for making them under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"); and

2. The undisputed evidence establishes that Twitter is an interactive computer service immunized against Plaintiff's claim by Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c) ("CDA").

This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities and any attachments thereto, the Stipulation of Undisputed Facts in Connection with Cross Motions for Summary Judgment (Dkt. 69) ("SOUF") and all attachments thereto, the Declaration of David H. Kramer, dated April 12, 2016 ("Kramer Decl.") and all attachments thereto, the Declaration of Donald Hoffman dated April 11, 2016 ("Hoffman Decl.") and all attachments thereto, the Declaration of James Scott Kelley dated April 8, 2016 ("Kelley Decl.") and all attachments thereto, and the Declaration of Marcos Martinez, a Twitter user known on the service as Jose Perez dated April 6, 2016 ("Perez Decl."), as well as other documents and records on file herein, and any oral/and or documentary evidence which may be presented up to and including the time of the hearing on this motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Twitter is a popular online platform that allows users all over the world to communicate through short messages called "Tweets." Twitter's service has helped transform the way that people communicate, and is widely used by political activists, journalists, celebrities, political leaders, public agencies, and countless others to share information, break news, and discuss the issues of the day. Twitter and other online services like it have been able to flourish as robust platforms for speech because the law has consistently recognized that they are protected from liability for publishing or transmitting what their millions of users say.

Twitter is a user-directed service. Twitter users choose how to view the Tweets that others create. Users can, for example, read Tweets on Twitter's website, use Twitter's apps on mobile devices, or they can sign up for Tweets to be delivered to their phones as text messages. In this case, a Twitter user chose the last option. In order to receive Tweets via text message, the user had to complete a multistep process, which included giving his mobile phone number to Twitter and requesting delivery of Tweets from certain specific users as texts to his number. The user later stopped using that number (though he never informed Twitter of that), and a wireless carrier assigned it to someone else, who turned out to be the Plaintiff, Beverly Nunes. Following the user's instructions, Tweets in the form of text messages continued to be transmitted automatically via Twitter's platform to the phone number that the user provided.

Based on these events, Plaintiff sued Twitter under the TCPA. Based on the undisputed evidence in the record, Plaintiff's claim fails as a matter of law. For two independent reasons, Plaintiff's motion for summary judgment should be denied and summary judgment should be entered on Twitter's behalf.

*First*, as the FCC recently confirmed, the TCPA does not apply to a service like Twitter that acts as an intermediary with respect to text messages transmitted via its platform. Recognizing that such communications services "inure to the benefit of consumers," the FCC made clear that where users determine whether, when, and to what numbers messages are sent, the platform does not "initiate" the messages, as the TCPA requires for liability. That is the

situation here. Plaintiff's effort to impose TCPA liability on Twitter runs headlong into the FCC's ruling and an unbroken line of cases applying that ruling in similar circumstances.

*Second,* Plaintiff's claims are barred by Section 230(c)(1) of the CDA. This provision provides an expansive immunity for online intermediaries that disseminate their users' information. The CDA applies here because Plaintiff seeks to treat Twitter as the publisher of its users' messages by imposing liability for the act of distributing them. Such publisher liability is at the core of what Section 230(c)(1) precludes. Plaintiff's scattered arguments about the CDA ignore the text of the statute, the policies behind it, and the extensive body of case law giving it effect in a wide array of contexts.

Applying the FCC's ruling and Section 230(c)(1)'s immunity in this case advances critical policy objectives. As both the FCC and Congress have recognized, online intermediaries enable an unprecedented diversity of socially valuable expression. Exposing a service like Twitter to TCPA liability merely for carrying out users' instructions to deliver user-selected text messages to user-supplied phone numbers would jeopardize that intermediary role and the speech it facilitates. It could deter those services from offering SMS messaging functionality and reduce the flow of valuable, time-sensitive information to millions of people worldwide. The FCC's ruling and Section 230 independently preclude the TCPA from being used in that way and entitle Twitter to summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Twitter's Online Platform for User Communication

Twitter is a global communications platform that allows for public self-expression and conversation in real time. Hoffman Decl. ¶2; Pl. Br. at 1, 2, 4; SOUF ¶1. Twitter enables its users to communicate with each other through the service using short messages called "Tweets." SOUF ¶2. Tweets are messages of users' creation that may include photos, videos, hyperlinks to other Internet destinations, and up to 140 characters of text. Hoffman Decl. ¶2; SOUF ¶¶10-11, 13. Twitter empowers virtually anyone with a communications device, whether a desktop or laptop computer, tablet, or mobile phone to create and distribute Tweets, and to discover the Tweets of others. Hoffman Decl. ¶5; SOUF ¶¶10-12, 18-20, 23-24.

Twitter has approximately 320 million active users worldwide, including all manner of political leaders, educators, media outlets, social activists, artists, public agencies, commercial interests, and ordinary individuals. Hoffman Decl. ¶¶6-7. Each day, Twitter users share hundreds of millions of Tweets via the Twitter Platform. *Id.* ¶6; SOUF ¶2.

In the U.S., users can create and share their Tweets through a variety of means including: by posting them on the Twitter website, by "Tweeting" from a smartphone or tablet using the Twitter mobile application, or by sending a text message from their cellphone to a five digit phone number (or "short code") associated with the Twitter service. Hoffman Decl. ¶8; SOUF ¶¶10-11. Likewise Twitter users anywhere in the world can almost instantaneously receive and view other Twitter users' Tweets by whatever means is available to them – on the Twitter website, within the Twitter mobile application, or by SMS text message. Hoffman Decl. ¶9.[1]

Twitter's user-directed platform allows the US embassy in Beijing to post daily Tweets from @BeijingAir about the air quality there. It is possible for those tweets to be posted via the Twitter mobile application, read by an environmental scientist in Germany on her laptop, or by a tourist planning a visit from Australia as text messages on his cellphone. *Id.* ¶10. Twitter also allows countless public agencies and emergency organizations to provide users who request it with real-time information on emergency events.[2]

       1.    <u>Processes for Twitter Users to Receive Tweets via SMS Messages</u>

The Parties' Stipulation of Undisputed Facts describes the basic operation of the Twitter service, including how individual users can (1) create and access content, (2) subscribe to receive Tweets from other users by "Following" them, and (3) instruct Twitter to automatically deliver

---

[1] SMS stands for Short Message Service and refers to the text messaging service component of communication systems that use standardized protocols to transmit short messages over wireless cellphone networks. SOUF ¶9; Kelley Decl. ¶3. The ability to use Twitter via text message over wireless cellphone networks is particularly important for the many millions of Twitter users who lack reliable Internet access. Hoffman Decl. ¶9.

[2] For example, a school principal in Alabama, concerned about tornados can subscribe to receive Tweets from Alabama's Emergency Management Agency (@alabamaema) and instruct Twitter to deliver those Tweets to her as SMS text messages. Hoffman Decl. ¶11. On March 1, 2016, that principal would have received two SMS text messages alerting her to tornados threatening parts of her state. *Id.*

Tweets from specified users to their cellphones via SMS text message. *See generally* SOUF; *see* Pl. Br. §§II.A-II.D. That process, however, merits elaboration.

Twitter's platform does not transmit Tweets via SMS by default. Kelley Decl. ¶4. To the contrary, Twitter requires its users to take a series of affirmative steps to program Twitter's systems to deliver Tweets via SMS messages to the cellphone numbers they supply and verify. *Id.*; SOUF ¶¶7-8, 23-26. In the accompanying Hoffman Declaration, a Twitter software engineer describes the process as it existed during the relevant timeframe (with helpful screenshots). To receive the Tweets of other users via SMS, a user must: (1) create a Twitter account; (2) supply Twitter with a cellphone number by adding it to their account information; (3) verify that he or she controls that cellphone number through a back and forth exchange with Twitter's computer system; (4) select the option to receive Tweets via SMS generally; (5) "Follow" other users' Twitter accounts; and (6) separately, for each account followed, affirmatively request to receive Tweets from that account by enabling it for mobile delivery. Hoffman Decl. ¶¶12-19 (further detailing the process); Kelley Decl. ¶5; *see also* SOUF ¶¶7-8, 19, 23-26.

This involved process ensures that Twitter does not transmit Tweets via SMS text message (or "SMS Tweets") unless its users knowingly and explicitly direct it to do so. Kelley Decl. ¶4. Twitter has no control over whether a user takes these steps. Hoffman Decl. ¶¶20-24. And if a user does not complete each of these required actions, Twitter's system would not transmit Tweets to them via SMS. Hoffman Decl. ¶¶25-26; Kelley Decl. ¶¶4-5.

## 2. The User-Initiated SMS Tweets at Issue In This Case

The SMS Tweets at issue in this case resulted from a Twitter user following these user-initiated processes. It is undisputed that a user named "Jose Perez" ("Perez") created the @Agema222 account on Twitter and programmed Twitter to deliver the Tweets from two accounts he had chosen to Follow on the service (@swagcodespoiler and @dayzdevteam) as SMS text messages to the cellphone number he provided and verified as his own. Pl. Br. §II.H; *see generally* SOUF ¶¶37-40. In his accompanying declaration, Perez himself explains that he took the affirmative steps required to program Twitter's system to deliver Tweets from the two other users' accounts to his cellphone number via SMS. Perez Decl. ¶¶2-5.

Perez took these steps because, as he puts it, he "wanted to get the information shared by @swagcodespoiler and @dayzdevteam as quickly as [he] could" and SMS message was the "fastest and most convenient way" for him to receive the information. *Id.* ¶8. To him, "Twitter ... was just the connection between [him] and @swagcodespoiler and @dayzdevteam...." *Id.* ¶10. At some point, Perez relinquished his cellphone number and obtained a new one. *Id.* ¶12. He did not, however, update his @Agema222 account information to remove the number that he was no longer using. *Id.*

### 3. Reassignment of Perez's Phone Number to Plaintiff

In October 2013, unbeknownst to Twitter, Plaintiff's wireless carrier assigned her Perez's old cellphone number. SOUF ¶41; Kelley Decl. ¶29. Thereafter, Plaintiff received the Tweets from @swagcodespoiler and @dayzdevteam that Perez had programmed Twitter to send to that cellphone number via SMS. On June 19, 2014, Plaintiff filed suit claiming that Twitter violated the TCPA by sending her these SMS Tweets. Dkt. 1. She did not, however, include her cellphone number in the complaint. In late July 2014, Plaintiff's counsel supplied that number at Twitter's request and Twitter promptly halted the transmission of SMS Tweets to the number. Kelley Decl. ¶29; SOUF ¶52.

### B. Legal Proceedings to Date

Although Plaintiff styles her case as a putative class action, all class-related issues were postponed pending resolution of Plaintiff's individual claim. (Dkt. 48, Order dated December 9, 2014). The Court stayed most other issues, including various statutory and constitutional questions, pending the outcome of a TCPA case currently before the D.C. Circuit Court of Appeals. (Dkt. 61, Order dated September 10, 2015). The focus of the parties' present cross-motions for summary judgment is narrow. They address only: (1) "whether Twitter made the text message calls" for purposes of the TCPA; and (2) whether Twitter is entitled to immunity under Section 230(c) of the CDA. (Dkt. 61). A ruling in Twitter's favor on either issue ends the case.

### ARGUMENT

A party is entitled to summary judgment when it establishes "that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In this case, the parties have stipulated to every fact that "might affect the outcome of the suit under the governing law." *Id.* at 248. The legal issues presented here thus are appropriate for summary judgment. *Norian Corp. v. Stryker Corp.*, 433 F. Supp. 2d 1051, 1058 (N.D. Cal. 2004).

## I.    TWITTER IS AN INTERMEDIARY, NOT THE INITIATOR OF THE MESSAGES AT ISSUE

Last year, the FCC, the agency charged with implementing the TCPA, issued a ruling making clear that intermediary services whose systems send text messages at the instruction of their users are not the "initiators" of those messages and thus not liable for them. Since then, courts have uniformly applied that ruling to reject TCPA claims like the one that Plaintiff makes here.[3] The FCC's ruling squarely applies in this case and entitles Twitter to summary judgment.

### A.    The FCC's 2015 Order Confirms That Intermediaries Like Twitter Are Not Liable Under the TCPA

The TCPA prohibits the "making" of various types of phone calls to wireless numbers. 47 U.S.C. § 227(b).[4] The FCC has interpreted this prohibition to mean that no person or entity may "*initiate* any telephone call" in violation of the statute. 47 C.F.R. § 64.1200(a)(1) (emphasis added). But, as Congress has made clear, the statute does "not apply to the common carrier or other entity that transmits the call or message and that is not the originator or controller of the content of the call or message." S. Rep. No. 102-178 (1991).

Giving effect to these principles, the FCC recently confirmed that the TCPA does not apply to intermediary services that operate platforms for user-directed text messages. *In the Matter of Rules and* Regulations *Implementing the TCPA of 1991*, 30 FCC Rcd. 7961, ¶¶25-37 (the "2015 Order"). In its 2015 Order, the FCC explained that where a service is transmitting text

---

[3] *See Payton v. Kale Realty, LLC*, No. 13 C 8002, 2016 U.S. Dist. LEXIS 21655, at *19 (N.D. Ill. Feb. 22, 2016); *Kauffman v. Callfire, Inc.*, No. 3-14-cv-1333-H-DHB, 2015 U.S. Dist. LEXIS 149089, at *3, 9, 11-12 (S.D. Cal. Oct. 8, 2015); *Huricks v. Shopkick, Inc.*, No. C-14-2464, MMC, 2015 U.S. Dist. LEXIS 112596, at *7 (N.D.Cal. Aug. 24, 2015); *Selou v. Integrity Sol. Servs. Inc.*, No. 15-10927, 2016 U.S. Dist. LEXIS 18189, at *10 (E.D. Mich. Feb. 16, 2016); *McKenna v. WhisperText*, No. 5:14-cv-00424-PSG, 2015 U.S. Dist. LEXIS 120090, at *4, 13-14 (N.D. Cal. Sept. 9, 2015).

[4] The Ninth Circuit has held that SMS text messages are "calls" under the TCPA. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009). For purposes of this motion, Twitter accepts that ruling, though it reserves the right to challenge it at a later stage.

1   messages at the direction of its users, the service does not "make" or "initiate" calls within the

2   meaning of the TCPA, and thus cannot be charged with liability for them. *Id.*[5]

3        In adopting that rule, the FCC considered three different services, finding that two of

4   them were not "initiators" of the messages they sent. The FCC's discussion of these services

5   makes clear that intermediaries whose systems transmit messages in response to users'

6   requests—where users make the critical decisions about when and to what numbers messages

7   should be transmitted—are not liable under the TCPA. That is so even if the service provider

8   processes the messages and transmits them through its system and even if the service provider

9   supplies some (or even all) of the content of the messages.

10       **YouMail**. YouMail allows users to send auto-reply text messages in response to

11  voicemails left for them. 2015 Order ¶31. The FCC concluded that these text messages are not

12  initiated by YouMail despite its technical involvement in constructing and sending the texts

13  because YouMail users determine if they want auto-reply texts sent, to whom replies are sent,

14  and what replies say (beyond a hyperlink automatically inserted by YouMail). *Id.* Once the user

15  makes these selections, YouMail is "reactive"; when a user receives a voicemail from a caller,

16  YouMail "simply sends a text message to that caller, and only to that caller." *Id.* ¶¶30-32. As the

17  FCC explained: "What is relevant is the reactive and tailored nature of YouMail's service, and

18  that an app user controls the bulk of the message—along with the matters of whether the auto-

19  reply messages are sent and to whom they are sent." *Id.* ¶33.

20       **TextMe.** TextMe allows users to send text messages inviting their contacts to join the

21  service. Even though TextMe supplied the entire content of those messages, the FCC ruled that

22  TextMe was not the "initiator." *Id.* ¶37. Before TextMe transmitted the invitations, users were

23  required to make multiple affirmative choices to cause the messages to be sent. These choices

24  included: tapping a button to "invite [their] friends"; choosing whether to invite all contacts or

25

26       [5] Twitter, as part of a trade group called the Internet Association, urged the FCC to adopt this approach because it properly "distinguishes between conduits and their users" and thereby

27  "encourage[s] the development of technologies which maximize user control over what information is received by individuals, families, and schools...." Kramer Decl., Ex. A at 5

28  (Notice of Ex Parte Presentation, submitted by Markham C. Erickson on behalf of the Internet Association, CG Docket No. 02-278 (June 11, 2015)).

just those that they individually selected; and choosing whether the messages would be sent by clicking a final button. In response to these user actions, TextMe constructed a text message that added the user's TextMe username and the text of an invitation together with a link to the TextMe website, and transmitted the invitation as an SMS text message to wireless carriers in the format they required. *Id.* ¶36.[6] The FCC explained based on these facts "that the app user's actions and choices effectively program the cloud-based dialer to such an extent that he or she is so involved in the making of the call as to be deemed the initiator of the call." *Id.* ¶37.[7]

The FCC's approach in absolving these intermediary services from TCPA liability offers a clear roadmap for courts assessing similar claims. And since the FCC's 2015 Order, courts have uniformly followed that roadmap in holding that intermediary services do not initiate messages under the TCPA. For example:

***Payton v. Kale Realty, LLC/Voiceshot.*** Voiceshot operates an Internet-based service that allows subscribers to send and receive group text messages. 2016 U.S. Dist. LEXIS 21655, at *4. To send messages through the service, a Voiceshot subscriber has to supply the recipients' phone numbers, type the content of the message, and click a "begin" button. *Id.* at *4-5. Relying on the 2015 Order, the court entered summary judgment for Voiceshot because Voiceshot requires its users "to take affirmative steps to determine whether, when, and to whom they would send text messages," and those users supplied the content of the messages. *Id.* at *19-20.

***Kauffman v. Callfire, Inc.*** Callfire offers an Internet-based platform through which its customers can send text messages to a list of numbers supplied by the customer. 2015 U.S. Dist. LEXIS 149089, at *3, 9. Based on the 2015 Order, the court found that CallFire was not the initiator of the messages (and thus was entitled to summary judgment) because it "required its

---

[6] *See* Kramer Decl. Ex. B at 5-6, 10, 13 (*TextMe Petition for Expedited Declaratory Ruling and Clarification*, CG Docket No. 02-278 (filed March 18, 2014)).

[7] In contrast to YouMail and TextMe, the FCC concluded that a third Internet-based communications service, Glide, was the initiator of invitation texts message that it sent to its users' contacts. 2015 Order ¶34. Glide, by default, automatically sent text messages inviting everyone in a user's cellphone contacts to join the service, unless the user affirmatively took steps to opt-out. The FCC found that Glide initiated the messages under these circumstances because its user "plays no discernible role in deciding whether to send the invitational text messages, to whom to send them, or what to say in them." *Id.* ¶35.

users to take affirmative steps to determine whether, when, and to whom they would send text messages." *Id.* at *9-10.

*Huricks v. Shopkick, Inc.* Shopkick operates a shopping application for mobile devices. 2015 U.S. Dist. LEXIS 112596, at *1-2. The plaintiffs alleged that Shopkick violated the TCPA by sending them text messages, identified as "from a friend," with a link to Shopkick's website. *Id.* at *2. Shopkick supplied the content of the messages, but users were required to follow a multi-step process before any messages would be sent. *Id.* at *10. Applying the 2015 Order, the court granted summary judgment to Shopkick, explaining that "the steps the user must have taken to cause the Shopkick invitational text messages to be sent are indistinguishable in all material respects from the steps a user of the TextMe app must take to cause the TextMe invitational texts to be sent." *Id.*[8]

B.   **Twitter is Protected Under the FCC's 2015 Order And The Case Law Applying That Order To Intermediary Services**

The FCC's 2015 Order and the cases following it apply equally, if not more strongly, to Twitter in this case. Like the text messages in *YouMail*, *TextMe*, *VoiceShot*, *CallFire* and *Shopkick* – the SMS Tweets at issue here were sent in response to a user's affirmative instructions about what, where, and when to send. As a matter of law, Twitter did not initiate those messages and cannot be held liable for them under the TCPA.

It is undisputed that the text messages that Plaintiff received in this case were transmitted by Twitter's system only as a result of a Twitter user's multiple affirmative choices to request them. SOUF ¶¶37-43; Hoffman Decl. ¶¶ 25-26; Kelley Decl. ¶¶4-6; Perez Decl.¶¶2-5, 8. Had the user not taken each of these affirmative steps, no SMS messages would ever have been sent to Plaintiff's number. Hoffman Decl. ¶26; Kelley Decl. ¶5. It was this Twitter user, not Twitter

---

[8] Courts also have applied the 2015 Order on motions to dismiss TCPA claims where it was clear from the complaints' allegations that the defendant service was used as an intermediary by others to initiate calls and texts. *See Selou*, 2016 U.S. Dist. LEXIS 18189, at *10 (plaintiff's allegations showed that users initiated the calls using the platform's technology); *McKenna v. WhisperText*, No. 5:14-cv-00424-PSG, 2015 U.S. Dist. LEXIS 120090, at *4, 13-14 (N.D. Cal. Sept. 9, 2015) (plaintiff's allegations showed that users determined whether and to whom texts would be sent).

itself, who determined whether any text messages would be sent, to what number they would be sent, and when they would be sent.

Twitter's role in transmitting the SMS Tweets here is indistinguishable in all material respects from the role that TextMe, YouMail, VoiceShot, CallFire and Shopkick played in message transmittal. With Twitter as with TextMe, the Twitter "user's actions and choices effectively program[ed]" the Twitter *service* such that the user should be "deemed the initiator of the call." 2015 Order ¶37; Kelley Decl. ¶5-6. With Twitter as with YouMail, Twitter's system is "reactive and tailored." 2015 Order ¶32. Twitter transmits Tweets via SMS only in response to users' instructions to do so, and only to the cellphone number that a Twitter user supplies and verifies. Hoffman Decl. ¶¶12-19, 26. With Twitter, as with VoiceShot, CallFire and Shopkick, users are required to take a series of affirmative steps to determine whether, when, and to what numbers texts will be sent. *See Payton*, 2016 U.S. Dist. LEXIS 21655, at *19; *Kaufman*, 2015 U.S. Dist. LEXIS 149089, at *9; *Huricks*, 2015 U.S. Dist. LEXIS 112596, at *9; Hoffman Decl.¶¶12-26; Kelley Decl. ¶¶4-5. The analysis should go no further.

Plaintiff's Motion distorts or ignores the substance of the FCC's 2015 Order, and makes virtually no mention of the authorities that have unanimously applied it to reject claims like the one she is pursuing here. Instead, Plaintiff spends much time discussing Twitter's limited role in formatting the SMS Tweets at issue. Pl. Br. at 7-9; *see* Kelley Decl. ¶¶6-16 (describing Twitter's automated formatting processes). But that activity is of no consequence. The record is clear that none of these formatting changes alters the fundamental content of the messages, which originates with the user who created the Tweet in the first place. Kelley Decl. ¶7; SOUF ¶¶16-17, 19-20, 23-24, 28-29, 42-50. Twitter merely packages and formats messages to comport with SMS limitations and to provide the user with functionalities equivalent to what they would experience by accessing the same message on Twitter's website. Kelley Decl. ¶¶8-10, 13-16. That does not make Twitter the initiator of the messages.

Indeed, Twitter's level of involvement is far less than TextMe and Shopkick's role in their users' invitation text messages. Both of those platforms supplied the *full content* of those messages, yet were not liable for initiating them. 2015 Order ¶37; *Huricks,* 2015 U.S. Dist.

LEXIS 112596, at \*12 (service that supplied full content, user name and hyperlink in text messages did not initiate messages that resulted from a series of user-directed choices); *see also* 2015 Order ¶33 (YouMail's inclusion in text messages of links to a webpage where users could opt-out of future messages did not render it the initiator of those messages).[9] Regardless of its formatting tweaks to the SMS Tweets Plaintiff received, Twitter was not the initiator of the messages because its user, not Twitter, instructed Twitter's system to send them.[10]

Plaintiff also argues that because the text messages she received could not have been sent without Twitter's involvement, Twitter should be charged with initiating them. This argument again misunderstands the FCC's test. The same "but for" causation argument could have been made about each of the services that the FCC and courts have exempted from TCPA liability. As the *Payton* court explained, the fact that a technology provider "makes it possible for people to communicate with one another . . . does not mean [the technology provider] *caused* th[e] message to be initiated over its network, just as people who save money do not *cause* bank robbers to rob a bank." 2016 U.S. Dist. LEXIS 21655, at \*16. Twitter, like YouMail and TextMe (and the providers at issue in *Payton, Selou, Whispertext, Shopkick* and *Callfire*) designed a system that, in response to multiple affirmative choices by its users, will transmit text messages to the numbers supplied by those users. Because a Twitter user selected the options that caused

---

[9] Plaintiff argues that Twitter should be deemed to have initiated the SMS Tweets because it did not add information to the messages informing recipients how to halt future transmissions. Pl. Br. at 17. Plaintiff cites the 2015 Order as supposed authority for this novel proposition. But the Order says no such thing. All the FCC said was that by including such information in messages, YouMail did not exercise control over the messages' content so as to render YouMail the initiator of those messages. 2015 Order ¶33. Neither the FCC nor any court has ever suggested that an intermediary must include such information in text messages or else be considered an initiator of those messages.

[10] Plaintiff repeatedly refers to SMS Tweets in her brief as "notifications of Tweets." *See, e.g.,* Pl. Br. at 5-8, 12, 17-18. Apparently, Plaintiff believes that this nomenclature better fosters the misimpression that Twitter bears responsibility for the messages. Regardless of what either party calls them, the reality is that the messages at issue are the Tweets themselves, formatted for delivery via SMS, not a notification message from Twitter that a Tweet has been posted. *See* Hoffman Decl. ¶¶27-28; SOUF ¶¶16-17, 19-20, 23-24, 28-29, 42-50. This is readily apparent by comparing the Tweets at issue here as they appeared on Twitter's website, with the SMS messages about which Plaintiff complains. *Compare e.g.* Kolton Ex. 4, Part 1 at TWTR000062 (screenshot of @dayzvevteam Tweet appearing on the @dayzdevteam page of the Twitter website) *with* Nunes Supp. Decl. Ex. A, Part 3 at PL000175 (screenshot from Plaintiff's phone of the same @dayzdevteam Tweet formatted as an SMS message).

1  the messages to be sent, and supplied the phone number to which they were to be sent, Twitter

2  did not initiate those messages and is not liable for them. *See* 2015 Order ¶31-33, 36.[11]

3      Under the FCC's Order and the cases uniformly applying it, Twitter cannot be deemed

4  the "initiator" of the messages about which Plaintiff complains in this case. The Court need go

5  no further to enter summary judgment in Twitter's favor.

6          **C.      Plaintiff's Efforts To Evade The FCC's 2015 Order Are Meritless**

7      Plaintiff offers no serious challenge to this analysis. The arguments she does make

8  misunderstand the law, ignore the facts, and misstate Twitter's position. None of them advances

9  Plaintiff's claims or allows her to resist Twitter's summary judgment motion.

10                  1.      Twitter Has Not Admitted Liability

11     Plaintiff argues that Twitter has "admitted" that it is liable for the text messages at issue

12 because of its colloquial references to sending text messages. This is sophistry. Twitter has

13 admitted nothing that makes it the "initiator" of the messages under the FCC's Order.

14     All that Twitter has said is that it "sends" text messages. But that is not the relevant

15 question under the TCPA. As the FCC has made clear, the issue is not whether an intermediary

16 "sends" the messages through its system. The question is who is the "initiator" of the message

17 (that is, who determines whether, to whom, and when the messages should be sent). 2015 Order

18 ¶32. Those are very different things. *See, e.g., Rinky Dink, Inc. v. Elec. Merch. Sys.,* No. C13-

19 1347-JCC, 2015 U.S. Dist. LEXIS 22108, at *22-23 (W.D. Wash. Feb. 24, 2015) (observing that

20 "[m]essage 'initation' and message 'transmission' are distinct concepts"). Intermediaries "send"

21 user-initiated messages: that is the functionality they provide. But that clearly does not make

22 _____

23      [11] Plaintiff also argues that Twitter "controls the recipient lists" for the SMS Tweets at issue
   and should therefore be deemed to have initiated them. The "controlling the recipient lists"
24 language does not appear in the FCC's 2015 Order, but rather is plucked from a prior decision
   about fax broadcasting services. *Rules and Regulations Implementing the TCPA of 1991*, 68 F.R.
25 44144, 44169 at ¶ 138 (July 25, 2003). But, even in that context, the question is not concerned
   with mere possession of numbers in a database. Rather, it asks who supplied the fax numbers to
26 be called. *Id.* ("if the fax broadcaster supplies the fax numbers used to transmit the
   advertisement, the fax broadcaster will be liable for any unsolicited advertisement faxed to
27 consumers and businesses without their prior express invitation or permission"). Here, Twitter
   did not "supply" Plaintiff's cellphone number to anyone. It is undisputed that a Twitter user
28 supplied the number and explicitly instructed that messages be sent to it. Pl. Br. at 10-11; SOUF
   ¶¶37-40, 43; Hoffman Decl. ¶¶25-26.

them "initiators" of those messages liable for them under the TCPA. If it did, the FCC's 2015 Order would be a dead letter.

Indeed, YouMail and TextMe, as well as the services in *Peyton*, *Selou, Whispertext, Shopkick* and *Callfire* all "sent" or transmitted text messages in the ordinary sense of the word. *See* Kramer Decl. Ex. C at 7 (*YouMail Petition for Expedited Declaratory Ruling*, CG Docket No. 02-278 (filed April 19, 2013)) (YouMail's system "<u>only sends a single text response</u>, when instructed to do so by a subscriber's settings") (emphasis in original); Kramer Decl. Ex. B at 6-7 (*TextMe Petition for Expedited Declaratory Ruling and Clarification*) ("TextMe does not send any text messages to non-users."). The FCC expressly described both YouMail and TextMe as "sending" messages in its Order. 2015 Order ¶32 ("in response to a call made to the app user, YouMail simply *sends* a text message to that caller....") (emphasis added); *Id.* ¶36 ("TextMe then *sends* the invitational text message....." ) (emphasis added). Yet it still found that they were not liable because they had not *initiated* the messages. The same is true of Twitter. Plaintiff's word game gets her nowhere.

### 2. Plaintiff Focuses on the Wrong User

Next, Plaintiff argues that the Twitter users who created the Tweets could not be the initiators of the text messages at issue because they did not instruct Twitter to send those Tweets to Plaintiff's phone number. Pl. Br. at 16-19. Plaintiff's argument is completely misdirected. The users who created the Tweets are not the key actors on the question of initiation. The user who matters for this purpose is the one who instructed that those messages (originating from other Twitter users) be sent to his phone via text. That is clear from the 2015 Order. The YouMail app sent text messages (based on its users' instructions) in response to voicemails left for the users. The people who left the voicemails that triggered the transmission of texts had no involvement in deciding whether, when or to whom the texts would be sent. But that did not make YouMail the initiator of the messages. YouMail's system merely implemented requests by users to have text messages delivered in response to voicemails. So it is here. It makes no difference whether the Twitter users whose Tweets triggered the transmission of requested SMS messages knew to whom their Tweets would be delivered or by what means. What is relevant is a Twitter user

1  expressly instructed Twitter's system to deliver the Tweets as text messages to the number he

2  supplied. That fact, which Plaintiff ignores, disposes of Plaintiff's TCPA claim.

3                      **3.**    <u>Twitter Did Not Knowingly Allow Its Platform to be Used Illegally</u>

4        In a final attempt to end run the 2015 Order and its progeny, Plaintiff argues that Twitter

5  should be deemed to have initiated the messages in question because it knowingly allowed its

6  service to be used for illegal purposes. Again, Plaintiff misapprehends the law.

7        According to the FCC, if a service receives "actual notice" that someone is using the

8  service in violation of the TCPA and fails to take steps to address that use thereafter, that would

9  be "consider[ed]" as a "possible indicator" that the service was complicit in the user's

10  subsequent TCPA violations. 2015 Order ¶30 & n.110. There is nothing remotely like that here.

11  Plaintiff argues that Twitter should be charged with the requisite knowledge because it knows

12  generally that cellphone numbers can be recycled and that some unidentified users' numbers

13  presumably have been. But that is not "actual notice" of anything. All that imparts is that the

14  service might be used by someone, somewhere, to generate unwelcome messages to someone. It

15  is akin to knowledge that people who initiate text messages can misdial phone numbers leading

16  to misdirected texts. Such knowledge is possessed by any intermediary whose services are used

17  to carry messages. The FCC cannot have meant, by devising a rare exception for truly culpable

18  services, to swallow altogether the protection that it expressly crafted for intermediaries. And the

19  cases to have addressed this issue require considerably more. *See Kauffman,* 2015 U.S. Dist.

20  LEXIS 149089, at *13 (absent proof of notice of TCPA violations from the FCC or other

21  comparable notice, plaintiff failed to show service provider had sufficient knowledge of illegal

22  messaging activity to render it responsible); *Huricks*, 2015 U.S. Dist. LEXIS 112596, at *14

23  (service's general knowledge that users were generating unwelcome text message invitations did

24  not transform service into initiator of those messages).

25        Moreover, as detailed in the Hoffman and Kelley Declarations, Twitter is far from the

26  culpable service provider that the FCC's limited exception envisions. Twitter takes pains to

27  avoid misdirected text messages. It requires its users not only to supply, but also to verify their

28  cellphone numbers, and to follow a multi-step process to explicitly direct the transmission of

messages to that number. Hoffman Decl. ¶¶12-19; Kelley Decl. ¶¶4-5; SOUF ¶¶7-8, 19, 23-29. Although there is no source of comprehensive information on recycled cellphone numbers,[12] Twitter goes to great lengths to try to determine when its users give up their numbers so that it can block further messages to those numbers. Kelley Decl. ¶¶21-28. It provides ready means (and ready notice of those means) for users and non-users alike to halt the transmission of any text messages to a cellphone number using basic, well-known commands. *Id.* ¶¶17-20. And when Twitter did receive actual notice from Plaintiff's counsel that Plaintiff was receiving unwelcome text messages and counsel supplied her cellphone number, Twitter promptly blocked messages to that number. *Id.* ¶29; SOUF ¶52. It is meritless to suggest, as Plaintiff does, that Twitter was knowingly complicit in alleged TCPA violations here.[13]

* * *

The FCC's 2015 Order was specifically intended to shield services like Twitter from TCPA liability in precisely the circumstances about which Plaintiff complains. Plaintiff's efforts to avoid application of that ruling here badly miss the mark. Because there are no genuine issues of material fact in dispute, Twitter is entitled to judgment as a matter of law.

## II.     PLAINTIFF'S TCPA CLAIM IS BARRED BY SECTION 230 OF THE CDA

In addition to running squarely into the FCC's 2015 Order, Plaintiff's TCPA claim is precluded by Section 230(c)(1) of the CDA.

---

[12] 2015 Order at 8093 (dissenting statement of Commissioner O'Rielly) ("'[T]here is no comprehensive database of reassigned numbers'" and "[t]here is simply no realistic way for a company to comprehensively determine whether a number has been reassigned.").

[13] Plaintiff closes her argument about the FCC's 2015 Order with an evidence-free diatribe about Twitter's supposedly exclusive knowledge and control over the text messages at issue in the case. The argument contains too many misstatements to correct. But it is flatly wrong to claim, as Plaintiff does, that only Twitter "knew" the phone number to which the SMS Tweets in question were being sent. Pl. Br. at 21. Both the Twitter user who supplied and verified the number, and Plaintiff herself knew that. Perez Decl. ¶¶2-5, 8; Nunes Decl. ¶1; SOUF ¶¶37-38, 41. It is likewise wrong to claim that Twitter was the only party who could determine that the number had been reassigned. Twitter could not, in fact, determine the number had been reassigned despite its considerable efforts. Kelley Decl. ¶¶21-29. But its user, Plaintiff and their wireless carriers all could. *Id.* ¶¶17-20, 22. And it is incorrect to say that only Twitter could have blocked the messages. Again, the Twitter user and Plaintiff could have easily done the same. *Id.* ¶¶17-20.

## A. Section 230 Protects Online Services From Liability For Distributing User-Supplied Information

The protections that the FCC and courts have afforded intermediary services reflect a broader understanding that Internet-based intermediaries—services like Twitter—should not be liable when they act as conduits for their users' information. The CDA establishes just such a protection. This statute was enacted "to maintain the robust nature of Internet communication, and accordingly, to keep government interference in the medium to a minimum." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997); *accord* 47 U.S.C. § 230(b)(2) (declaring federal policy to "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation"). As the Ninth Circuit has explained: "Making interactive computer services and their users liable for the speech of third parties would severely restrict the information available on the Internet. Section 230 therefore sought to prevent lawsuits from shutting down websites and other services on the Internet." *Batzel v. Smith*, 333 F.3d 1018, 1027-28 (9th Cir. 2003).

The relevant portion of Section 230 states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).[14] This provision "overrides the traditional treatment of publishers, distributors and speakers under statutory and common law." *Batzel*, 333 F.3d at 1026. "Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role." *Zeran*, 129 F.3d at 330. It confers "broad immunity for publishing content provided primarily by third parties." *Carafano v. Metrosplash.com. Inc.*, 339 F.3d 1119, 1129 (9th Cir. 2003). Section 230(c)(1) applies to any claim, no matter what form it takes, that "would treat a defendant as a publisher or speaker of third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009). That includes federal statutory causes of action. *See id.* at 1100 n.4; *Fair Housing Council of San Fernando*

---

[14] A separate provision protects service providers from liability when they restrict the availability of material that they consider to be "objectionable." 47 U.S.C. § 230(c)(2). Section 230(c)(2) provides a distinct immunity not at issue in this case. *See Batzel*, 333 F.3d at 1030 n.14; *infra* § II.C

*Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1171 (9th Cir. 2008) (en banc). And it also

applies to shield service providers who act merely as "distributors" of information from others.

*See Zeran*, 129 F.3d at 331-32 (distributor liability "is merely a subset, or a species, of publisher

liability, and is therefore also foreclosed by § 230").

   "There has been near-universal agreement that section 230 should not be construed

grudgingly." *Doe v. Backpage.com, LLC*, No. 15-1724, 2016 U.S. App. LEXIS 4671, at *11 (1st

Cir. Mar. 14, 2016). Recognizing the vital role that intermediaries play in ensuring the free flow

of online communications, courts have consistently "recognized the provision to protect internet

service providers for the display of content created by someone else." *Jones v. Dirty World*

*Entm't Recordings LLC*, 755 F.3d 398, 406-07 (6th Cir. 2014) (citation omitted); *accord Doe v.*

*MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) ("Courts have construed the immunity

provisions in § 230 broadly in all cases arising from the publication of user-generated content.").

Congress has endorsed this approach, recognizing that "[t]he courts have correctly interpreted

section 230(c)" (H.R. Rep. No. 107-449, at 13 (2002)) and extended its reach into "new areas"

(*Jones*, 755 F.3d at 408 (citation omitted)). Under the CDA, intermediaries like Twitter are

broadly protected against claims arising from the dissemination of third-party content, including

decisions about "whether to publish, withdraw, postpone, or alter content." *Zeran*, 129 F.3d at

330; *accord Jones*, 755 F.3d at 416 ("The CDA expressly bars lawsuits seeking to hold a service

provider liable for its exercise of a publisher's traditional editorial functions….").

## B. The CDA Bars Plaintiff's Claim

   "By its plain language, § 230 creates a federal immunity to any cause of action that

would make service providers liable for information originating with a third-party user of the

service." *Zeran*, 129 F.3d at 330 (4th Cir. 1997). More specifically, Section 230(c)(1) "bars a

claim if (1) the defendant asserting immunity is an interactive computer service provider, (2) the

particular information at issue was provided by another information content provider, and (3) the

claim seeks to treat the defendant as a publisher or speaker of that information." *Jones*, 755 F.3d

at 409 (citation omitted); *accord Batzel*, 333 F.3d at 1037 (same). That is the situation here.

Twitter provides an interactive computer service, and Plaintiff seeks to hold it liable as a

publisher for distributing messages created and requested by third parties. Congress has foreclosed that effort.

### 1. Twitter is the Provider of An "Interactive Computer Service"

The CDA defines "interactive computer service" broadly, as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet…." 47 U.S.C. § 230(f)(2). Twitter undisputedly meets this definition. SOUF ¶4; *accord FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1195 (10th Cir. 2009) ("The prototypical service qualifying for this statutory immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others.").[15]

### 2. The Information At Issue Was Provided By Third Parties

"[I]mmunity under the CDA depends on the pedigree of the content at issue." *Jones*, 755 F.3d at 409. Section 230(c)(1) immunizes service providers for acting in a publisher role with respect to "any information provided by another information content provider." 47 U.S.C. § 230(c)(1).[16] This case plainly involves information of that sort.

The following facts are undisputed: (1) the content of the Tweets at issue was supplied by the users of the @swagcodespoiler and @dayzdevteam accounts (SOUF ¶¶12, 28, 36; Hoffman Decl.¶ 24-25); and (2) that content was distributed to Plaintiff's cellphone because of delivery instructions set by a Twitter user, when he took multiple affirmative steps that directed Twitter's systems to deliver those Tweets via text message to the number he provided to Twitter. SOUF ¶¶7-8, 23-29, 37-43; Hoffman Decl. ¶26. It is clear, therefore, that the Plaintiff's claims derive entirely from "content provided primarily by third parties." *Carafano*, 339 F.3d at 1123. It was Twitter users who authored messages that Plaintiff did not want to receive and another Twitter

---

[15] Section 230 "also gives immunity to users of third-party content." *Roommates.com*, 521 F.3d at 1162 n.7; *see* 47 U.S.C. § 230(c)(1). While not directly at issue here, this protection would appear to cover Twitter users who request to have other users' Tweets delivered to them.

[16] The CDA defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet…." 47 U.S.C. § 230(f)(3).

user who instructed Twitter systems to transmit those messages to a particular cellphone number. Twitter was not responsible for creating or developing the content about which Plaintiff is complaining. It simply provided a neutral platform through which users could choose to create, disseminate, and receive user-generated information in various forms. As such, Twitter is not an "information content provider" with respect to the messages at issue. *See Jones*, 755 F.3d at 409 (website operator is not "responsible for the development of content created by a third party merely by displaying or allowing access to it"); *Roommates.com*, 521 F.3d at 1169 ("providing neutral tools to carry out what may be unlawful or illicit searches does not amount to 'development' for purposes of the immunity exception"); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1198 (N.D. Cal. 2009) ("the provision of neutral tools generally will not affect the availability of CDA immunity").

Notwithstanding the undisputed fact that the information triggering Plaintiff's suit originated with third parties, Plaintiff argues that Twitter is responsible for creating or developing that information because its system automatically formatted the messages for SMS delivery as its user instructed. *See* Pl. Br. at 24. Plaintiff does not cite a single case to support her position. That is not surprising, as the case law uniformly establishes that these kinds of neutral formatting changes do not transform a service provider into an "information content provider." *Jones*, 755 F.3d at 410 ("merely taking action that is necessary to the display of allegedly illegal content" is protected by Section 230(c)(1)). As the Ninth Circuit has explained, "so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process." *Carafano*, 339 F.3d at 1124.[17] Re-formatting or tweaking user content to make it available via a given communications medium is squarely within the publisher role. *Barnes*, 570 F.3d at 1102 ("publication involves reviewing, editing, and deciding whether to publish or to withdraw from

---

[17] *See also, e.g., Batzel*, 333 F.3d at 1031 & n.18 ("deciding whether to publish, withdraw, postpone or *alter* content do not transform an individual into a 'content provider' within the meaning of § 230" (citation omitted) (emphasis added)); *Roommates.com*, 521 F.3d at 1170 ("an editor's minor changes to the spelling, grammar, and length of third-party content do not strip him of section 230 immunity").

1  publication third-party content"). Twitter does not lose immunity merely because it automatically

2  processes third-party content so that its users can receive others' Tweets as text messages.[18]

3         3.    Plaintiff's Claim Seeks to Hold Twitter Liable as a "Publisher or Speaker"

4         Finally, Plaintiff's claim treats Twitter as the "speaker or publisher" of the third-party

5  messages at issue. In making this determination, the name of the cause of action does not matter.

6  The test is simply "whether the duty that the plaintiff alleges the defendant violated derives from

7  the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1)

8  precludes liability." *Barnes*, 570 F.3d at 1102. That is the case here.

9         Plaintiff argues that Twitter violates the TCPA because it "*processes* the content received

10  in the Tweets, *reformats* the content for delivery to Followers based on the delivery preferences

11  set by those Followers, *applies various rules* to further determine whether, when and where the

12  notifications should be sent, and then *distributes* notifications of the Tweets to Followers." Pl.

13  Br. at 9 (emphases added). This is classic publisher conduct. "[A] publisher reviews material

14  submitted for publication, perhaps edits it for style or technical fluency, and then decides

15  whether to publish it." *Barnes*, 570 F.3d at 1102; *accord Zeran*, 333 F.3d at 331 ("Those who are

16  in the business of making their facilities available to disseminate the writings composed, the

17  speeches made, and the information gathered by others may also be regarded … as publishers.")

18  (quoting *Prosser and Keeton on the Law of Torts* § 113, at 803 (5th ed.1984)). And "lawsuits

19  seeking to hold a service provider liable for its exercise of a publisher's traditional editorial

20

21

22         [18] Plaintiff also argues that because certain agreements purport to make users of short codes
23  responsible for all content associated with a campaign using the code, Twitter somehow became
    an information content provider under the CDA. Pl. Br. at 24-25. This argument is makeweight.
24  As an initial matter, the agreements on which Plaintiff relies are not admissible, and there is no
    evidence that Twitter has actually entered into them. *See* Twitter's Opposition to Plaintiff's
25  Request for Judicial Notice in Support of Motion for Partial Summary Judgment (Dkt. 84). But
    even if the agreements were properly before the Court and applied to Twitter, they would still be
26  irrelevant. The agreements say nothing about whether Twitter provided or developed the
    information contained in the SMS Tweets for purposes of the CDA. They seem merely to
27  absolve the short code provider of responsibility for how the short codes are used. They do not
    purport to address the relationship between Twitter and its users, and they cannot turn Twitter
28  into the provider of information comprised of user content and transmitted at the direction of
    users.

functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." *Zeran*, 129 F.3d at 330.

In particular, services acting as *distributors* are shielded by Section 230. As the Ninth Circuit has explained, the CDA "overrides the traditional treatment of publishers, *distributors*, and speakers under *statutory* and common law." *Batzel*, 333 F.3d at 1026 (emphasis added). Accordingly, "section 230 prohibits 'distributor' liability for Internet publications." *Barrett v. Rosenthal*, 40 Cal. 4th 33, 39-40 (Cal. 2006); *id*. at 48 (explaining that it is implausible "that Congress intended to immunize 'publishers' but leave 'distributors' open to liability"); *see also Barnes*, 570 F.3d at 1104 (rejecting argument that "the term 'publisher' in section 230(c)(1) refers only to primary publishers and not to secondary publishers or distributors"); *Zeran*, 129 F.3d at 331-32 (rejecting argument that "the term 'distributor' carries a legally distinct meaning from the term 'publisher'").

The only way Twitter could be held liable in this case would be to treat it as the publisher or distributor of SMS Tweets containing information provided by third parties that were sent and received at the direction of Twitter's users. That is precisely what the CDA forbids.

### C.    Plaintiff's Efforts To Escape Twitter's CDA Immunity Fail

Plaintiff does not engage with the analysis above. Her brief ignores nearly all of the leading CDA case law and, indeed, does not even quote the text of Section 230(c)(1). Plaintiff offers a few scattered arguments for evading Twitter's CDA immunity, none of which has merit.

*First*, Plaintiff says that the CDA "does not even purport to grant immunity to TCPA offenses." Pl. Br. at 22. That is irrelevant. "Section 230(c)(1) is general." *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc*., 519 F.3d 666, 671 (7th Cir. 2008). Courts have applied the statute to "a wide variety of causes of action, including housing discrimination, negligence, and securities fraud and cyberstalking." *Backpage*, 2016 U.S. App. LEXIS 4671, at *13 (citations omitted). The Ninth Circuit has made clear that "what matters is not the name of the cause of action … what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes*, 570 F.3d at 1101-02. That is exactly what Plaintiff's TCPA claim seeks to do.

*Second*, Plaintiff points to *Sherman v. Yahoo!, Inc.*, 997 F. Supp. 2d 1129 (S.D. Cal.

2014) (Pl. Br. at 22-23), but that case is irrelevant. The argument in *Sherman* was based only on

***Section 230(c)(2)*** of the CDA—a distinct "statutory provision with a different aim" from Section

230(c)(1). *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1175 (9th Cir. 2009). "Section

230(c)(1) is concerned with liability arising from information provided online. Section 230(c)(2)

is directed at actions taken by Internet service providers or users to restrict access to online

information." *Barrett*, 40 Cal. 4th at 49.[19] That *Sherman* rejected an argument under Section

230(c)(2) thus says nothing about whether Twitter is protected by Section 230(c)(1). *See Batzel*,

333 F.3d at 1030 n.14 (explaining that Section 230(c)(2) is "not relevant" to a case based on

Section 230(c)(1)).

*Third*, again improperly conflating Section 230(c)(1) and (c)(2), Plaintiff claims that the

general heading for Section 230(c) ("Protection for 'good samaritan' blocking and screening of

offensive material") means that subsection (c)(1) applies only where a service provider blocks or

screens offensive material. Pl. Br. at 23 & n.17. The Ninth Circuit rejected this very argument

(*see Barnes*, 570 F.3d at 1105), as have other courts (*e.g.*, *Craigslist*, 519 F.3d at 670-71).

Section 230(c)(1)'s scope extends well beyond "screening under subsection (c)(2)." *Id.* It

protects service providers regardless of whether they make efforts to remove or block

objectionable items. *See, e.g.*, *Jones*, 755 F.3d at 416 (explaining that the "decision not to

remove" content is protected by 230(c)(1)) (citation omitted); *Barnes*, 570 F.3d at 1105

("Subsection (c)(1), by itself, shields from liability all publication decisions, whether to edit, to

remove, or to post, with respect to content generated entirely by third parties.").

Finally, Plaintiff argues that the CDA applies only where a service provider is accused of

publishing harmful *content*, and thus that a TCPA claim is not covered because the statute

assigns liability without regard to the content of the message. Pl. Br. at 22-23.[20] But content

---

[19] *See also Barnes*, 570 F.3d at 1105 (subsection (c)(2) "protects internet service providers from liability not for publishing or speaking, but rather for actions taken to restrict access to obscene or otherwise objectionable content"); *Craigslist*, 519 F.3d at 670-71 ("subsection (c)(2) does not deal with the liability of speakers and publishers, the subject of subsection (c)(1)").

[20] Plaintiff's premise here is wrong. The TCPA provision at issue here is not "content neutral." On its face, the provision exempts, among other things, "a call made for emergency

(continued...)

1    neutrality simply is not the touchstone for CDA protection. Nothing in Section 230 limits

2    immunity to efforts to hold intermediaries liable based on the substantive content of user

3    messages. The operative word in the CDA is not "content"; it is "information." 47 U.S.C.

4    § 230(c)(1). And courts have rightly brushed aside efforts to narrow that term. The Third Circuit

5    emphatically rejected the argument that "the statute's use of the term 'information' is restricted

6    to 'communication or reception of knowledge or intelligence….'" *Green v. Am. Online (AOL)*,

7    318 F.3d 465, 471 (3d Cir. 2003). Like the malware signal transmitted through AOL's network

8    in *Green*, a text-message Tweet is "information," whether considered in light of its content or the

9    fact of its delivery. *Id*. ("the dictionary includes 'signal' as a definition of 'information'").

10    Similarly, as explained by the California Court of Appeal, the CDA extends beyond "claims

11    stemming from harms caused by the defendant's republication of inherently offensive or harmful

12    content." *Doe II v. MySpace Inc.*, 175 Cal. App. 4th 561, 569 (2009).

13         These cases make clear that Section 230(c)(1) covers far more than claims based on the

14    semantic content of the information at issue. Given the text and purpose of Section 230, the issue

15    is not whether the intermediary published inherently harmful content; it is whether it faces

16    liability for allowing material to be published. *Doe II*, 175 Cal. 4th at 573. Indeed, one of the

17    core purposes of the CDA is to relieve intermediaries like Twitter of the nearly impossible

18    burden of having to review user content and determine whether its dissemination would be

19    legally permissible. In applying the statute, the distinction between harms caused by the *content*

20    of a message and harms caused by the *receipt* of the message is one without a difference. Either

21    way, the intermediary would be held liable as a publisher—for the act of disseminating

22    information. Twitter is equally treated as a publisher when it is sued on account of the

23    transmission of Tweets via text message as when it is sued on account of the transmission of

24    allegedly defamatory Tweets. In both cases, the target of the claim is the distribution—or

25    _____

26         (...continued from previous page)
     purposes," as well as calls made to a cellphone number "to collect a debt owed to or guaranteed

27    by the United States." 47 U.S.C. § 227(b)(1)(A). Likewise, lack of consent is an element of the
     claim, and the type of consent required varies depending upon the content of the call. 47 C.F.R.

28    § 64.1200(a)(1)(iii), (a)(2). Accordingly, the content of any call (or text) must be considered in
     determining whether it violates the TCPA.

publication—of information originated by someone else; and in both cases, the CDA bars the claim. *See Doe*, 528 F.3d at 418 (Section 230 applies "broadly in all cases arising from the publication of user-generated content") (citations omitted).

In short, no matter how Plaintiff portrays her claim, it seeks to impose liability on Twitter "for assuming the role for which § 230 specifically proscribes liability—the publisher role." *Zeran*, 129 F.3d at 332-33.

## CONCLUSION

For the foregoing reasons, Twitter respectfully requests that the Court grant Twitter's Cross Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

Dated: April 12, 2016

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: */s/ David H. Kramer*
    David H. Kramer
    dkramer@wsgr.com

*Attorneys for Defendant Twitter, Inc.*