UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEVERLY NUNES,<br><br>   Plaintiff,<br><br>  v.<br><br>TWITTER, INC.,<br><br>   Defendant. | Case No. 14-cv-02843-VC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 68, 73, 85, 92 |

  Twitter contends it cannot be liable under the Telephone Consumer Protection Act for the unwanted tweets it delivered via text message to the plaintiff's cell phone, because it should not be considered the one responsible for sending those text messages. Twitter also argues that, even if it could be liable under the Telephone Consumer Protection Act, it would be immunized from liability under the Communications Decency Act. Because both of these arguments are wrong, the plaintiff's motion for partial summary judgment is granted, and Twitter's cross-motion for partial summary judgment is denied.

**I.**

  Twitter is a social networking platform. It gives people a vehicle to express themselves online in short soundbites called "tweets" that are limited to 140 characters. By default, any Twitter user can sign up to "follow" any other Twitter user, which means Twitter will cause the follower to receive all tweets the author publishes. When an author publishes tweets, he's often publishing them to a wide audience, and he often has no personal connection with most members of that audience.

Sometimes the author will post lots of tweets. Sometimes his tweets will be interesting. Other times, not so much. Take, for example, erstwhile Magistrate Judge Paul Grewal, who recently left the bench to work for one of Twitter's competitors. Apparently 964 people are interested in what Judge Grewal has to say, because that's how many Twitter followers he has. In early June 2016, during his last two days on the bench, Judge Grewal posted nine tweets. For example, he said: "Anyone looking for a screaming deal on a slightly-worn judicial robe? I've got one ready to move." In another example (one he was regretting until Game 5 but now is very proud of), Judge Grewal said the following about the NBA Finals: "Here comes @KyrieIrving. Count on it." On his final day, he said: "Last claim construction issued; it's time to go. Thank you N.D. Cal. from the bottom of my heart."

The gratitude Judge Grewal feels towards the Northern District pales in comparison to our appreciation of him. In a few short years, due to his expertise in intellectual property law and his overall judgment and wisdom, Judge Grewal became not merely one of the most important members of the Northern District, but one of the most important members of the federal judiciary. He will be sorely missed.

However, some people out there may be less appreciative of Judge Grewal: the ones who inherited the recycled cell phone numbers of his Twitter followers. Those people may find themselves wishing Judge Grewal would just shut down his Twitter account, so they can stop being subjected to his tongue-in-cheek offers to sell robes and his musings about Cleveland sports. And that's what this case is about: people with recycled cell phone numbers receiving unwanted tweets via text message.

Twitter users can view tweets from the people they follow in a variety of ways. For example, users can visit Twitter's website and check their "timelines," which are lists of tweets by users they follow, posted in reverse-chronological order. Or users can sign up with Twitter to receive updates by email. Or they can access Twitter through apps they have on their smart phones — in which case they can often enable push notifications to alert them to specific users' tweets, even when the apps are closed. Or, as relevant to this case, users can sign up with

Twitter to receive tweets via text message to their cell phones.

When people who have signed up to receive tweets from Twitter via text message change their cell phone numbers, they don't always bother to tell Twitter that their numbers have changed. And sometimes cell phone carriers "recycle" old phone numbers and assign them to new cell phone users. The new owner of a cell phone number might not have a Twitter account, and she might not have a Twitter app on her phone. But she may nonetheless start receiving uninvited text messages from Twitter containing tweets that the previous holder of the cell phone number had signed up for. That would be bad enough if the prior owner of the cell phone number had only signed up to receive texts of Paul Grewal's tweets; imagine if the prior owner had also signed up to receive texts of tweets by Ayesha Curry (who, at last count, had tweeted over 8,200 times).

The plaintiff in this case, Beverly Nunes, inherited a recycled cell phone number. She was not a Twitter user, but the prior owner of her number was. Before relinquishing the number, he had signed up to receive tweets via text, and Nunes began receiving these text messages. She replied to some of the text messages in an effort to get them to stop, but to no avail. She then filed this lawsuit, which is a proposed class action on behalf of herself and others similarly situated — that is, other people in the United States who received unwanted text messages from Twitter. The lawsuit alleges that Twitter, by sending these unwanted text messages to people with recycled cell phone numbers, is violating the Telephone Consumer Protection Act of 1991.

The parties have filed cross-motions for partial summary judgment with respect to Nunes' individual claim, prior to proceedings on class certification. The cross-motions involve two issues, which the parties agree present questions of law for the Court to decide. The first is whether Twitter can potentially be liable to Nunes under the TCPA. The second is whether, if Twitter could potentially be liable under the TCPA, it is nonetheless shielded from liability by the Communications Decency Act of 1996.

## III.

As pertinent here, the TCPA makes it unlawful to make certain calls to cell phones using

an automatic telephone dialing system without the consent of the recipient. 47 U.S.C. § 227(b)(1)(A). The Ninth Circuit has held that a text message is a "call" within the meaning of the statute, so that question is not presented here. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) (deferring to the Federal Communications Commission). And the parties have not yet teed up other questions relevant to Twitter's potential liability, such as whether Twitter uses an automatic telephone dialing system. For now, Twitter simply argues that it does not "make" the call when the owner of a recycled number receives a tweet from Twitter via text message. If Twitter does not "make" the call, it can't be liable under the TCPA, even if the other requirements for liability under that statute could ultimately be met.

### A.

Twitter's contention that it does not "make" the call is contrary to the language of the TCPA. The statute says it is unlawful "to make any call" to a cell phone using an "automatic telephone dialing system" without "the prior express consent" of the recipient of the call. 47 U.S.C. § 227(b)(1)(A). In the circumstances presented by this case, Twitter is the only conceivable "maker" of any of these calls. Twitter is the one that uses what Nunes alleges to be an "automatic telephone dialing system" to send the text message to the recipient. And Twitter is the actual sender of the text (after converting the tweet to a format that can be delivered via text).

The only other theoretical candidates to be the "maker" of the call are the author of the tweet and the prior owner of the recycled number who signed up to receive the tweet. At different points in the case, Twitter has suggested that one or the other is the maker of the call within the meaning of the TCPA. But either interpretation is too far removed from the ordinary meaning of the phrase "make any call."

The author of a tweet can't possibly be the maker of the call. Under Twitter's default settings, the author does not control who may sign up to receive his tweets. Even if the author keeps track of which Twitter users are following him, he does not know which (if any) of those followers have signed up to receive his tweets via text message, because Twitter doesn't share that information. In other words, the author doesn't even know whether he's making a "call" at

4

all when he posts a tweet.  And he is certainly not involved in the mechanics of actually transmitting any text message to anyone.  This eliminates the author of the tweet as a candidate for "maker" of the call within the meaning of the TCPA.

With respect to the former owner of the recycled number, Twitter contends that because the former owner signed up to *receive* tweets by text in the future, this means the former owner "makes" all the text-message calls to that number in the future.  This is, of course, contrary to the ordinary meaning of the word "make" — when someone signs up to receive a call from someone else in the future, he is not "making" that call when it comes in.  So Twitter relies less on the plain language of the statute, and more on a 2015 FCC ruling that gives extensive guidance on how to interpret the TCPA.  Twitter urges the Court to defer to the guidance in that ruling, which the Court will do.  *See Satterfield*, 569 F.3d at 952–53.  The FCC ruling, however, further undermines Twitter's argument.

The FCC ruling sometimes uses the word "initiate" when explaining the meaning of the word "make."  For example, the ruling states that, considering the totality of the circumstances, "making" a call "can include being 'so involved in the placing of a specific telephone call' as to be deemed to have initiated it."  *Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7980 ¶ 30 (2015) [hereinafter *2015 FCC Order*] (quoting *DISH Network, LLC*, 28 FCC Rcd. 6574, 6583 ¶ 27 (2013)).  Twitter argues that when the owner of a cell phone number signs up to receive tweets via text message, he has thereby "initiated" all text messages Twitter will send to that number going forward, and he has thereby made himself the "maker" of all future calls.  But the FCC's ruling contemplates merely that a person can be deemed to have "made" (or "initiated") a call if he was heavily involved in the "placing" of a "specific" call.  *Id*.  There is no suggestion that a person can be the "maker" of the call if he merely signed up to *receive* any unspecified number of calls in the future, and as previously noted, such an interpretation would be contrary to the plain meaning of the statute.

That distinguishes this case from the factual scenarios considered by the FCC in the portion of its 2015 ruling involving two apps, TextMe and YouMail.  With respect to TextMe,

the FCC considered the scenario where a person decides to use his TextMe app to send a text message to people on his contact list, inviting those people to sign up for TextMe as well.  It is the user of the TextMe app who, by entering a series of commands, is "placing" a "specific" call to people on his contact list.  "These affirmative choices by the app user [led the Commission] to conclude that the app user and not TextMe is the maker of the invitational text message."  *Id.* at 7984 ¶ 37.  In contrast, when the new owner of a recycled number is receiving tweets via text message, the former owner of the number is not "placing" any "specific" calls to her.  He can't be, because he likely doesn't know when (or even if) the person whose tweets he signed up to receive via text message will compose a tweet.  Nor does he know, once he relinquishes his number, to whom (if anyone) new text messages will be sent.

With YouMail, the user programs his app so that when someone calls his cell phone, a text message is automatically sent to the caller.  For example, he might program the app to respond to a missed call with a message that says "thanks for your call, I'll get back to you soon."  Thus, when the missed caller receives the text message, it's because the YouMail app user had chosen to send a specific text message to a specific person, using the YouMail app as a tool to do so.  As the FCC noted, "the app users choose whether to send text messages," and "their involvement in the process of creating and sending the messages in response to received calls are key factors in determining whether the app provider or the app user is the initiator of the call for TCPA purposes."  *Id.* at 7981 ¶ 32; *see id.* at 7982 ¶ 33.  In contrast, when the new owner of a recycled number is receiving tweets via text message that the former owner signed up for, the former owner is not choosing to send text messages to the recipient, and the former owner does not have involvement in the process of "creating and sending" the tweets.

These comparisons make clear that the questions presented to the FCC by the TextMe and YouMail petitions are different from the question presented by this case.  In resolving each of these petitions, the FCC considered two parties (an app provider and an app user) involved in sending a text message to decide which among them could be responsible for "making" or "initiating" a call.  And the factors the FCC identified for assessing a party's involvement in a

6

call — deciding whether, or when, or to whom a message is sent, or determining the content of that message — are relevant to assessing each party's relative responsibility for causing a message to be sent. But in this case, the person who wrote the tweet isn't a candidate for making the call at all, so it's not useful here to ask who decided whether, or when, or to whom the message would be sent, or what the message would say. In short, Twitter's insistence on applying language used by the FCC to discuss TextMe and YouMail disregards the great emphasis the FCC places on the need to consider each case individually, based on the totality of the circumstances presented by that case. *See, e.g.*, *id.* at 7980–82 ¶¶ 30–33. Under the circumstances of this case (which are quite different from the circumstances presented by TextMe and YouMail's petitions), a conclusion that anyone other than Twitter is the "maker" of the call to the owners of the recycled numbers stretches too far from the ordinary meaning of the language of the TCPA.[1]

### B.

Twitter's statutory interpretation argument gets even weaker after "considering the goals and purposes of the TCPA," which is the backdrop for determining the "maker" of a call in a given case. *See id.* at 7980 ¶ 30.

The FCC discussed the purposes of the statute extensively in its 2015 ruling, particularly in its consideration of recycled numbers. In this portion of its ruling, the FCC was not required

---

[1] Nor do the district court cases cited by the parties offer much guidance about what to do in this case, because they involve the same issue that was before the FCC in the TextMe and YouMail petitions, namely, whether a platform that enables its users to send specific messages to specific people is itself an initiator of those calls. *Payton v. Kale Realty, LLC*, --- F. Supp. 3d ----, 2016 WL 703869, at *1–2, *5–6 (N.D. Ill. Feb. 22, 2016) (finding web-based text-messaging platform did not initiate text messages received by plaintiff where the platform's users "take affirmative steps to determine whether, when, and to whom they would send text messages" and the platform "did not have any role in creating the content of the text message," *id.* at *6); *Kauffman v. Callfire, Inc.*, 141 F. Supp. 3d 1044, 1046, 1048–49 (S.D. Cal. 2015) (finding web-based text-messaging platform did not initiate text messages received by plaintiff where "Callfire required its users to take affirmative steps to determine whether, when, and to whom they would send text messages" and "Callfire played no part in drafting the content of the messages," *id.* at 1048); *Hurick's v. Shopkick, Inc.*, No. 14-cv-2464-MMC, 2015 WL 5013299, at *3 (N.D. Cal. Aug. 24, 2015) ("The Court finds the steps the user must have taken to cause the Shopkick invitational text messages to be sent are indistinguishable in all material respects from the steps a user of the TextMe app must take to cause the TextMe invitational texts to be sent.").

to decide who "makes" a particular call to the owner of a recycled number. Rather, the FCC was called upon to decide who should be deemed the recipient of the call — that is, the "called party." 47 U.S.C. § 227(b)(1)(A). Certain companies noted that it is difficult or impossible to find out when a cell phone number has been reassigned to a new user. Therefore, they observed, whenever a company uses an autodialer to call a cell phone number after having received consent to do so, it runs a risk that it is unwittingly calling someone else who didn't actually want the call. Arguing that it would be unfair to hold them liable in this scenario, the companies proposed that the statutory phrase "the prior express consent of the called party" be interpreted to refer to consent given by the former owner of the recycled number. They argued that, even if the person actually receiving the call is the new owner of the recycled number, the former owner should still be considered the "called party," and the companies should therefore be deemed to have received consent to make the call (even though the new owner of the number never consented herself). In other words, the companies argued that the "called party" should be the intended recipient of the call, regardless of who actually receives the call.

The FCC rejected this argument, saying it "would turn the TCPA's consumer protection on its head." *2015 FCC Order*, 30 FCC Rcd. at 8003 ¶ 80. The FCC emphasized that one of the primary purposes of the TCPA is to protect consumers from unwanted calls made with autodialing equipment, and noted that the companies' proposed interpretation of "called party" would leave the unwitting owners of recycled cell phone numbers entirely unprotected by the statute: "an 'intended called party' standard does nothing to protect the new subscriber to a reassigned number." *Id.* at 8003 ¶ 78; *see also id.* at 8005 ¶ 82 ("[W]hat is clear from the record is that the consumer who inherits the wireless number neither expects nor desires these calls.").

The FCC appeared to acknowledge that its solution to this statutory interpretation question was imperfect — the Commission was faced with a choice of interpreting the TCPA either as giving no protection to recipients of recycled cell phone numbers, or as potentially exposing companies to liability even when the companies are unaware they are making autodialed calls to owners of recycled numbers. The FCC chose the latter: "when a caller

8

chooses to make robocalls to a wireless number that may have been reassigned, it is the caller — and not the wireless recipient of the call — who bears the risk that the call was made without the prior express consent required under the statute." *Id.* at 8010 n.312; *see also id*. at 8006 ¶ 84 ("If callers choose to use autodialers . . . they risk TCPA liability.").

Indeed, as Commissioner Pai noted in his dissent, the FCC's treatment of recycled numbers could have significant consequences for companies that unwittingly send text messages using an autodialer to owners of recycled numbers. For example:

> [T]he *Order*'s strict liability approach leads to perverse incentives. Most significantly, it creates a trap for law-abiding companies by giving litigious individuals a reason *not* to inform callers about a wrong number. This will certainly help trial lawyers update their business model for the digital age.
>
> This isn't mere hypothesis; it is fact. Take the case of Rubio's, a West Coast restaurateur. Rubio's sends its quality-assurance team text messages about food safety issues, such as possible foodborne illnesses, to better ensure the health and safety of Rubio's customers. When one Rubio's employee lost his phone, his wireless carrier reassigned his number to someone else. Unaware of the reassignment, Rubio's kept sending texts to what it thought was an employee's phone number. The new subscriber never asked Rubio's to stop texting him — at least not until he sued Rubio's in court for nearly half a million dollars.

*Id.* at 8080 (dissenting statement of Comm'r Pai). But the FCC chose to interpret the TCPA in a way that threatens this type of result, favoring the interests of the unwitting owner of a recycled number over the interests of the unwitting company sending text messages with an autodialer.

The FCC's discussion is instructive here. It may be true, as Twitter argues, that it's presently difficult or impossible for companies to detect when they are sending out texts to people with recycled numbers. But as the FCC noted, there are apparently many steps businesses can take to identify reassigned numbers. *Id.* at 8006–08 ¶¶ 85–87 (majority ruling). And if Twitter's proposed interpretation of "make any call" were to prevail, the owners of recycled numbers who receive unwanted tweets via text message would have no protection under the TCPA. That conclusion, in addition to being contrary to the text of the statute, would be in sharp tension with the FCC's 2015 decision about how to implement the TCPA when recycled

numbers are involved, and its discussion of how the statute's purposes should be effectuated.

Finally, a few words in response to Twitter's arguments about the potential consequences of this ruling.  At oral argument, Twitter insisted that if it were deemed the "maker" of the calls by which tweets are sent to recycled cell phone numbers, it would have no choice but to stop sending those tweets.  The implication seemed to be that this result would be unbearable.  But even if Twitter made good on its promise to stop sending tweets by text message, Twitter users would be able to view tweets in all sorts of other ways: by checking their timelines on Twitter's website or in Twitter apps, by enabling push notifications from their Twitter apps, or by signing up for email notifications from Twitter.  It's not at all clear, particularly in light of the FCC's ruling about recycled numbers, why the need to disseminate tweets in this particular way (that is, by text message) should prevail over the need to protect owners of recycled numbers from getting unwanted texts.

Also at oral argument, as well as in a letter following oral argument, Twitter pursued an example involving Southwest Airlines, whose customers can input their cell phone numbers on Southwest's website to receive alerts about the status of flights they are taking.  Twitter argued that companies like Southwest could be exposed to liability whenever they send alerts by text to their passengers, and they would have no choice but to terminate their texting services.  But there are two responses.  First, just as with Twitter, Southwest can send alerts to its customers by other means, including email.  Again, it's unclear why the desire to send alerts by text message (rather than email, or push notification through an app) should prevail over the TCPA's goal of protecting people with recycled numbers from receiving unwanted texts sent by companies using autodialers.  Second, even after Southwest customers have entered their cell numbers on the website, they are prompted, when they purchase tickets for each individual flight, to make a decision about how to be alerted.  And if it's by text, the customer is shown the number to which the text will be sent.  Therefore, a Southwest customer, each time he purchases a flight, will receive a prompt to help ensure that he, and not some unwitting recipient, will receive the alerts.

Moreover, perhaps there remains a question whether the TCPA could be interpreted as

10

excusing companies like Twitter, Southwest, and Rubio's for inadvertently sending text messages to the owners of recycled numbers during some brief initial period. In its 2015 ruling, the FCC made clear that, at least in the context of actual telephone calls, companies may sometimes escape liability for the first call made to a recycled cell phone number. *Id.* at 8009 ¶¶ 89–90. At times the FCC seemed to suggest that this "one free call" concept applies to text messages as well (and Commissioner Pai's dissent interprets the ruling this way). However, it seems unrealistic to expect that companies could, at least in some circumstances, readily detect that a number has been recycled after sending one text. If the FCC is correct that the statute can be interpreted as excusing one telephone call to a recycled number, perhaps it could be interpreted as allowing for a more forgiving (and more realistic) standard to be applied to text messages.

But at the end of the day, none of this changes the fact that Twitter is the "maker" of the call under the plain language of the TCPA. If the TCPA is as inflexible as the FCC appears to believe, and if the result is as unbearable as Twitter contends, then Twitter should ask Congress to amend the statute. It seems likely that Congress, when it enacted the TCPA, did not consider whether companies like Twitter, Southwest, and Rubio's could be liable for sending text messages to recycled numbers. But "[i]f Congress has failed to appreciate changes in the telecommunications business, [these companies] should alert their lobbyists." *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 642 (7th Cir. 2012).

## IV.

The second issue presented by the cross-motions for summary judgment is whether the Communications Decency Act shields Twitter from potential liability under the TCPA. As pertinent here, the Communications Decency Act bars any lawsuit against an "interactive computer service" if the lawsuit seeks to treat the service as "the publisher or speaker of any information provided by another information content provider." 47 U.S.C § 230(c)(1). This provision "immunizes providers of interactive computer services against liability arising from content created by third parties." *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc) (footnotes omitted); *see also Barnes v.*

*Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009).

Twitter argues that this lawsuit seeks to treat Twitter as the "publisher" of information provided by another content provider (namely, the author of the tweet). But as the Ninth Circuit stated in *Barnes*, "publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." 570 F.3d at 1102 (citing *Roomate.com*, 521 F.3d at 1170–71). Twitter does not "review" the content of tweets. It does not "edit" the content of tweets. It does not make decisions about whether to send out a tweet. Nor does Nunes' suit seek to impose "liability arising from content created by" the people who post tweets. *See Roomate.com*, 521 F.3d at 1162.

To analogize to a more traditional publishing platform, if someone delivers newspapers containing false gossip, and the person who is the subject of the gossip sues the delivery person for defamation, that lawsuit seeks to treat the delivery person as a publisher. But if the delivery person throws an unwanted newspaper noisily at a door early in the morning, and the homeowner sues the delivery person for nuisance, that suit doesn't seek to treat the delivery person as a publisher. The suit doesn't care whether the delivery person is throwing a newspaper or a rock, and the suit certainly doesn't care about the content of the newspaper. It does not involve the delivery person's "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes*, 570 F.3d at 1102. Nor is the lawsuit asking a court to impose "liability arising from content." *Roomate.com*, 521 F.3d at 1162. It merely seeks to stop the nuisance. The same is true of this lawsuit regarding unwanted tweets sent by text to the owners of recycled numbers.

Twitter relies heavily on the Third Circuit's decision in *Green v. AOL*, 318 F.3d 465 (3d Cir. 2003). But that case doesn't change the analysis. In *Green*, the plaintiff alleged that someone sent him malware through AOL, causing his computer to freeze. *Id.* at 469. The plaintiff sued AOL under state law, as well as under the First Amendment. The Third Circuit concluded that the lawsuit sought to treat AOL as a "publisher," because the lawsuit alleged that AOL was "promulgating harmful content" and "failing to address certain harmful content on its

12

network." *Id.* at 471.  In other words, the plaintiff was alleging that AOL had a duty to act like a publisher by sifting through the content that went out over its system, to make sure that the content was not something bad, like malware.[2]  Nunes' claim against Twitter under the TCPA does not depend on the content of any tweet, or on any assertion that Twitter is required to sift through content to make sure the content is not bad.  Just the opposite — if Twitter ends up being liable under the TCPA, it would be liable whether the content of the unwanted tweets is bad or good, harmful or harmless.  Either way, the unwanted tweet is a nuisance.

## V.

In light of the foregoing, Nunes' motion for partial summary judgment is granted, and Twitter's cross-motion for summary judgment is denied.

**IT IS SO ORDERED.**

Dated: July 1, 2016

 

VINCE CHHABRIA
United States District Judge

---

[2] The Third Circuit went on, dubiously, to conclude that malware falls within the statutory meaning of "information," so that the plaintiff's lawsuit sought to treat AOL as the "publisher . . . of . . . information" within the meaning of the Communications Decency Act.  *Green v. AOL*, 318 F.3d 465, 471 (3d Cir. 2003).